UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EUREKA V LLC, | : | |
| Plaintiff, | : | Civil Action No. |
| | : | |
| | : | 3 02 CV 356 (DJS) |
| | : | |
| VS. | : | |
| | : | |
| THE TOWN OF RIDGEFIELD, THE BOARD OF | : | |
| SELECTMEN OF THE TOWN OF RIDGEFIELD, | : | |
| THE BOARD OF FINANCE OF THE TOWN OF | : | |
| RIDGEFIELD, THE ECONOMIC DEVELOPMENT | : | |
| COMMISSION OF THE TOWN OF RIDGEFIELD, | : | |
| THE BENNETT'S FARM DEVELOPMENT | : | |
| AUTHORITY, and BARBARA SERFILIPPI, IN | : | |
| HER OFFICIAL CAPACITY AS THE TOWN | : | |
| CLERK OF THE TOWN OF RIDGEFIELD, | : | |
| | : | |
| Defendants. | : | OCTOBER 5, 2004 |

## MEMORANDUM IN SUPPORT OF MOTION
## TO AMEND OR SUPPLEMENT AFFIRMATIVE DEFENSES

Pursuant to Fed. R. Civ. P. 15, Defendants hereby move to amend or supplement their

affirmative defenses based on the August 26, 2004 final judgment entered in an action that the

Town of Ridgefield brought against Eureka V, LLC and others in the Superior Court for the

Judicial District of Danbury, Docket No. CV 01 – 0344176 S, a copy of which is attached hereto

as Exhibit A.  In that judgment, the court (Moraghan, J.) adjudicated certain facts which are

dispositive of this federal action.  Those facts include the final determination that Eureka's

proposed residential development in Ridgefield is neither "reasonably probable" nor "physically

possible."

Based on principles of res judicata and collateral estoppel, none of Eureka's claims in this

federal action is viable, since Eureka's proposed development cannot proceed, as Judge

Moraghan unequivocally and definitively held.  Judge Morghan's judgment is binding on this

court, and therefore new affirmative defenses, which could not have been plead before this

August 26, 2004 judgment became final, are proper.

Leave to amend should be freely given and only denied under limited circumstances.
The United States Supreme Court, in <u>Foman vs. Davis</u>, 371 U.S. 178, 182 (1962), held: "In the
absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on
the part of the movant, repeated failure to cure deficiencies by amendments previously allowed,
undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the
amendment, etc. – the leave sought should, as the rules require, be 'freely given.'"  *See also*
<u>Anthony v. City of New York</u>, 339 F.3d 129 (2d Cir. 2003): "Rule 15(a) provides that leave to
amend 'shall be freely given when justice so requires,' and we have interpreted this instruction in
favor of allowing the amendment absent a showing by the non-moving party of bad faith or
undue prejudice."  This Circuit has stated that "leave to file a supplemental pleading should also
be freely permitted when the supplemental facts connect it to the original pleading." <u>Quaratino v.
Tiffany & Co.</u>, 71 F.3d 58, 66 (2d Cir. 1995).

With respect to the special defense of collateral estoppel, courts have upheld dismissals
on collateral estoppel grounds even when it was not raised until a supplemental memorandum
was filed while a motion for summary judgment was pending, and even when collateral estoppel
was never raised as an affirmative defense, but instead was raised by the court *sua sponte*.  See
<u>Curry v. City of Syracuse</u>, 316 F.3d 324 (2d Cir. 2003) and <u>Doe v. Pfrommer</u>, 148 F.3d 73 (2d
Cir. 1998).  This reaffirms the court's interest and the public policy of avoiding relitigation of
issues already determined.  Further, it provides support for the argument that the motion to
amend or supplement in order to assert collateral estoppel will not cause unfair surprise or undue

prejudice.  For example, in <u>Khandhar v. Elfenbein</u>, 943 F.2d 244 (2d Cir. 1991), the court granted the defendant's motion to amend based on collateral estoppel, where the plaintiff, prior to initiating suit, raised the same issues and sought to recover for the same injuries which he had already been compensated for in an arbitration proceeding.

