UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EUREKA V LLC | : | CIVIL CASE NO: |
| | : | |
|    Plaintiff, | : | 3 02 CV 356 (DJS) |
| | : | |
| VS. | : | |
| | : | |
| THE TOWN OF RIDGEFIELD, THE | : | |
| BOARD OF SELECTMEN OF THE TOWN | : | |
| OF RIDGEFIELD, THE BOARD OF | : | |
| FINANCE OF THE TOWN OF RIDGEFIELD | : | |
| THE ECONOMIC DEVELOPMENT | : | |
| COMMISSION OF THE TOWN OF | : | |
| RIDGEFIELD, THE BENNETT'S FARM | : | |
| DEVELOPMENT AUTHORITY, and | : | |
| BARBARA SERFILIPPI, IN HER OFFICIAL | : | |
| CAPACITY AS THE TOWN CLERK OF THE | : | |
| TOWN OF RIDGEFIELD | : | |
| | : | |
|    Defendants. | : | OCTOBER 5, 2004 |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Defendants move for summary judgment because this Court is bound by the final and unappealed judgment in a condemnation case brought by the Town of Ridgefield ("Ridgefield") against Eureka V, LLC ("Eureka") and others, in which Judge Moraghan adjudicated certain facts which are dispositive of this federal action. More specifically, on August 26, 2004, Judge Moraghan held, among other things, that Eureka's proposed residential development in Ridgefield is neither "reasonably probable" nor "physically possible." None of Eureka's claims in this federal action is viable, since Eureka's proposed residential development cannot proceed, as Judge Moraghan unequivocally and definitively held. Since Judge Moraghan's judgment is binding on this Court, summary judgment should enter in favor of the Defendants on all counts of the First Amended Verified Complaint dated July 26, 2002.

1

## FACTS

### The State Court Judgment

In 1998, Eureka acquired the Bennett's Pond property (the "Property"), totaling 682 acres, of which about 613 acres are in Ridgefield. The Property situated in Ridgefield is divided north and south by Bennett's Pond Road. On September 25, 2001, the citizens of Ridgefield voted to acquire all of the Property by eminent domain. The subject of the state court action was that portion of the Property to the north of Bennett's Pond Road (the "North Parcel"). On November 9, 2001, the Town of Ridgefield filed its statement of compensation as to the North Parcel, followed by depositing $8.5 million with the clerk of the court, as provided by statute. On December 20, 2001, the Town of Ridgefield issued a certificate of taking of the North Parcel. In the state condemnation case that Ridgefield brought in the Superior Court for the Judicial District of Danbury (Docket # CV01-0344176 S) (the "State Case"), Eureka appealed the amount of the taking and claimed that it was entitled to payment of more than $8.5 million in compensation.

In the State Case, a prior action between the same parties as in this federal action, the following issue was actually litigated, submitted for determination, and in fact determined: was development pursuant to the plan Eureka submitted to the Town of Ridgefield and its agencies (the "Master Plan") reasonably probable or physically possible? See Judge Moraghan's August 26, 2004 Memorandum of Decision, a copy of which is attached hereto as Exhibit A (the "Judgment"), at 8-11. That issue had a direct bearing on the value to be determined by the court.

In the Judgment, Judge Moraghan held that "*the residential development proposed by Eureka is not reasonably probable or physically possible*." Id., at 11. (Emphasis supplied.) In making this determination, Judge Moraghan considered Eureka's plan to develop *all* of the Property

situated in Ridgefield, not just the North Parcel. He based this conclusion on evidence in the trial court record, including the following, applicable to *all* of the Property situated in Ridgefield:

- "Roseland Property Company, which was retained by Eureka to develop the property, wrote to the Milstein Brothers [owners of an interest in Eureka] reciting that 'the single greatest constraint to efficient land development is the lack of sewer infrastructure. The parcel situated over the one state's [ sic] primary aquifers *cannot be developed at any accessible* [sic] *level using septic*.'" Id., at 9. (Emphasis supplied.)

- "The Department of Environmental Protection (DEP) stated that 'since the primary purpose of the proposed sewer line [for development of all the Property, both north and south of Bennett's Farm Road] is to serve new development within the public water supply watershed *it is contrary to state policy*.'" Id., at 9. (Emphasis supplied.)

