UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------------x

EUREKA V LLC,                                          :

               Plaintiff,                         :          Civil Action No.

                               :

                               :          3 02 CV 356 (DJS)

VS.                                                    :

                               :

THE TOWN OF RIDGEFIELD, THE BOARD OF                   :
SELECTMEN OF THE TOWN OF RIDGEFIELD,                   :
THE BOARD OF FINANCE OF THE TOWN OF                    :
RIDGEFIELD, THE ECONOMIC DEVELOPMENT                   :
COMMISSION OF THE TOWN OF RIDGEFIELD,                  :
THE BENNETT'S FARM DEVELOPMENT                         :
AUTHORITY, and BARBARA SERFILIPPI, IN                  :
HER OFFICIAL CAPACITY AS THE TOWN                      :
CLERK OF THE TOWN OF RIDGEFIELD,                       :

                               :

               Defendants.                        :          OCTOBER 27, 2004

-------------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      Eureka V LLC ("Eureka") submits this memorandum of law in opposition to the Defendant's Motion for Summary Judgment (the "Motion"). The Motion is frivolous, made in bad faith and should be rejected out of hand.

      The trial in Ridgefield v. Eureka, CV-01-0344176 S (Conn. Sup. Ct., J.D. Danbury) (08/26/04) involved an entirely different parcel of land than at issue here. The feasibility of Eureka's Affordable Housing Master Plan of Development was not actually litigated and was not necessarily determined in the State Case -- *it was not at issue at all in that case* -- and the Judgment most certainly is not dependent upon the determination of that issue. Moreover, even if the court were to conclude that Eureka's initial plans for affordable housing were not technically "feasible," that could not possibly constitute a defense to Ridgefield's taking of

Eureka's property in bad faith, for an improper purpose and as a pretext to thwart affordable housing.

## PRELIMINARY STATEMENT

This case involves a gross abuse of the municipal power of eminent domain. Shortly following Plaintiff's filing with the Town of Ridgefield ("Ridgefield" or "Town") of its Affordable Housing Mixed Use Master Plan of Development ("Affordable Housing Master Plan"), a concept plan showing a substantial affordable housing development and some 400,000 square feet of commercial office space, the Town's Selectmen decided to take Plaintiff's property by eminent domain to stop its affordable housing plans and set about to create a rationale to do so.

The Selectmen first tried to take the entire property for open space, and, when unsuccessful, then considered various other alternatives, including creating a "port district" in land-locked Ridgefield under a state statute that includes eminent domain powers. Ultimately, they decided on a two step approach: (1) take the northern part of the property, consisting of 458 acres, for open space; and (2) take the southern part of the property, consisting of 155 acres, pursuant to Chapter 132 of the Connecticut General Statutes for a municipal development project. The end result of the municipal development project, assuming it is actually pursued by the Town, would be the sale of the property to other private developers or businesses.

On September 25, 2001, a referendum was passed purporting to authorize the taking of Plaintiff's property in this manner, even though there had been no study of the need for a municipal development project; the required project plan had not been prepared, reviewed or received the statutorily mandated approvals – all prerequisites to taking of property by eminent domain under Chapter 132; and the Plaintiff itself proposed 445,000 square feet of commercial

development on the southern portion of the property (along with 150 residential units under Connecticut's Affordable Housing Appeals Procedure).

The preparation and approval process of the town's municipal development project plan was a sham. The plan fails to comply with many of the mandatory requirements of a project plan, is riddled with unsupported and speculative assumptions and the plan's authors disclaim responsibility for virtually everything in the plan. The proposed taking of Plaintiff's property is in bad faith and is a pretext to stop Plaintiff's affordable housing plans. The defendants have abused the municipal power of eminent domain and perverted Chapter 132 of Connecticut's General Statutes. Eureka seeks injunctive relief and money damages by reason of the Defendants' unlawful efforts to take its property.

Ridgefield's desperation to avoid a trial on the merits has prompted it to move for summary judgment, primarily on alleged collateral estoppel grounds. The Defendants claim that in Ridgefield v. Eureka, CV-01-0344176 S (the "State Case"), a trial of the value of the 458 acre North Parcel that was taken by Ridgefield by eminent domain for open space, and which is not the subject of this action, the State Court has "unequivocally and definitively" decided that Eureka's Affordable Housing Master Plan is neither "reasonably probable nor physically possible." Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Memo") at 1. This assertion is knowingly false.

In fact, the only residential development at issue in the State Case concerned a potential subdivision [10 lots] on the 245 acres zoned for residential use, about which the appraisers differed as to whether open space or residential development was the highest and best use. The potential of the balance of the entire Bennett's Farm Property to support residential development, as contemplated by Eureka's Affordable Housing Master Plan, was never an issue in the State

Case, let alone one that was decided adversely to Eureka. That issue could only have been actually litigated and necessarily determined if Eureka and its appraisers had argued that the North Parcel should be valued in accordance with the zone change necessary for Eureka's Affordable Housing Master Plan, an argument Eureka never made.

In reality, the only potential estoppel effect of the State Court decision is against Ridgefield. The State Court squarely held that commercial development on the CDD zoned portion of the North Parcel, which Ridgefield's expert appraiser estimated would support some 800,000 square feet of office development [and which is where the bulk of Eureka' affordable housing was to be built], was reasonably probable and physically possible. This necessarily included a finding that sewer and water were reasonably available to support that development and, a fortiori, that residential development of that portion of the site is feasible, the only question being the number of units that could be built.

