EXHIBIT G

DOCKET NO.: CV-01-0344176S

\* \* \* \* \* \* \* \* \* \* \* \* \* \* X

TOWN OF RIDGEFIELD,                    :

               PLAINTIFF,        :        SUPERIOR COURT OF CONNECTICUT

    -VS-                               :        JUDICIAL DISTRICT OF DANBURY

EUREKA V, LLC, ET AL                   :        JANUARY 29, 2004

             DEFENDANTS.     :

\* \* \* \* \* \* \* \* \* \* \* \* \* \* X

B E F O R E:

        THE HONORABLE HOWARD J. MORAGHAN, JUDGE TRIAL
           REFEREE

A P P E A R A N C E:

                  COHEN AND WOLF, P.C.
                  BY:  MONTE E. FRANK, ESQUIRE
                      And
                      JONATHAN S. BOWMAN, ESQUIRE
                1115 Broad Street
                Bridgeport, Connecticut  06601
                  ATTORNEY FOR THE PLAINTIFF

                  SHIPMAN & GOODWIN, LLP
                  BY:  BARRY C. HAWKINS, ESQUIRE
                    1 Landmark Square
                    Stamford, Connecticut  06901
                  ATTORNEY FOR DEFENDANTS

                  GREGORY AND ADAMS, P.C.
                  BY:  MATHEW C. MASON, ESQUIRE
                    190 Old Ridgefield Road
                    Wilton, Connecticut  06897
                  ATTORNEY FOR DEFENDANTS

                               Donna Haas
                            Court Monitor

1   J O H N   L E A R Y:, called as a witness, was examined and

2   testified as follows:

3              THE CLERK:  Raise your right hand, please.

4              Do you solemnly swear or solemnly and sincerely

5   affirm, as the case may be, that the evidence you shall

6   give concerning this case, shall be the truth, the whole

7   truth and nothing but the truth, so help you God or upon

8   penalty of perjury?

9              THE WITNESS:  I do.

10             THE CLERK:  You may be seated.

11             Please state your name and address for the record

12   and spell your name, please.

13             THE WITNESS:  My name is John middle initial J.

14   Leary, L-E-A-R-Y.  My office address is 35 Elm Street,

15   New Haven, Connecticut.

16             MR. BOWMAN:  Your Honor, before we start with the

17   direct examination of Mr. Leary there are two typos

18   which have been corrected and were corrected at his

19   deposition and counsel has no objection to my

20   substituting the pages.  If that's all right with you?

21             THE COURT:  Counsel?

22             MR. HAWKINS:  That's fine, Your Honor.

23             THE COURT:  Very well.

24             MR. BOWMAN:  I'll just tell you what they are  --

25   Actually, maybe your exhibit has the first correction,

26   one is a page  --

7              THE COURT:  Which exhibit are we talking about?

1    and that's the portion of the property that's also located in the

2    CDD zoning classification.

3          And, it appeared to me, that the physically possible use

4    was to do some development on that CDD portion of the property and

5    to maintain the rear or the R residential portions of the site,

6    mostly RAA as open space.

7          Q    Maybe I wasn't clear in my question.  I was trying to ask

8    you, what your conclusion was with respect to what was legally

9    permissible?

10         A    I'm sorry.

11         Q    Sure.

12         A    What was legally permissible?

13         Q    Yeah.

14         A    And, I answered the physical question.

15         Q    Right.

16         A    I apologize.  Legally permissible uses included; in the CDD

17   zone portion of the property, which I think is about 213 acres,

18   various types of corporate development, research and development

19   and other types of facilities.  And, in the residential portions of

20   the property, which are the remaining 245 or so acres, single-

21   family development.

22         Q    And, was that consistent with then current zoning?

23         A    Yes.

24         Q    What role  --  What is the role of zoning, in connection

25   with the legally permissible analysis?

26         A    Zoning defines, at least, what is legally permissible as of

27   a given time, unless it is changed or modified.

1    Q   All right.   Now, I think you already answered the next

2   question, but let me just ask you one more with respect to physical

3   possibility; do I understand that the zone in which the most

4   developable portion falls is the CDD?

5    A   Correct.

6    Q   Okay.   Now, if you could turn to page A-18 of your report.

7   Assuming we're all on the same page, my version has a box in the

8   lower portion of that page that says, "Site Data"?