The United States Supreme Court requires that the federal courts give state judgments such collateral estoppel and res judicata effect as would the courts of the rendering state.  See, for example, <u>Allen v. McCurry</u>, 449 U.S. 90 (1980) and <u>Migra v. Warren City School District Board of Education</u>, 465 U.S. 75 (1984), cited with approval in <u>Gelb v. Royal Globe Insurance Company</u>, 798 F.2d 38, 42 (2d Cir. 1986).  This rule applies even where the state judgment adjudicates federal questions.  See, for example,  <u>Gelb</u>, <u>supra</u>, at 42; <u>St. John v. Wisconsin Employment Relations Board</u>, 340 U.S. 411 (1951); and <u>Rollins v. Dwyer</u>, 666 F.2d 141 (5th Cir. 1982).

In Connecticut, collateral estoppel, or issue preclusion, 'is that aspect of res judicata that prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties or those in privity with them upon a different claim . . . An issue is *actually litigated*  if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined . . .  1 <u>Restatement (Second), Judgments</u> §27, comment (d) (1982)."  (Citations omitted; emphasis in original; internal quotation marks omitted.)  <u>Efthimiou v. Smith</u>, 268 Conn. 499, 506-07 (2004); see also <u>Rinaldi v. Enfield</u>, 82 Conn. App. 505, 516 (2004).

For a case in point, see <u>Albahary, et al. v. City of Bristol</u>, 84 Conn. App. 329 (2004).  In that eminent domain proceeding for the taking of an easement, the plaintiffs were owners of unimproved property located next to the City of Bristol's landfill.  The plaintiffs' property was

contaminated by the operation of that landfill long before the City of Bristol took plaintiffs'
property by eminent domain.  The trial court, in assessing damages for the taking, compared the
value of the property in its polluted condition and its value after the taking of the easement.  The
plaintiffs appealed, arguing that this formulation was improper, because their property became
polluted by the defendants' operation of the landfill long before the taking of the easement.  In
plaintiffs' view, to compensate them for the  pretaking pollution, they were entitled to damages
derived from comparing the value of the property with clean groundwater and the value of their
property after the taking.

       In a prior federal action the same plaintiffs had brought against the City of Bristol, they
"presented functionally identical claims but were unable to prove that they had suffered
measurable losses."  Id., at 335.  The Supreme Court upheld the trial court's decision not to
award the plaintiffs damages for pre-taking contamination based, in part, on collateral estoppel.
In the prior federal action, the plaintiffs sought, among other things, damages as a result of the
landfill's contamination, based on a theory of inverse condemnation.  The federal court rejected
that claim, because plaintiffs received over $2 million from mineral extraction contracts after
their property was contaminated, and thus the condemnation had not deprived them of the
reasonable use of their property.

       In upholding the trial court decision, the Supreme Court (Peters, J.) held:  "We conclude .
. . that the judgment of the federal court has established, unequivocally and definitively, that the
plaintiffs did not suffer any economic loss because of the pretaking pollution of the groundwater
on their property.  It follows that, in this action, the plaintiffs have no basis for arguing that their
condemnation award must include compensation for pretaking pollution.  No matter how the
plaintiffs characterize their claim, the fact remains that groundwater pollution has not diminished

the profits generated by the mining operations on their property.  Under these circumstances, we agree with the trial court's formula for valuing the damages to which the  plainitffs were entitled due to the taking of an easement on their property.  The trial court properly measured these damages by a comparison between the value of the property at the time of the taking, albeit in its polluted condition, and its value after the taking, in its polluted condition." Id., at 341.

Likewise, in the case at bar, Judge Moraghan has already determined, unequivocally and definitively, that the very residential development that is the subject of the federal action cannot occur – indeed, is not 'physically possible." Accordingly, all Eureka's claims must fail, as a matter of law.

In 1998, Eureka acquired the Bennett's Pond property (the 'Property"), totaling 682 acres, of which about 613 acres are in Ridgefield.  The Property situated in Ridgefield is divided north and south by Bennett's Pond Road.  On September 25, 2001, the citizens of Ridgefield voted to acquire all of the Property by eminent domain.  The subject of the state court action was that portion of the Property to the north of Bennett's Pond Road (the 'North Parcel").  On November 9, 2001, the Town of Ridgefield filed its statement of compensation as to the North Parcel, followed by depositing $8.5 million with the clerk of the court, as provided by statute.  On December 20, 2001, the Town of Ridgefield issued a certificate of taking of the North Parcel.  In the state condemnation case that Ridgefield brought in the Superior Court for the Judicial District of Danbury (Docket # CV01-0344176 S) (the 'State Case"), Eureka claimed that it was entitled to payment of more than $8.5 million in compensation.