- "Prior to the December 20, 2001 taking, Eureka commissioned and received a report from Fletcher-Thompson as to the development potential of the property. The report states that 'since the existing residential zone to the north is largely unusable, the property is primarily an office zone." The consulting corporation also concluded that 'the existing zoning for the property *guarantees for the short term that development of the site will not occur*. The site favors a large corporate headquarters park yet *does not have the transportation infrastructure to support the use* making approval difficult.'" Id., at 9. (Emphasis supplied.)

Eureka's Master Plan provides for construction of 710 residential units, 560 of which are planned for the North Parcel. Of these 710 residential units, 30% would constitute affordable housing. (See the First Amended Verified Complaint dated July 26, 2002, par. 20.) Since the federal action is premised on the assumption that Eureka could build affordable housing in accordance with its Master Plan, if building affordable housing on the Property is not feasible, the premise of the federal action fails, and the federal action fails with it, as a matter of law.

Since the feasibility of development in accordance with the Master Plan is essential to the viability of all of Eureka's counts in the federal action, the following additional findings in the Judgment, pertaining to the North Parcel, are particularly significant:

- "Eureka's suggestion that the requisite water and septic systems could be made available to support a residential development equates to *wishful thinking*." Id., at 9. (Emphasis supplied.)

3

- "There is no evidence in this case of the possible utilization of some substitute for obtaining drinking water for the proposed residential development. The possibility of utilizing Danbury's sewer facilities is *too nebulous to seriously entertain*." Id., at 8. (Emphasis supplied.)

- "Various and sundry local and state regulations have served to convert any reasonably probable development of this subject property to a '*mere nice thought*.'" Id., at 8. (Emphasis supplied.)

**This Federal Action**

Affirmative defenses in this federal action raise the very same issue that Judge Moraghan already ruled on in the State Case in favor of Ridgefield: the lack of feasibility of residential development as provided in Eureka's Master Plan, which includes affordable housing. In this federal action, plaintiffs summarize their claim in the first paragraph of their July 26, 2002 First Amended Verified Complaint: "In short, in early 2001, the Selectmen of the Town of Ridgefield decided in bad faith to take Plaintiff's property and stop its plans for developing affordable housing on the property, and set about to create a pretext for doing so. The proposed taking is unlawful and constitutes an abuse of the municipal power of eminent domain."

The viability of each count of the First Amended Verified Complaint depends upon the feasibility of Eureka developing the Property, as this analysis of the complaint reveals:

**General Allegations**: The allegations asserted in all counts include the following:

- As part of the Planning and Zoning Commission's pre-application process for a proposed 10 lot subdivision on a portion of the North Parcel . . . Eureka filed with the Commisssion's staff an "Affordable Housing Mixed Use Master Plan of Development ("Master Plan"), which showed Eureka's plans for development of the entire Bennett's Farm Property. The Master Plan shows (i) a residential development of 710 units (including the 10 lot subdivision), of which 30 percent would constitute affordable housing under . . . . Conn. Gen. Stat. §8-30g, and (ii) 445,000 square feet of commercial development. The proposed development of the South Parcel was for 150 residential units, 30 percent of which would constitute affordable housing, and all 445,000 square feet of commercial development." Par. 20.

- "The Selectmen's overriding objective in pursuing eminent domain was to take control of the property and ensure that there would be no residential development – and in particular, no affordable housing – on the property." Par. 27.

These allegations make explicit that Eureka brought this federal action to enable it to develop the Property, and that, unless the Property can be developed for residential purposes, Eureka has no viable claim. Additional specific allegations in the three counts of this complaint reinforce the conclusion that if Eureka cannot develop the Property for residential purposes, it has no viable claim in this federal action.

**First Count** (to enjoin implementation of the Preliminary Project Plan): "The purpose of Ridgefield's 'Preliminary Project Plan' [for the Property – commercial rather than residential development] was not to develop the Property, but rather 'to block a multi-family affordable housing development under Conn. Gen. Stat. §8-30g. . . ." Par. 73(a).