Moreover, even if Eureka's Affordable Housing Master Plan, its initial plan for affordable housing on the entire Bennett's Farm Property, were somehow determined not to be "feasible," i.e., not all 700 units could be built for whatever reason, Ridgefield has made absolutely no showing of how that could possibly be a defense to Plaintiff's claims. Ridgefield has deliberately mischaracterized Plaintiff's claims as being dependant on the feasibility of its Affordable Housing Master Plan, when the precise number of units of affordable housing that ultimately might be constructed on the site is simply irrelevant to whether a municipality may take property to thwart affordable housing and violate Federal Fair Housing laws. Ridgefield has not cited to a single case or any other authority in support of its assertion that its so-called "affirmative defenses" are in fact defenses to Plaintiff's claims, or that it is entitled to judgment as a matter of law on any those defenses. Indeed, the very notion that the law would condone a

municipality taking property in bad faith and to stop affordable housing, simply upon a showing by the municipality that the property owner's initial proposed development was not technically "feasible" is absurd.

## FACTUAL BACKGROUND

### A.     The Bennett's Farm Property

In February 1998, Eureka acquired approximately 682 acres of real property located in Danbury (69 acres) and Ridgefield (613 acres), Connecticut from the IBM Corporation.  In Ridgefield, 458 acres are located to the north of Bennett's Farm Road (the "North Parcel") and were taken from Eureka by the Town of Ridgefield on December 20, 2001, by eminent domain. The remaining 155-acre tract is located to the south of Bennett's Farm Road (the "South Parcel") and is the subject of this action (collectively, the North Parcel and the South Parcel are referred to herein as the "Bennett's Farm Property").

The Bennett's Farm Property consists of approximately 370.4 acres zoned CDD (Corporate Development District), 237.1 acres zoned RAAA (Residential 3 Acres), 2.0 acres zoned RAA (Residential two acre) and 5.9 acres zoned RA (Residential 1 Acre), all as defined in the zoning regulations of the Town of Ridgefield.  The entire 155-acre South Parcel is zoned CDD.  [First Amended Verified Complaint ("Complaint") ¶¶ 12 – 13.]

### B.     Eureka's Affordable Housing Mixed Use Master Plan of Development

On January 24, 2001, as part of the Ridgefield Planning and Zoning Commission's pre-application process for a proposed 10 lot subdivision on the 245 acre residentially zoned portion of the North Parcel, Eureka filed with the Commission's staff an "Affordable Housing Mixed Use Master Plan of Development" ("Affordable Housing Master Plan"), which contained Eureka's plans for development of the entire Bennett's Farm Property.  The Affordable Housing

Master Plan shows (i) a 10 lot subdivision on the 245 acre residentially zoned property, (ii) a residential development of 710 units (including the 10 lot subdivision), of which 30 percent would constitute affordable housing under Connecticut's Affordable Housing Appeals Procedure, Conn. Gen. Stat. §8-30g, and (iii) 445,000 square feet of commercial development. Five hundred and fifty residential units would be built on the CDD zoned portion of the North Parcel. The proposed development of the South Parcel was for 150 residential units, and all 445,000 square feet of commercial development. [Complaint ¶ 20.]

Within weeks if not days of Eureka's filing of its Affordable Housing Master Plan, Ridgefield's Selectmen decided to take Plaintiff's property by eminent domain to stop affordable housing and set about to create a rationale to do so. [Complaint ¶¶ 25-68.]

### C.   Ridgefield's Bad Faith Efforts to Take the Property by Eminent Domain.

Given that Ridgefield claims that lack of feasibility of Eureka's Affordable Housing Master Plan is an affirmative defense to Eureka's claims, it is important that the Court appreciate the factual and legal basis for Eureka's claims.

Soon after Eureka filed its Affordable Housing Master Plan, Ridgefield began actively to pursue acquisition of the Bennett's Farm Property by eminent domain and devise a strategy to stop affordable housing on the property. The Selectmen initially determined that Ridgefield should take the entire Bennett's Farm Property for open space. However, the Board of Finance refused to support such an acquisition, which led the Selectmen to explore and create alternative schemes by which Ridgefield could take control of Eureka's property. Indeed, the Selectmen even considered designating the land-locked Bennett's Farm Property a "port district" under a state statute that allows towns to establish a port authority to administer and take property by eminent domain. [E.g. Complaint ¶¶ 25-34.]

The Selectmen's bad faith efforts to stop Eureka's affordable housing plans are evidenced by, among other things, their public comments about Eureka's affordable housing plans and their desire to take control of the Bennett's Farm Property.  For example, at the April 11, 2001, Special Meeting of the Board of Selectmen, Selectman Manners stated that she "would like to see the Town in control of the entire parcel to do what it sees fit."  [Complaint ¶ 35.]  At the August 29, 2001, public hearing, in response to a question about Eureka's development plans and why Ridgefield should not "let the Planning and Zoning Commission handle this," Selectman Manners explained that

> Eureka V submitted a 700 [unit] Residential Plan. They <u>can</u> bust the zoning regulations if they put in 30% low income housing units (which would cost $350,000). The Planning and Zoning Commission will not give Eureka V what it wants. (Emphasis in original.)

[Complaint ¶ 50.]  At the same hearing, First Selectman Marconi stated that he "wants to take control of our destiny."  [<u>Id.</u>] He had previously made clear his views about affordable housing and Eureka's plans to develop the property:

> What are our options?  What are we going to do?  Build 700 homes in this town, apartments or townhouses would result in *another two-school minimum, incredible tax increases, and a scar on our community forever*.  Our options are an outright purchase . . . . Option number 2, eminent domain . . .
>
> It's an open-ended question [whether Eureka can build 700 units], but the possibility of it, I believe is slim.  But, nonetheless, it's a threat and it's been used many, many times before.  *It's a horrible piece of legislation [Conn. Gen. Stat. § 8-30g].  Attempts have been made to remove it at the State, they refused to even get it on the floor, and it's hurt communities such as Ridgefield across the state where developers have used this a tool, as a club over the heads of the P and Z Commission, to force them to approve their projects.  That's something that we have to deal with now.* (Emphasis added).