9    A   Yes.

10    Q   I just want to ask you a couple of questions about that, in

11   the portion of the box labeled, "Utilities" you talk about the fact

12   that quote, "Water capacity appears sufficient for site

13   development."   Close quote.

14    A   Yes.

15    Q   How did you determine that?

16    A   The various reports I read talked about what is known as

17   the east parcel of the overall Bennett Pond property, which was, in

18   fact, a potential well site on the east side of Route 7, just

19   across from the south and north parcels.   And, studies seem to

20   indicate that that was a suitable source of water for development

21   of some portions of this site.

22    Q   And, you also indicate, in that utilities category there

23   that, quote "Sewer requires expansion of existing plant and line

24   extensions."   Close quote.

25    A   Yes.

26    Q   What does that mean?

27    A   That means, that the existing plant that serviced that

1    Route 7/Route 35 area, directly south of the south portion of the

2    Bennett Pond property, had the ability to be expanded and that in

3    order to serve this site, it would have to be expanded and then

4    lines would have to be extended from that sewer, expanded sewer

5    plant, to this property to service development.

6         Q    Now, on page A-20, towards the bottom, you specifically

7    refer to the report prepared by Mr. Inglese in 1995?

8         A    Yes.

9         Q    Is that report consistent with the conclusions that you

10   drew with respect to the physical limitations of the property?

11        A    Yes.

12        Q    I guess we all know there's wetlands and steep slopes, so I

13   don't think we have to get into that.

14             Did you analyze the other two criteria issues of financial

15   feasibility and maximum profitability?

16        A    Yes.

17        Q    Where did you do that?

18        A    They're played out in the valuation section of the

19   appraisal.

20        Q    Okay.  So, what then, in conclusion, was your opinion as to

21   the highest and best use of the subject property?

22        A    My opinion was that the highest and best use, as set forth

23   on page A-21 of my report is twofold; that the eventual development

24   and marketing of the CDD portions of the property, including the

25   2.6 acres along the frontage that is surrounded by the CDD portion,

26   for a total of 215 acres, should be marketed as a corporate

27   facility site at or about the time that Route 7 widening project

1    was completed, which at that time, was scheduled for the summer of

2    2004.

3        Q    And, did that conclusion  --  Question withdrawn.

4             Was that conclusion consistent with present zoning?

5        A    Yes.

6        Q    And, did it recognize the physical limitations of the

7    property as you saw them?

8        A    Yes.

9        Q    And, was it something that was max  --  financially

10   feasible and capable of generating the maximum profitability for

11   the property?

12       A    Yes.

13       Q    Now, did you ask Eureka for it's protective development

14   costs associated with its initial purchase in February of '98 and

15   it's proposed mixed-use development?

16       A    Yes.  Can I  --  Can I backup to your previous question

17   just a moment, please?

18       Q    Yeah, I didn't mean to step on your toes there.

19            Go ahead?

20       A    I talked to you about the first part of the highest and

21   best use, which was the CDD portion of the site or 215 acres being

22   for eventual development for the corporate facilities.

23       Q    All right.

24       A    The remaining 245 acres.

25       Q    Right.

26       A    Which is the single family residential zone portions of the

27   site to the rear and surrounding the sensitive, Bennett Pond

1    wetlands, my highest and best use would be to set those aside for

2    open space.

3              THE COURT:  It's what?

4       A   I would set those aside for open space.  So, you would

5    develop the front portion of the property, leave the rear, all the

6    reports indicate that it's a very sensitive area and getting roads

7    in there for the limited number of lots that you could possibly

8    develop, would be counterproductive.

9       Q   Okay.  Just  --  Could you just keep your voice up, because

10   it does tend to tail off a little bit, the end, and I'm not giving

11   you  --  cutting you any slack for having been traveling either.

12           Now, my question, to repeat is, did you ask Eureka for its

13   projected development costs associated with its initial purchase in

14   its proposed mixed-use development?

        A   Yes.

16      Q   And, why did you do so?

17      A   I originally asked for that in my original assignment back

18   in 2000, so I could determine their rational for the original

19   purchase price of eight million dollars for the land in February of

20   1998.  And also to, if possible, factor in their development plans

21   and the cost of those plans to an analysis of the property.

22      Q   Did it have anything to do with your highest and best use

23   analysis?

24      A   Well, it would have been part of the over  --  it was part

25   of the overall highest and best use analysis.

26      Q   Okay.  And, did they give you those costs back in your 2000

     assignment?