In the State Case, a prior action between the same parties as in this federal action, the following issue was actually litigated, submitted for determination, and in fact determined: was development pursuant to the plan Eureka submitted to the Town of Ridgefield and its agencies

(the 'Master Plan') reasonably probable or physically possible?  See Judge  Moraghan's August

26, 2004 Memorandum of Decision, a copy of which is attached hereto as Exhibit A (the

'Judgement'), at 8-11.

In the Judgment, Judge Moraghan held that "*the residential development proposed by Eureka*

*is not reasonably probable or physically possible*."  Id., at 11.  (Emphasis supplied.)  In making

this determination, Judge Moraghan considered Eureka's plan to develop  *all* of the Property

situated in Ridgefield, not just the North Parcel.  He based this conclusion on evidence in the

trial court record, including the following, applicable to *all* of the Property situated in Ridgefield:

- 'Roseland Property Company, which was retained by Eureka to develop the property, wrote
  to the Milstein Brothers [owners of an interest in Eureka] reciting that 'the single greatest
  constraint to efficient land development is the lack of sewer infrastructure.  The parcel
  situated over the one state's [ sic] primary aquifers *cannot be developed at any accessible*
  [sic] *level using septic*.'"  Id., at 9.  (Emphasis supplied.)

- 'The Department of Environmental Protection (DEP) stated that 'since the primary purpose
  of the proposed sewer line [for development of all the Property, both north and south of
  Bennett's Farm Road] is to serve new development within the public water supply watershed
  *it is contrary to state policy*.'"  Id., at 9.  (Emphasis supplied.)

- 'Prior to the December 20, 2001 taking, Eureka commissioned and received a report from
  Fletcher-Thompson as to the development potential of the property.  The report states that
  'since the existing residential zone to the north is largely unusable, the property is primarily
  an office zone."  The consulting corporation also concluded that 'the existing zoning for the
  property *guarantees for the short term that development of the site will not occur*.  The site
  favors a large corporate headquarters park yet *does not have the transportation infrastructure*
  *to support the use* making approval difficult.'"  Id., at 9.  (Emphasis supplied.)

Eureka's Master Plan provides for construction of 710 residential units, 560 of which are

planned for the North Parcel.  Of these 710 residential units, 30% would constitute affordable

housing.  (See the First Amended Verified Complaint dated July 26, 2002, par. 20.)  Since

the federal action is premised on the assumption that Eureka could build affordable housing

in accordance with its Master Plan, if building affordable housing on the Property is not

feasible, the premise of the federal action fails, and the federal action fails with it, as a matter

of law.

Since the feasibility of development in accordance with the Master Plan is essential to the

viability of all of Eureka's counts in the federal action, the following additional findings in

the Judgment, pertaining to the Northern Parcel, are particularly significant:

- "Eureka's suggestion that the requisite water and septic systems could be made available to support a residential development equates to *wishful thinking*." Id., at 9.  (Emphasis supplied.)

- "There is no evidence in this case of the possible utilization of some substitute for obtaining drinking water for the proposed residential development.  The possibility of utilizing Danbury's sewer facilities is *too nebulous to seriously entertain*." Id., at 8.  (Emphasis supplied.)

- "Various and sundry local and state regulations have served to convert any reasonably probable development of this subject property to a '*mere nice thought*.'"  Id., at 8. (Emphasis supplied.)

## This Federal Action

Affirmative defenses in this federal action raise the very same issue that Judge Moraghan

already ruled on in the State Case in favor of Ridgefield: the lack of feasibility of residential

development as provided in Eureka's Master Plan, which includes affordable housing.   In this

federal action, plaintiffs summarize their claim in the first paragraph of their July 26, 2002 First

Amended Verified Complaint:  "In short, in early 2001, the Selectmen of the Town of Ridgefield

decided in bad faith to take Plaintiff's property and stop its plans for developing affordable

housing on the property, and set about to create a pretext for doing so.  The proposed taking is

unlawful and constitutes an abuse of the municipal power of eminent domain."

The viability of each count of the First Amended Verified Complaint depends upon the

feasibility of Eureka developing the Property, as this analysis of the complaint reveals:

**General Allegations**:  The allegations asserted in all counts include the following:

- As part of the Planning and Zoning Commission's pre-application process for a proposed 10 lot subdivision on a portion of the North Parcel . . . Eureka filed with the Commisssion's staff an "Affordable Housing Mixed Use Master Plan of Development ('Master Plan'), which showed Eureka's plans for development of the entire  Bennett's  Farm Property.  The Master Plan shows (i) a residential development of 710 units (including the 10 lot subdivision), of which 30 percent would constitute affordable housing under . . . . Conn. Gen. Stat. §8-30g, and (ii) 445,000 square feet of commercial development.  The proposed development of the South Parcel was for 150 residential units, 30 percent of which would constitute affordable housing, and all 445,000 square feet of commercial development."  Par. 20.