**Second Count** (to enjoin taking by eminent domain): "The defendants' intended condemnation of the South Parcel violates [various constitutional provisions] . . . in that the condemnation is not being carried out to serve a public use or purpose, in one or more of the following respects: . . . the prevention of affordable housing . . . is not a proper public purpose." Par. 78(d). This count also alleges that ". . . the sole purpose of the taking is to block Eureka's development plans, and in particular its affordable housing plans . . . ." Par. 79(e).

**Third Count** (for claimed violation of the Federal Fair Housing Act): "Plaintiff, as the intended provider of dwelling units, is acting in aid of certain rights granted by the Federal Fair Housing Act." Par. 86.

**Affirmative Defenses**

Defendants have asserted ten affirmative defenses in their Amended Affirmative Defenses dated October 5, 2004, of which the following are dispositive of this federal action in light of Judge Moraghan's final determinations in the Judgment:

- **Second Affirmative Defense**

    "The Town of Ridgefield condemned the North Parcel, without any challenge by Eureka. To the extent that the plan alleged in paragraph 24 of the First Amended Verified Complaint contemplated affordable housing units on the North Parcel, Eureka can no longer implement that plan and this action is therefore moot."

- **Ninth Affirmative Defense**

    "By its Memorandum of Decision dated August 26, 2004, the Superior Court for the Judicial District of Danbury, under docket No. CV01-0344176S, Town of Ridgefield v. Eureka V, LLC, et al., Moraghan, J. (the 'State Case') held that the residential development proposed by Eureka V, LLC 'is not reasonably probable or physically possible.' The State Case is a final, non-appealable judgment. It constitutes a prior action between the same parties in which that issue was actually litigated, submitted for determination and in fact determined. Accordingly, Eureka is collaterally estopped from relitigating that issue and is thereby precluded from obtaining any relief in this action."

- **Tenth Affirmative Defense**

    "The concept plan of Eureka V, LLC, which includes affordable housing, is not feasible. Therefore, it is precluded from obtaining any relief in this action."

**ARGUMENT**

Judge Moraghan's judgment has collateral estoppel effect in this federal action. Summary judgment should enter on all counts of the First Amended Verified Complaint dated July 26, 2002 because Judge Moraghan held that Eureka's proposed residential development is "not reasonably probable or physically possible" and that "Eureka's suggestion that the requisite water and septic systems could be made available to support a residential development equates to wishful thinking." Each count of Eureka's complaint is predicated on the fundamental underlying premise that Eureka could develop residences on the Property. Eureka's affordable housing plan called for a total of 710 units, 560 of which were to be situated on the North Parcel. Judge Moraghan has already determined unequivocally that none of those 560 units can be built on the North Parcel. He also determined, with respect to the Property as a whole, that "[t]he residential development proposed by Eureka is not reasonably probable or physically possible," particularly because of sewer and water constraints. Accordingly, summary judgment must enter for the defendants on all three counts.

**Standard for Summary Judgment**

Where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, a party is entitled to summary judgment. Fed. R. Civ. P. 56(c); Miner, et al. v. Sheridan, et al., 1999 WL 200694, at *2 (D. Conn.), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). After discovery, if the nonmovant has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then summary judgment is appropriate. Miner, supra, at *1, citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The substantive law governing the case identifies those facts

that are material on a motion for summary judgment. Miner, supra, at *1, citing Anderson, supra, at 258.

A court must grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact. Miner, supra, at *1, citing Miner v. Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Miner, supra, at *1, citing Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).

**Federal Courts must give the same collateral estoppel and res judicata effect to state court judgments as would the courts of the rendering state.**

The United States Supreme Court requires that the federal courts give state judgments such collateral estoppel and res judicata effect as would the courts of the rendering state. See, for example, Allen v. McCurry, 449 U.S. 90 (1980) and Migra v. Warren City School District Board of Education, 465 U.S. 75 (1984), cited with approval in Gelb v. Royal Globe Insurance Company, 798 F.2d 38, 42 (2d Cir. 1986). This rule applies even where the state judgment adjudicates federal questions. See, for example, Gelb, supra, at 42; St. John v. Wisconsin Employment Relations Board, 340 U.S. 411 (1951); and Rollins v. Dwyer, 666 F.2d 141 (5th Cir. 1982).