[Complaint ¶ 36.]  According to Connecticut's Affordable Housing Appeals Procedure List, only 1.71 percent of Ridgefield's housing inventory qualifies as "affordable" and Conn. Gen. Stat. § 8-30g applies to all towns that do not have at least 10 percent "affordable" housing.

At the September 12, 2001, public hearing the Selectmen's real purpose was again revealed when Selectman Heymen spoke in opposition to the proposed taking:

> What was submitted to the Planning and Zoning Commission, which I saw, and I looked at it the other day, is an application for 710 homes. Under state law, under the affordable housing act, they can eliminate or not go along with local zoning, it then becomes the burden of the town to give reasons why we should deny it. And we've been mixing this up about what the land is zoned for and the 700 acres - - 700 housing units. It's a separate issue.

> The land is zoned for one way, as I mentioned. An applicant can come in and disregard local zoning and come in with an affordable housing project, which is what is on the desk at the planning and zoning office today. *I know of no community in Connecticut, I know of no community in Connecticut that has been able to take land by eminent domain as a method of not allowing affordable housing.* I know – well, okay, go ahead.

[Complaint ¶ 52.]

On July 18, 2001, the Board of Selectmen passed resolutions in furtherance of a two part taking the Bennett's Farm Property by eminent domain: the North Parcel for "open space, recreation and other municipal purposes" and the South Parcel, which is the subject of this action, for "a municipal development project pursuant to Chapter 132 or Charter 5881, respectively, of the General Statutes of Connecticut." [Complaint ¶ 41.]

On September 25, 2001, the voters of Ridgefield passed a referendum approving (1) acquisition of the North Parcel for open space, recreation, and other municipal purposes and of the South Parcel for corporate, municipal and/or purposes set forth in Section 8-197 or 32-22 of the Connecticut General Statues, and (2) for the preparation of a development plan for the South Parcel, and authorizing borrowing to finance said appropriation. No development plan had been reviewed or approved prior to the referendum. [Complaint ¶ 54.]

Ridgefield's Preliminary Project Plan was a sham. David Schiff, AICP, a certified planner with extensive experience with municipal projects, identified some of the major

deficiencies with the Preliminary Project Plan in a Report he prepared which was read into the

record at a hearing relating to Ridgefield's approval of the Preliminary Project Plan:

> (i) The Preliminary Project Plan simply states its finding, "that public action is warranted in order to carry out and administer the project and to preserve the property for business or industrial purposes" without any explanation as to why its current owner cannot or will not accomplish the same objective;

> (ii) The Plan raises numerous unanswered questions about various characteristics of the property and makes recommendations for additional work that should be done, such as undertaking "an environmental assessment of the property prior to acquisition" and soil testing for sewer feasibility;

> (iii) "No specific evaluation has been done of septic feasibility at the subject property," a central assumption relating to development of the site;

> (iv) The development yields are entirely speculative because of the number of unsupported assumptions on which they are based, including factors such as the desire to protect environmental resources, septic capability of the property, water yields at the property, and market factors at the property;

> (v) There is no marketability analysis and Planimetrics disclaims any expertise in the area, stating that, "[t]he Town of Ridgefield should engage persons with specific expertise in commercial real estate to obtain more detailed information";

> (vi) There is no bona fide plan for relocating project-area occupants;

> (vii) There is no bona fide financing plan;

> (viii) There is no bona fide evaluation of project economics and the plan notes that, "the cost and revenue estimates in this report are for general information only...";

> (ix) There is no title search; and

> (x) There is no appraisal in the project plan, and the appraisal report referred to in the Plan is nearly two years old.

[Complaint ¶¶ 61-63; Certified Transcript of February 6, 2002 Public Hearing at pages 4-10.]

On December 20, 2001, Ridgefield completed its acquisition of the North Parcel by filing

of a Certificate of Taking and depositing $8,500,000 with the Court, which was paid to Eureka.

[Complaint ¶ 55.]

Eureka commenced the instant action to enjoin the taking of the South Parcel, asserting, among other things, that the proposed taking was unlawful, in bad faith, unreasonable or otherwise improper in an attempt to thwart affordable housing. It also appealed the value of the North Parcel in a separate state court action.

**D.      Trial of the Valuation of the North Parcel.**

In Ridgefield v. Eureka, CV-01-0344176 S (the "State Case"), Eureka appealed the amount of compensation paid to it. Following a two week trial, the Court concluded that Eureka was entitled to an additional $3,000,000 above the $8,500,000 already paid to it, plus interest and appraisal fees. Memorandum of Decision dated August 26, 2004 ("Dec.") at 23-25.

The State Case involved only the value of the North Parcel. The issues were framed by the appraisals of the parties' experts. Eureka's expert appraisers, Christopher Kerin of Kerin Commercial Realty and Thomas Merola of Valuation Services, both concluded that the highest and best use of the North Parcel was for a mixed use development consistent with the existing zoning, i.e., a subdivision [10 lots] of the 245 acres zoned for residential development, and commercial development of the 213 acres zoned CDD (Commercial Development District).[1] Affidavit of Matthew C. Mason sworn to October 26, 2004 ("Mason Aff.) ¶ 6.

Ridgefield's appraiser, John Leary, agreed that the highest and best use of the CDD zoned property was for commercial development, and opined that sewer and water were reasonably available to support development of some 800,000 square feet of office development, but concluded that the highest and best use of the residential property was for open space. Mason Aff. ¶ 7.