- 'The Selectmen's overriding objective in pursuing eminent domain was to take control of the property and ensure that there would be no residential development – and in particular, no affordable housing – on the property."  Par. 27.

These allegations make explicit that Eureka brought this federal action to enable it to develop the Property, and that, unless the Property can be developed for residential purposes, Eureka has no viable claim.  Additional specific allegations in the three counts of this complaint reinforce the conclusion that if Eureka cannot develop the Property for residential purposes, it has no viable claim in this federal action.

**First Count** (to enjoin implementation of the Preliminary Project Plan): 'The purpose of Ridgefield's 'Preliminary Project Plan' [for the Property – commercial rather than residential development] was not to develop the Property, but rather 'to block a multi-family affordable housing development under Conn. Gen. Stat. §8-30g. . . ."  Par. 73(a).

**Second Count** (to enjoin taking by eminent domain): 'The defendants' intended condemnation of the South Parcel violates [various constitutional provisions] . . . in that the condemnation is not being carried out to serve a public use or purpose, in one or more of the following respects: . . . the prevention of affordable housing . . . is not a proper public purpose." Par. 78(d).  This count also alleges that ". . . the sole purpose of the taking is to block Eureka's development plans, and in particular its affordable housing plans . . . ."  Par. 79(e).

**Third Count**  (for claimed violation of the Federal Fair Housing Act): "Plaintiff, as the intended provider of dwelling units, is acting in aid of certain rights granted by the Federal Fair Housing Act." Par. 86.

**Affirmative Defenses**

Defendants have asserted ten affirmative defenses in their Amended Affirmative Defenses dated October 5, 2004, of which the following are dispositive of this federal action in light of Judge Moraghan's final determinations in the Judgment:

- **Second Affirmative Defense**

  "The Town of Ridgefield condemned the North Parcel, without any challenge by Eureka. To the extent that the plan alleged in paragraph 24 of the First Amended Verified Complaint contemplated affordable housing units on the North Parcel, Eureka can no longer implement that plan and this action is therefore moot."

- **Ninth Affirmative Defense**

  "By its Memorandum of Decision dated August 26, 2004, the Superior Court for the Judicial District of Danbury, under docket No. CV 01-0344176S, Town of Ridgefield v. Eureka V, LLC, et al., Moraghan, J. (the 'State Case') held that the residential development proposed by Eureka V, LLC 'is not reasonably probable or physically possible." The State Case is a final, non-appealable judgment.  It constitutes a prior action between the same parties in which that issue was actually litigated, submitted for determination and in fact determined.   Accordingly, Eureka is collaterally estopped from relitigating that issue and is thereby precluded from obtaining any relief in this action."

- **<u>Tenth Affirmative Defense</u>**

    'The plan of Eureka, which includes affordable housing, is not feasible. Therefore, it is precluded from obtaining any relief in this action."

    Defendants' proposed amended affirmative defenses are attached hereto as Exhibit B. Those proposed amended affirmative defenses are the same as the affirmative defenses already filed with this court, except with the addition of the last two affirmative defenses.

    Accordingly, the Defendants move, pursuant to Fed. R. Civ. P.15, that they be allowed to amend or supplement their affirmative defenses.

                                         THE DEFENDANTS,


                                         By: _____
                                             Stewart I. Edelstein, Esq. (ct06021)
                                             Jonathan S. Bowman, Esq. (ct08526)
                                             Monte E. Frank, Esq. (ct13666)
                                             Cohen and Wolf, P.C.
                                             1115 Broad Street
                                             Bridgeport, CT  06604
                                             Tel:  203/368-0211
                                             Fax: 203/576-8504
                                             Sedelstein@cohenandwolf.com

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed by first class, postage prepaid mail on the 5th day of October, 2004.

Matthew C. Mason, Esq.
Gregory and Adams, P.C.
190 Old Ridgefield Road
Wilton, CT  06897
Tel:  203/762-9000
Fax: 203/834-1628

_____
Stewart I. Edelstein