In Connecticut, collateral estoppel, or issue preclusion, 'is that aspect of res judicata that prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties or those in privity with them upon a different claim . . . An issue is *actually litigated* if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined . . . 1 Restatement (Second), Judgments §27, comment (d) (1982)." (Citations omitted; emphasis in original; internal

quotation marks omitted.)  Efthimiou v. Smith, 268 Conn. 499, 506-07 (2004); see also Rinaldi v. Enfield, 82 Conn. App. 505, 516 (2004).

     For a case in point, see Albahary, et al. v. City of Bristol, 84 Conn. App. 329 (2004).  In that eminent domain proceeding for the taking of an easement, the plaintiffs were owners of unimproved property located next to the City of Bristol's landfill.  The plaintiffs' property was contaminated by the operation of that landfill long before the City of Bristol took plaintiffs' property by eminent domain.  The trial court, in assessing damages for the taking, compared the value of the property in its polluted condition and its value after the taking of the easement.  The plaintiffs appealed, arguing that this formulation was improper, because their property became polluted by the defendants' operation of the landfill long before the taking of the easement.  In plaintiffs' view, to compensate them for the pretaking pollution, they were entitled to damages derived from comparing the value of the property with clean groundwater and the value of their property after the taking.

     In a prior federal action the same plaintiffs had brought against the City of Bristol, they "presented functionally identical claims but were unable to prove that they had suffered measurable losses." Id., at 335.  The Supreme Court upheld the trial court's decision not to award the plaintiffs damages for pre-taking contamination based, in part, on collateral estoppel.  In the prior federal action, the plaintiffs sought, among other things, damages as a result of the landfill's contamination, based on a theory of inverse condemnation.  The federal court rejected that claim, because plaintiffs received over $2 million from mineral extraction contracts after their property was contaminated, and thus the condemnation had not deprived them of the reasonable use of their property.

In upholding the trial court decision, the Supreme Court (Peters, J.) held: "We conclude . . . that the judgment of the federal court has established, unequivocally and definitively, that the plaintiffs did not suffer any economic loss because of the pretaking pollution of the groundwater on their property. It follows that, in this action, the plaintiffs have no basis for arguing that their condemnation award must include compensation for pretaking pollution. No matter how the plaintiffs characterize their claim, the fact remains that groundwater pollution has not diminished the profits generated by the mining operations on their property. Under these circumstances, we agree with the trial court's formula for valuing the damages to which the plaintiffs were entitled due to the taking of an easement on their property. The trial court properly measured these damages by a comparison between the value of the property at the time of the taking, albeit in its polluted condition, and its value after the taking, in its polluted condition." Id., at 341.

Likewise, in the case at bar, Judge Moraghan has already determined, unequivocally and definitively, that the very residential development that is the subject of the federal action cannot occur – indeed, is not "physically possible." Accordingly, all Eureka's claims must fail, as a matter of law.

## CONCLUSION

This case presents the very issue already determined by Judge Moraghan in the state court action: whether it is feasible for Eureka to proceed with residential development in accordance with its Master Plan. It cannot, as Judge Moraghan has already determined. As a matter of law, Eureka cannot seek injunctive relief or any relief under the Federal Fair Housing Act, since it cannot pursue the very residential development which is the subject of this case. Since this case presents no genuine issues of material fact, and on the facts presented Defendants

10

prevail as a matter of law, summary judgment should be entered on all counts of the complaint in favor of the Defendants.

                          THE DEFENDANTS

                          By:_____
                          Stewart I. Edelstein, Esq. (ct06021)
                          Jonathan S. Bowman, Esq. (ct 08526)
                          Monte E. Frank, Esq. (ct 13666)
                          Cohen and Wolf, P.C.
                          1115 Broad Street
                          Bridgeport, CT  06604
                          Tel: 203-368-0211
                          Fax: 203-576-8504
                          sedelstein@cohenandwolf.com

## CERTIFICATION

      This is to certify that a copy of the foregoing was mailed by first class, postage prepaid mail on the 5th day of October, 2004, to:

Matthew C. Mason, Esq.
Gregory and Adams, P.C.
190 Old Ridgefield Road
Wilton, CT  06897
Tel: 203-762-9000
Fax: 203-834-1628

_____
Stewart I. Edelstein