---

[1] When determining fair market value of a property, the starting point is to determine its highest and best use, i.e. the use that is (a) legally permissible, (b) physically possible, (c) financially feasible, and (d) will most likely produce the greatest value or financial return to the investor. See, e.g., Peter Rock Assoc. v. North Haven, 46 Conn. Supp. 458, 470, 756 A.2d 335, 343-44 (1998), aff'd. 59 Conn. App. 1, 756 A.2d 290 (2000); Dec. at 3-4.

The appraisal reports and the trial testimony of Eureka's appraisers make crystal clear that they did not base their opinions of value on Eureka's Affordable Housing Master Plan. Eureka's appraisers referenced the Affordable Housing Master Plan only as background in their review of the history of development applications for the property, including Eureka's application for a zone change and text amendment for its Affordable Housing Master Plan, which plan was withdrawn following the taking of the North Parcel. Mason Aff. ¶¶ 6, 17-20. [2]

Mr. Kerin testified as follows on cross-examination:

Q.    Okay. Let me ask you this, did affordable housing play any role in how you arrived at your opinion of value?

A.    I appraised the property with no approvals in place.

THE COURT:        Did it afford any basis?

THE WITNESS:      No.

Mason Aff. ¶ 9.

Similarly, on cross examination Mr. Merola testified as follows:

Q.    All right. Now did affordable housing play any role on how you arrived at your opinion of value?

A.    No.

Mason Aff. ¶ 10.

Mr. Kerin also observed that the property's value would be substantially higher if the zone change necessary for Affordable Housing Master Plan was approved, but that he did not value the property under that scenario. Mason Aff. Ex. B at 16. The State Court correctly observed "there was no evidence that such a zone change or text amendment was likely to

---

[2] The Affordable Housing Master Plan also contained maps which showed undisputed information such as wetlands and topography, zoning, allowable development, and other basic information about the site, which was introduced into evidence to provide that basic information to the Court.

happen" (Dec. at 10), because Eureka and its appraisers did not value the property under that scenario and therefore offered no evidence on that issue, although they certainly could have if they had approached the valuation case differently.

In sum, the only issue before the Court concerning residential development was the residentially zoned portion of the North Parcel on which Eureka proposed only 10 lots, not the entire North Parcel, not the entire Bennett's Farm Property, not the South Parcel and not Eureka's Affordable Housing Master Plan. Accordingly, any finding made by the State Court about residential development necessarily concerned *only* that potential development on the residentially zoned portion of the North Parcel, not Eureka's Affordable Housing Master Plan or residential development on the balance of the property.

        E.        **The State Court Decision**

Much of the State Court Decision addresses the highest and best use of the subject North Parcel. Dec. at 5-11. With respect to the CDD zoned property, the court concluded as follows: "Commercial development is the highest and best use of the two hundred and thirteen (213) acres in the CDD. Neither party disputes this point. . . . Considering the evidence in the record, commercial development on the subject property would be legally permissible, financially possible, maximally profitable and physically possible." Dec. at 5. Thus, the State Court found that sewer and water are available to the support development of the CDD zoned portion of the North Parcel [which is where the bulk of Eureka's affordable housing was to be built under its Affordable Housing Master Plan], since such development could not be "financially possible, maximally profitable and physically possible" absent the reasonable availability of utilities, including sewer and water, to support it.

The Court then turned to the residentially zoned property. "The highest and best use of the two hundred and forty-seven (247) acres zoned RAAA is a point of contention for the parties." Dec. at 5. The Court noted that Eureka's appraisers determined the parcel should be used for residential development, while Ridgefield's appraiser concluded that it should be open space. Dec. at 5, 6. The Court ultimately concluded that the highest and best use of this portion of the property was for open space, based on a variety of factors including the topography and extensive wetlands on this portion of the site. Dec. at 10. The Court stated: "In addition, the residentially zoned portion of the parcel consists of wetlands and uneven terrain which would make road and building construction costly and difficult. The residential development proposed by Eureka is not reasonably probable or physically possible." Dec. at 11.

Thus, it is indisputable that the Court's conclusions about residential development pertained only to the residentially zoned portion of the property and specifically whether the highest and best use of that portion of the site was for a potential 10 lot residential development, as Eureka's appraisers contended, or open space as Ridgefield's appraiser maintained. Since Eureka never argued for a valuation based on the Affordable Housing Master Plan, the notion that the feasibility of that plan was litigated and decided by the Court and was necessary to its Judgment is preposterous.

## THE APPLICABLE STANDARD

A.    The Standard for Summary Judgment

This Court recently summarized the relevant legal standard on a motion for summary judgment as follows:

> A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

> Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute." ' American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir.1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir.1975)). A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). *The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.* See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

Epperson v. Entertainment Express, 2004 WL 2227663 at *(D. Conn. 2004) (Squatrito, J)

(Emphasis added).

B.    Collateral Estoppel

The Connecticut Supreme Court summarized the law of collateral estoppel as follows:

> [C]ollateral estoppel, or issue preclusion, is that aspect of res judicata that prohibits the re-litigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties or those in privity with them upon a different claim . . . .An issue is *actually litigated* if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined . . . An issue is *necessarily determined* if, in the absence of a determination of the issue, the judgment could not have been validly rendered.

Efthimiou v. Smith, 268 Conn. 499, 506-07 (2004) (Citations omitted; emphasis in original; internal quotation marks omitted.).[3]  See generally Dundon v. D.H. Komansky, 15 Fed. Appx. 27, 2001 WL 876904 at *2 (2d Cir. 2001).  Thus, the moving party must establish that the issue was (i) actually litigated and (ii) necessarily determined in the action.

---

[3]  In their explanation of the applicable law of collateral estoppel the Defendants cite to Efthimiou, but omit the last sentence quoted above which explains when an issue is necessarily determined:  "An issue is *necessarily determined*

- 14 -

Moreover, "[i]f an issue has been determined, but the judgment is not dependent upon the determination of the issue, the parties may relitigate the issue in a subsequent action." R & R Pool & Patio, Inc. v. Zoning Bd. of Appeals of Ridgefield, 257 Conn. 456, 466, 778 A.2d 61 (2001) (Citations omitted).  Collateral estoppel is inappropriate where two causes of action are based upon different statutes whose application and underlying goals are different.  Rinaldi v. Town of Enfield, 82 Conn. App. 505, 516, 844 A.2d 949 (2004).

Here, Ridgefield claims that the State Court "has already determined, unequivocally and definitively that the very residential development that is the subject of the federal action cannot occur – indeed, is not 'physically possible.'"  Def. Memo at 10.  Nothing could be further from the truth.  The feasibility of Eureka's Affordable Housing Master Plan of Development was not actually litigated and was not necessarily determined in the State Case -- *it was not at issue at all in that case* -- and the Judgment is not in any way dependent upon the determination of that phantom issue.

## **ARGUMENT**

I.    **THE FEASIBILITY OF EUREKA'S AFFORDABLE HOUSING MASTER PLAN WAS NEVER LITIGATED AND WAS NOT NECESSARILY DETERMINED IN THE STATE CASE.**

Ridgefield describes the issue before the Court as follows:  "In the State Case, a prior action between the same parties as in this federal action, the following issue was actually litigated, submitted for determination, and in fact determined:  was development pursuant to the plan Eureka submitted to the Town of Ridgefield and its agencies (the 'Master Plan') reasonably probable, or physically possible?"  Def. Memo at 2.  This assertion is false, as the feasibility of

---

if, in the absence of a determination of the issue, the judgment could not have been validly rendered."  268 Conn. at 506-07(emphasis in original).

the Affordable Housing Master Plan was never litigated or submitted for determination by the Court -- it was never at issue in the State Case.

Ridgefield summarily asserts, without citation to *anything*, that the references to "residential development" in the State Court Decision are to the residential development proposed in Eureka's Affordable Housing Master Plan. However, Eureka never sought to value the North Parcel based upon its Affordable Housing Master Plan, which would require a zone change and text amendment. Rather, Eureka's experts valued the North Parcel consistent with the property's existing zoning, which supported only a 10 lot subdivision on the residentially zoned portion of the property (primarily due to wetlands and steep slopes) and commercial development of the CDD zoned portion of the North Parcel. *See supra* at 10-12. The Court explicitly recognized that all of the appraisers sought to value the property in accord with existing zoning: "Therefore, both the mixed-used development proposed by Eureka [residential development on the residentially zoned property and commercial development of the CDD zoned property] and Ridgefield's plan to use the land for commercial development [of the CDD portion] and open space [the residential zoned portion] are legally permissible for purposes of determining the highest and best use of the property." Dec. at 4-5.

The testimony of Eureka's appraisers was crystal clear that the affordable housing plan did not play any role in their opinions of value. Mr. Kerin testified as follows on cross-examination:

> Q.     Okay. Let me ask you this, did affordable housing play any role in how you arrived at your opinion of value?
>
> A.     I appraised the property with no approvals in place.
>
>         THE COURT:         Did it afford any basis?
>
>         THE WITNESS:       No.

Mason Aff. ¶ 9.

Mr. Merola testified to the same effect, also on cross-examination:

Q.    All right.  Now did affordable housing play any role on how you arrived at your opinion of value?

A.    No.

Mason Aff. ¶ 10.

Moreover, neither Eureka nor its counsel ever argued for a value of the North Parcel based upon its Affordable Housing Master Plan.  The only issue of residential development involved the potential 10 lot subdivision on the residentially zoned portion of the North Parcel, not Eureka's Affordable Housing Master Plan, which contemplated a zone change for much of the CDD zoned property and residential development on that portion of the site.

Ridgefield has made no showing whatsoever that the feasibility of the Affordable Housing Master Plan was actually litigated, submitted for determination and in fact determined. The only way that could have occurred was if Eureka attempted to value the property in accordance with the Affordable Housing Master Plan.  It did not and Ridgefield has not even claimed that it did.

In addition, as the Connecticut Supreme Court stated in R & R Pool & Patio, Inc. v. Zoning Bd. of Appeals of Ridgefield, 257 Conn. 456, 466, 778 A.2d 61 (2001), "[i]f an issue has been determined, but the judgment is not dependent upon the determination of the issue, the parties may relitigate the issue in a subsequent action."  There is not even a colorable argument that the judgment here is dependent upon the determination of the feasibility of Eureka's Affordable Housing Master Plan since Eureka did not seek to value the property under that development scenario.  Nonetheless, even if the parties had in some fashion litigated that issue --

which they did not -- the parties are free to relitigate it in a subsequent action since the judgment was not dependent on determination of that issue.

The Defendants' argument that certain aspects of the State Court Decision apply to the entire Bennett's Farm Property, including the South Parcel which was not at issue in the State Case, is particularly disingenuous given that the Defendants took precisely the opposite position in the State Court Case. There Ridgefield argued [successfully] that the South Parcel was a legally distinct property and issues pertaining to development of that parcel, including Ridgefield's own Preliminary Project Plan for development of the South Parcel and its plans for water and waste water treatment, were irrelevant to the value and development potential of the North Parcel. E.g., Mason Aff. ¶15. The Defendants can not have it both ways. Their attempt to do so is a further attempt to mislead and deceive the Court.

Ridgefield's reliance on Albahary v. Bristol, 84 Conn. App. 329, 853 A.2d 577 (2004) (Def. Memo. at 9 – 10) is misplaced. In Albahary it was clear that an issue – there the economic loss because of the pre-taking pollution of the groundwater on plaintiff's property -- had been litigated and determined in a prior action between the parties. Id. at 341. Thus, the plaintiff was collaterally estopped from relitigating that issue in the subsequent eminent domain valuation case. By contrast, the issue of the feasibility of the Eureka's Affordable Housing Master Plan was never litigated and decided in the State Court. As noted, that issue could only have been litigated and decided if Eureka and its appraisers had argued that the property should be valued in accordance with the zone change necessary for Eureka's Affordable Housing Master Plan, an argument Eureka never made.

Finally, the relevant legal standards and the issues before the Court in the valuation case, which involved only the North Parcel, and the case before this Court, which involves

Ridgefield's unlawful efforts to stop affordable housing, are so different as to make collateral estoppel completely improper. Rinaldi v. Town of Enfield, 82 Conn. App. 505, 516, 844 A.2d 949 (2004) (Cited at Def. Memo at 9) (Collateral estoppel is inappropriate where two causes of action are based upon different statutes whose application and underlying goals are different.).

## II.     IN ALL EVENTS, RIDGEFIELD HAS FAILED TO ESTABLISH ENTITLEMENT TO JUDGMENT AS A MATTER OF LAW

The Defendants claim entitlement to summary judgment on certain of their self-stylized affirmative defenses based on the assertion that Eureka's Affordable Housing Master Plan is not feasible. As the Court is well aware, in considering a motion for summary judgment on an affirmative defense, the Court must consider that the Plaintiff has established each of its claims in the Complaint. See e.g., Black's Law Dictionary (Fifth Ed.) (Defining affirmative defense as "new matter which, assuming the complaint to be true, constitutes a defense to it."). To prevail the Defendant must establish all elements of the defense and the Court must view all inferences and ambiguities in a light most favorable to Eureka. See e.g., Martin v. Alamo Community College District, 353 F.3d 409,412 (5th Cir. 2003) ("[A]s a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the . . . defense to warrant judgment in his favor.").

### A.     Eureka's Claims in its Amended Complaint

Eureka's complaint contains three counts. In Count One, plaintiff alleges that the defendants' proposed implementation of the Preliminary Project Plan violates §§ 7-136 and 7-148 and Chapter 132 of the General Statutes, does not constitute a bona fide plan for a municipal development project, constitutes a bad faith exercise of the authority granted to municipalities by these statutes and is unreasonable and unnecessary. In Count Two plaintiff alleges that the intended condemnation of the parcel violates the Fifth and Fourteenth Amendments to the United

States Constitution and Article First, § 11, of the Connecticut Constitution, in that it is not being carried out to serve a public use, and that the intended condemnation constitutes a bad faith, unreasonable and unnecessary exercise of the eminent domain power.  In Count Three Plaintiff alleges that the Defendants have violated the Federal Fair Housing Act, Title 42 U.S.C. § 3601 et seq.  The central factual allegation underlying all three counts is that the Defendants sought to take Eureka's property from it to stop its affordable housing plans.

The present case is on all fours with <u>AvalonBay v. Orange</u>, 256 Conn. 557, 775 A.2d 284 (2001).  There, the Connecticut Supreme Court upheld the trial court's granting of a permanent injunction in favor of the landowner on various grounds, concluding that the defendants' proposed industrial park under General Statutes Chapter 132 was a mere pretext designed to thwart affordable housing and otherwise take control of the property from its owner.

In <u>AvalonBay</u>, the plaintiffs were the contract purchasers (and eventual owners) of a 9.6 acre parcel in Orange, Connecticut.  In August 1997, AvalonBay filed for wetlands and special use permits, accompanied by a site plan, for approval to build a luxury apartment complex, a percentage of which would constitute affordable housing rental units under Connecticut's Affordable Housing Appeals Procedure, Conn. Gen. Stat. § 8-30g.  Plaintiff's applications were denied. Approximately three weeks later, the planning and zoning commission issued a moratorium on all planned residential developments in the town, effective September 26, 1997. 256 Conn. at 560-61.

In April 1998, while AvalonBay's appeal of the planning and zoning commission denial was pending, the town economic development commission hired a planning firm to draft a project plan for an industrial park that would occupy eighteen separate parcels of real property encompassing 172 acres, including the AvalonBay parcel. In September, 1998, a private

corporate entity was formed to oversee the proposed industrial park.  Before the project plan was completed, plans were formed to take the parcel by eminent domain. In November 1998, the town's voters rejected the proposed issuance of bonds for the acquisition of the parcel.  Id. at 561-62.

Nonetheless, the Selectmen proceeded with plans for the industrial park, passing a resolution in December 1998 for the issuance of bonds for the condemnation of the parcel. In January 1999 the project plan was approved by the economic development commission and by the board of selectmen the next month. On March 9, 1999, the plan to take the parcel by eminent domain was approved by the economic development commission and the next day, the board of selectmen voted to condemn the parcel.  The taking of the AvalonBay parcel by eminent domain for its inclusion in the industrial park was approved at a town meeting on March 29, 1999.  Id. at 561-62.

The plaintiffs commenced suit against the defendants seeking, inter alia, a permanent injunction against the project plan and the taking of the AvalonBay parcel by eminent domain. The plaintiffs alleged in the first count that the defendants' proposed implementation of the project plan "violates §§ 7-136 and 7-148 and Chapters 132 or 588l of the General Statutes, does not constitute a bona fide plan for a municipal development project, constitutes a bad faith exercise of the authority granted to municipalities by these statutes, and constitutes ultra vires action by the Town and its agencies...."  Id. at 562-63.  In the second count, the plaintiffs alleged "that the intended condemnation of the parcel violated article first, § 11, of the Connecticut constitution, in that it was not being carried out to serve a public use. The plaintiffs also alleged that the intended condemnation constituted a bad faith exercise of the eminent domain power."  Id. at 563.

The trial court determined that Orange had proceeded in bad faith and that the project plan was a pretext in an effort to thwart affordable housing on the AvalonBay parcel. Id. at 554-55. "In making these findings, the court principally relied on the timing and scarcity of detail in the project plan, as well as the actions and statements of the First Selectman and other town officials. On the basis of these findings, the trial court concluded, with respect to the first and second counts, that the plaintiffs were entitled to a permanent injunction prohibiting the town from proceeding with the implementation of the project plan and from proceeding with any plans for the condemnation of the subject property." Id. at 565.

On appeal, the Supreme Court affirmed the injunction preventing implementation of the Project Plan. The Court found that there was ample evidence to support the trial court's findings of bad faith and pretext:

> First, the record fully supports the trial court's finding that the project plan was hastily assembled, poorly envisioned and incomplete. There was ample evidence that the defendants developed the idea for an industrial park and began the process to create the project plan only after AvalonBay had filed its application for affordable housing, and only weeks before the issuance of a moratorium on planned residential developments. Indeed, even when the town initiated eminent domain proceedings against the parcel, the project plan was not complete.
>
> The plaintiffs offered the testimony of five expert witnesses, each of whom criticized the project plan. Those expert witnesses testified that the project plan was missing information, contained inaccurate information and did not meet the minimum standards of their professions. For example, David Schiff, a planning and development consultant, testified that the project plan's program overview was "unclear," "contradictory in certain places" and "internally inconsistent . . . ."

Id. at 579.

The Supreme Court held as follows:

> We conclude that when a trial court makes findings of bad faith on the part of a municipality in the context of a project plan developed and adopted pursuant to chapter 132, aimed at a proposed development of property that would be thwarted by the project plan, such findings provide a sufficient legal basis for granting an injunction against the implementation of the project plan.

Id. at 582.

Like AvalonBay, there is substantial evidence here that the Preliminary Project Plan was hastily assembled, poorly envisioned, incomplete and based on a host of unsupported assumptions. See supra at 8-9; Complaint ¶¶ 61-63. Like AvalonBay, the defendants developed the idea for a business park and began the process to create the project plan only after Plaintiff had filed its Master Plan showing an affordable housing development on a portion of the site. Indeed, here, following Eureka's filing of its Master Plan, the defendants first tried to take the entire Bennett's Farm Property, including the subject South Parcel, for open space. Only after the Board of Finance blocked those efforts did the Selectmen concoct the idea for a corporate park (their port authority idea proving untenable) without having done any study of the need for or likely success of such a park, and without regard for the fact that a substantially similar commercial development had been proposed by the current owner, obviating the need for municipal intervention under the controlling statutes. See supra at 5-6, 8-9.

Like AvalonBay, the actions and statements of the Selectmen indicated that they viewed eminent domain as a way to regain "control" of the property that the affordable housing statute allegedly takes away from municipalities; that they wanted to stop any residential development on the property; and that the affordable housing statute -- which they described as a "terrible piece of legislation" -- would, in the words of Selectman Manners, allow Eureka to "bust" the zoning. See supra at 7. Finally, like AvalonBay, the Preliminary Project Plan was not yet complete at the time the Town initiated eminent domain proceedings in the September 25, 2001 referendum. 256 Conn. at 576-80.

In many respects, the conduct of the defendants here is even worse than that of the officials in the Town of Orange, which was sufficient to warrant an injunction preventing the

taking in that case.   In <u>AvalonBay</u>, an economic development commission existed prior to formulation of plans to take the property and prior to retention of a planning firm to prepare a project plan.   Ridgefield created the EDC after it had already decided to take the property and retained a planning firm before the EDC even existed.    In <u>AvalonBay</u>, the town's economic development commission retained the planning firm to prepare the project plan; in Ridgefield, the Town itself retained Planimetrics, its planning consultants, in violation of Conn. Gen. Stat. § 8-189 which provides that the "development agency may initiate a development project by preparing a project plan . . . ."  Moreover, unlike Ridgefield, Orange never sought to take the property for open space or any other purpose, only to later proceed with a municipal development project.

In sum, the defendants' corporate park was proposed in bad faith and is nothing more than a pretext to wrest control of the property from Eureka in order to thwart its affordable housing plans.  Condemnation may be enjoined based on bad faith where the taking is premised upon a facially valid public use, but in reality is used for an ulterior purpose not authorized by the enabling statute. <u>Gohld Realty Inc. v. City of Hartford</u>, 141 Conn. 135, 149 (1954). <u>See</u> <u>Farist Steel Co. v. City of Bridgeport</u>, 60 Conn. 278, 292, 22 A. 561 (1891).[4]

The Fair Housing Act also makes it unlawful "[t]o refuse to sell or rent ... or otherwise make unavailable or deny, a dwelling to any person because of ... familial status...." 42 U.S.C. § 3604(a) (Emphasis added.).  "The phrase 'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning

---

[4]   The United States Supreme Court has granted certiorari to address the following question:        "What protection does the Fifth Amendment's public use requirement provide for individuals whose property is being condemned, not to eliminate slums or blight, but for the sole purpose of 'economic development' that will perhaps increase tax revenues and improve the local economy?"  <u>Kelo v. City of New London</u>, 268 Conn. 1, 843 A.2d 500 (2004), *cert. granted* 73 U.S.L.W. 3178, 73 U.S.L.W. 3204 (U.S. Sept. 28, 2004) (No. 04-108).  Thus, the Supreme Court may well conclude that Ridgefield's intended taking is unlawful on its face.

restrictions." See, e.g. Huntington Branch, National Association For the Advancement of Colored People v. Town of Huntington, 844 F.2d 926, 938 (2d Cir.), aff'd, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (per curium); Casa Marie, Inc. v. Superior Court of Puerto Rico, 988 F.2d 252, 257 n. 6 (1st Cir. 1993). The primary factor in the Defendants' attempts to take the property was their desire to stop affordable housing to prevent families with school age children from moving to Ridgefield, children that the Town would have to educate and for whom it would otherwise have to provide municipal services.

As the court can readily appreciate, each of Eureka's claims raises very serious legal and policy issues regarding the municipality's taking of property for improper purposes and to exclude affordable housing. It is against this backdrop that the Court must evaluate the alleged affirmative defenses, assuming the Court were even to get this far.

B.     Affirmative Defenses

Ridgefield seeks summary judgment on its new Ninth Affirmative Defense, collateral estoppel, and Tenth Affirmative Defense, that Eureka's Affordable Housing Master Plan is not feasible. Ridgefield's entire argument on these functionally identical "defenses" rests on the bald assertion that "if building affordable housing on the Property is not feasible, the premise of the federal action fails, and the federal action fails with it, as a matter of law." Def. Memo at 3. However, Eureka's claims are not in any way premised on the feasibility of its Affordable Housing Master Plan. Rather, the Complaint is premised on the straightforward proposition that following Eureka's disclosure of its affordable housing plans, Ridgefield's Selectman set about to take the property and devise a scheme to do so in order to stop affordable housing. There is absolutely nothing in the Complaint that premises Eureka's ability to prevail on its three-count complaint on the technical feasibility of its initial development plans for the property.

Remarkably, Ridgefield has not cited a single case or any other legal authority to support its astonishing claim that alleged lack of feasibility of Eureka's Affordable Housing Master Plan is a defense to Eureka's claims of bad faith exercise of eminent domain to stop affordable housing, as well as violation of Federal Fair Housing laws.  The reason is simple -- there is none. Ridgefield appears to believe that simply calling something an affirmative defense makes it one. However, there is absolutely no basis in law or otherwise to conclude that even if Eureka's 710 unit affordable housing plan was not technically feasible, a point Eureka most certainly does not concede, that the municipality is free to violate the law and take property in bad faith and for an improper purpose.[5]

Under Ridgefield's absurd and entirely unsupported view, a municipality is free to abuse the powers of eminent domain and take property from private citizens, in violation of the State and Federal Constitutions and numerous state and federal laws, if it subsequently can show that the property owner's initial affordable housing plans would not have been approved, by the condemning municipality no less.  Our research has not revealed a single case to support the proposition that feasibility of a property owner's plans is or even could be relevant to any of Plaintiff's claims, let alone constitute an affirmative defense to a bad faith exercise of eminent domain powers, and Ridgefield has not cited to anything to support its claim.  The very fact that Ridgefield would make such a patently untenable argument underscores that it has no regard for the law and the rights of property owners to be free from abusive governmental authority.

---

[5] Query under Ridgefield's theory whether it believes it has an affirmative defense to Eureka's claims if it is feasible to develop 709, rather than 710, units, or where it believes the cut off point exists. Moreover, Ridgefield's argument ignores the reality of the land use application process, where it is commonplace for applications to be revised, amended and/or resubmitted to accommodate concerns of planning officials and others, including changes in the number of units or the size of the development.

### III.   RIDGEFIELD HAS FAILED TO ESTABLISH THE AFFIRMATIVE DEFENSE OF MOOTNESS.

Ridgefield makes passing reference to its Second Affirmative Defense, that the action is moot because Eureka does not presently have a pending application for affordable housing.  Def. Memo at 6.  This defense, and Ridgefield's alleged entitlement to judgment as a matter of law, is utter nonsense.  First, none of the "undisputed facts" in its Rule 56 Statement relate to this defense, so Ridgefield has failed to establish the lack of material issues of fact relevant to this defense.  Second, Ridgefield has not articulated any link between the State Court Decision and this alleged defense.

Third, Ridgefield has not articulated any basis or reason as to why the action is moot even if no plan is pending at present, absent a showing that Eureka has completely abandoned its plans for affordable housing on the site – which it has not.  Ridgefield took 458 acres of Eureka's property, leaving it with 155 acres in Ridgefield (the subject of this action) and 69 acres in Danbury.  Eureka withdrew its Application for Zone Change Text Amendment, which pertained to the CDD portion of the North Parcel and portion of the South Parcel, following the taking of the North Parcel.  Such taking gutted its application and effectively rendered its application moot.  However, as Ridgefield is well aware, Eureka has *never* abandoned its plans for affordable housing on the South Parcel.  Mason Aff. ¶¶ 17-20.  Finally, the controversy in the present case arises out of intended implementation of the project plan for an improper purpose.  Ridgefield has made absolutely no showing that an actual plan must still be pending in order for Eureka to obtain injunctive relief against a municipality that seeks to stop affordable housing.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should: (i) deny the Motion for Summary Judgment; (ii) award Eureka it attorneys' fees in having to defend against the Motion; and (iii) such other relief as the court deems just and proper.

Plaintiff
Eureka V LLC


By     _____
Matthew C. Mason (ct 15291)
Gregory and Adams, P.C.
190 Old Ridgefield Road
Wilton, CT 06897
(203) 762-9000 (Tel.)
(203) 834-1628 (Fax)
mmason@gregoryandadams.com

## **CERTIFICATION**

THIS IS TO CERTIFY that a copy of the foregoing was mailed this day, postage pre-paid on October 28, 2004 to the following parties:

Stewart Edelstein, Esq.
Jonathan S. Bowman, Esq.
Cohen and Wolf, P.C.
1115 Broad Street
Bridgeport, CT 06601-1821

Monte E. Frank, Esq.
Cohen and Wolf, P.C.
158 Deer Hill Avenue
Danbury, CT  06810

_____
Matthew C. Mason, Esq.