LEXSEE 1995 U.S. DIST. LEXIS 22327

UNITED STATES OF AMERICA v. DUNCAN ROBINSON, ELIZABETH ROBINSON, RONAN-EDGEHILL NEIGHBORHOOD ASSOCIATION, JAMES BROWNLOW, ROBIE POOLEY, BEVERLY HODGSON, AND JOHN LEVENTHAL, Defendants.

Civ. No. 3:92CV00345 (TFGD)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

1995 U.S. Dist. LEXIS 22327

January 26, 1995, Filed

**DISPOSITION:** The defendants' objections to the magistrate's report and recommendation were sustained and the motions to dismiss were granted.

**COUNSEL:** [*1] For USA, plaintiff: John B. Hughes, U.S. Attorney's Office, New Haven, CT. Jennifer C. Cass, Paul F. Hancock, Brian F. Heffernan, Eileen Penner, U.S. Department Of Justice, Housing & Civil Enforcement Section, Washington, DC.

For DUNCAN ROBINSON, defendant: Joseph D. Garrison, Garrison, Phelan, Levin-Epstein, Chimes & Richardson, New Haven, CT. Lisa M. Grasso, Durant, Nichols, Houston, Mitchell & Sheahan, Bridgeport, CT.

For ELIZABETH ROBINSON, defendant: Joseph D. Garrison, Garrison, Phelan, Levin-Epstein, Chimes & Richardson, New Haven, CT.

For RONAN-EDGEHILL NEIGHBORHOOD ASSOCIATION, ROBIE POOLEY, defendants: Andrew B. Bowman, Law Offices Of Andrew Bowman, Westport, CT.

For BEVERLY HODGSON, JOHN LEVENTHAL, defendants: David S. Golub, Jonathan M. Levine, Silver, Golub & Teitell, Stamford, CT.

**OPINION**

**RULING ON OBJECTIONS TO RECOMMENDED RULING**

This action presents the question whether various homeowners and a neighborhood association can be liable under the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. §§ 3601 et seq.,[1] for the filing of a lawsuit seeking the enforcement of a facially valid zoning ordinance to bar a family containing [*2] handicapped foster children from occupying a residence without first obtaining a variance or special use permit. The defendants each moved to dismiss the government's Amended Complaint on the ground that the filing of the lawsuit was protected by the First Amendment, and the motions were referred to Magistrate Judge Thomas P. Smith. The Magistrate Judge recommended that the motions be denied, and the defendants filed timely objections. After *de novo* review, and for the reasons stated below, the defendants' objections are sustained and the motions to dismiss are granted.

   1   The Fair Housing Act constituted Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90-284, 82 Stat. 73, 81-89, and was amended by the Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619.

**BACKGROUND**

I. Facts

The government's Amended Complaint alleges the following facts. Marjorie Eichler ("Eichler") is the mother of seven adopted and three foster children. All ten children are handicapped. Eichler [*3] also is the president of There's No Place Like Home, Inc., a tax-exempt corporation whose primary purpose is to assist her in managing her family's financial affairs.

Eichler, acting on behalf of There's No Place Like Home, sought to purchase a larger home in March 1992. She placed a deposit on a former dormitory building, located at 150 Huntington Street in New Haven, Connecticut and owned by Albertus Magnus College, and the parties agreed to a closing date of June 16, 1992. Defen-

dant Robie Pooley ("Pooley"), president of defendant Ronan-Edgehill Neighborhood Association ("Neighborhood Association"), learned of the agreement and wrote to Albertus Magnus College, the College's realtor, and Eichler's realtor requesting information about the proposed use of the property. Pooley also attempted to gather a quorum of the Neighborhood Association to consider taking legal action. Meanwhile, defendants Duncan and Elizabeth Robinson ("the Robinsons"), Beverly Hodgson ("Hodgson") and John Leventhal ("Leventhal") consulted an attorney to discuss potential legal responses to the pending purchase of the building. In early April 1992 the Robinsons held a meeting of the Neighborhood Association [*4] to discuss the Eichlers' impending move into the neighborhood.

The Robinsons, who occupy the home next door to 150 Huntington Street, then filed suit in Connecticut Superior Court on May 1, 1992 against Eichler and There's No Place Like Home. Their complaint alleged that the Eichlers' proposed use of the property would violate New Haven's Zoning Ordinance, and it sought an order barring the family from occupying the property until Eichler obtained a zoning variance or special use permit. The Robinsons also sought a temporary restraining order on the ground that, in the absence of a variance or permit, occupancy by the Eichlers would cause them imminent harm by diminishing the attractiveness and value of their property. [2] The Superior Court issued an order directing the parties "to maintain the status quo" on May 18, 1992, thereby preventing Eichler and her family from assuming occupancy. Pooley, on behalf of the Neighborhood Association, then filed an intervening complaint joining the Robinsons' lawsuit, while the state joined the lawsuit as a defendant. [3]

> 2  The state complaint alleged the following specific injuries:
>
> > 1. [The Robinsons'] legal right and opportunity to appear to be heard by the New Haven Zoning Board of Appeals *prior to* [the Eichlers'] intended use will be infringed; and
> >
> > 2. Their right to use and enjoy their home consistent with their expectations of residence in an RS 1 District will be diminished or destroyed in that:
> >
> > > a. There will be increased noise, traffic and disruption from such impermissibly high density, including visits by [Department of Children and Youth Services] staff having responsibility for the unrelated minors placed with [Mrs. Eichler], the unrelated minors' relatives, and the general increased transportation needs;
> > >
> > > b. [The Robinsons'] right to the use and quiet enjoyment of their own property will be immediately and substantially impaired by the close proximity of the unlawful use of the adjoining Property, since that presence of the unrelated persons *in addition to* "family," [sic] under the circumstances presents a substantial likelihood that unsupervised pre-school children will enter [the Robinsons'] premises from [the Eichlers'] adjoining Property, thereby (1) diminishing [the Robinsons'] quietude and causing anxiety and worry for the children's safety and [the Robinsons'] liability therefore, (2) producing a noise and activity level antagonistic to the low density residential character of the neighborhood and (3) diminishing

Case 3:02-cv-00356-DJS    Document 122-5    Filed 06/11/2007    Page 3 of 6

Page 3
1995 U.S. Dist. LEXIS 22327, *

> the attractiveness, value and unique qualities [the Robinsons] have enjoyed and expected from an RS 1 zone.

State Complaint, P16 (emphases in original).

[*5]

3    Since Pooley's complaint on behalf of the Neighborhood Association merely sought permission to intervene, the Court considers the original and intervening complaints as a single lawsuit and looks to the original complaint as the basis of the government's allegations against all defendants.

Eichler and There's No Place Like Home then moved to dismiss the action and to dissolve the Court's stay order, and on May 26, 1992 the Superior Court held a hearing on the motions. During the course of the proceeding the presiding Superior Court Judge, the Honorable William J. Sullivan, inquired into the disabilities of the children who would be moving into the property. Eichler's counsel refused to divulge this information, arguing that a state statute prohibited such disclosure. The court recessed for lunch, and during the recess Eichler's counsel removed the case to federal court. This Court subsequently granted defendants' motion to remand the case to the Superior Court, concluding that no grounds for removal existed. *See Robinson v. Eichler*, 795 F. Supp. 1253 (D. Conn. 1992).

Eichler [*6] also responded to the defendants' lawsuit by filing a complaint of housing discrimination with the Department of Housing and Urban Development ("HUD"). On June 6, 1992 HUD referred the complaint to the United States Attorney General, who began an investigation. After the commencement of the investigation the Robinsons and the Neighborhood Association voluntarily dismissed the state lawsuit. The government then filed the instant action pursuant to the FHA, 42 U.S.C. § 3614(a).

## II. The State Lawsuit

The defendants' state complaint [4] alleged that Eichler intended to occupy the former dormitory at 150 Huntington Street as a "permanent family residence" [5] for the members of her family and "at least four foster children . . . unrelated . . . by blood, adoption or marriage." State Complaint PP14-15. The complaint asserted that the operation of such a residence at the proposed site, without a variance or special use permit, would violate the New Haven Zoning Ordinance because the proposed site was located in a zoning district designated as RS-1, which limits residences to single-family dwellings. *Id.* P15. [6] Article I of the Zoning Ordinance defines [*7] "family" as "one or more persons related by blood, marriage or adoption, and in addition, any domestic servants or gratuitous guests thereof; or a group of not more than four persons who need not be so related." New Haven Zoning Ordinance, Article I, § 1. Moreover, the Ordinance prohibits a homeowner in an RS-1 zone from taking in a roomer or boarder where the "family" is comprised of related persons. *See id.* The state complaint alleged that the Eichlers' proposed residence would violate zone RS-1 restrictions because the Eichlers, together with their foster children, fell under neither of the two definitions of "family" set forth in Article I. The defendants' lawsuit thus urged the Superior Court to interpret the term "family," as used in the New Haven Zoning Ordinance, so as to exclude foster children from those "related by blood, marriage or adoption."

4    The government relies extensively on the wording of the defendants' state complaint in support of its allegation that the filing of the lawsuit violated the FHA. The government did not, however, include the state complaint as an exhibit to its Amended Complaint, but submitted it as an attachment to a brief on the instant motion. This gives rise to a preliminary issue, which the parties have not addressed, as to whether the Court may review the state complaint when ruling on motions filed pursuant to Rule 12(b)(6).

In general a district court has discretion to accept or reject any supplementary materials offered in support of or response to a Rule 12(b)(6) motion, but if such matters are reviewed the court must consider the motion as one for summary judgment under Rule 56. *See Fonte v. Board of Managers of Continental Towers Condo*, 848 F.2d 24, 25 (2d Cir. 1992). The taking of judicial notice of facts outside the pleadings, however, does not so convert the motion. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). Judicial notice of the Robinsons' state complaint is appropriate here, as the complaint is a public document maintained by the Connecticut Superior Court and is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see, e.g., Kramer*, 937 F.2d at 774 (approving judicial notice of public disclosure documents filed with and maintained by the Securities and Exchange Commission); *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991) (approving judicial notice of filings in

bankruptcy court proceedings); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (citation omitted); *see generally* 2A James W. Moore & Jo D. Lucas, Moore's Federal Practice P12.09[3]. Accordingly, the Court considers the state complaint as the basis for the defendants' alleged violations of the FHA. The Court also takes judicial notice of the applicable sections of the New Haven Zoning Ordinance and the official regulations of the Connecticut Department of Children and Youth Services, *see* Moore's Federal Practice P8 17[12], as the latter department was named during the events in question. *See* 1993 Conn. Acts § 1 (Reg. Sess.) (renaming the Department of Children and Youth Services as the Department of Children and Families).

[*8]

5  *See* Conn. Gen. Stat. § 17a-154 (defining "permanent family residence" as "a child care facility . . . designed to provide permanent care to handicapped children in a home environment and family setting."). Regulations promulgated under this statute condition approval of a license for a permanent family residence on compliance with all local laws and ordinances, *see* Conn. Agencies Regs. § 17-52b-9(b), and require that any such facility comply with local maximum occupancy ordinances. *See id.* § 17-52b-2 ("When state statutes, administrative regulations or local ordinances limit the number of children to be cared for, such number shall be the maximum.").

6  Article III, § 11 of the New Haven Zoning Ordinance specifies that RS-1 districts "exist for the protection of certain fully developed single-family areas of relatively small total size but of unique and irreplaceable value to the community as a whole. The specific purpose of these districts is to stabilize and preserve the low-density residential character of these areas to the maximum possible extent."

The government [*9] alleges that by filing the lawsuit the Robinsons, Pooley, and the Neighborhood Association discriminated against the Eichler family because of its familial status, as defined in 42 U.S.C. § 3602(k),[7] and against the Eichler children because of their handicapped status, as defined by 42 U.S.C. § 3602(h).[8] The Amended Complaint further alleges that Leventhal and Hodgson, who were not parties to the state lawsuit, nonetheless discriminated against the Eichler family "by soliciting and orchestrating support" for the lawsuit in order "to interfere with the Eichlers' fair housing rights, because of the handicaps of the Eichler children and because of the foster child status of some of the children." Amended Complaint P27. Finally, the Amended Complaint alleges that the defendants acted intentionally, willfully, and with deliberate disregard for the rights of the Eichler family. *Id.* P37.[9]

7  Section 3604(a) of the FHA makes it unlawful to "make unavailable or deny[] a dwelling to any person because of . . . familial status." 42 U.S.C. § 3604(a); *see also* 42 U.S.C. § 3617 ("It shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of . . . any right granted by section . . . 3604 . . . of this title."). Section 3602(k) of the Act defines "familial status" as "one or more individuals (who have not attained the age of 18 years) being domiciled with . . . a parent or other person having legal custody of such individual or individuals." 42 U.S.C. § 3602(k).

[*10]

8  The FHA defines handicap as follows:

> "Handicap" means, with respect to a person--
>
> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
>
> (2) a record of having such an impairment, or
>
> (3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance as defined in section 802 of Title 21.

42 U.S.C. § 3602(h).

9  The government dismissed its allegations against another defendant, James Brownlow, on October 19, 1992.

The defendants moved to dismiss the Amended Complaint, arguing that the filing of the lawsuit was pro-

Case 3:02-cv-00356-DJS    Document 122-5    Filed 06/11/2007    Page 5 of 6

Page 5
1995 U.S. Dist. LEXIS 22327, *

tected by the First Amendment. Magistrate Judge Thomas P. Smith, in a thoughtful opinion, rejected these arguments and recommended that the Court deny the motions. The defendants filed timely objections to the Magistrate Judge's opinion, and accordingly the Court reviews the motions to dismiss *de novo*. 28 U.S.C. § 636(b)(1).

## DISCUSSION

As the defendants seek dismissal [*11] of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court's review follows the well-established precept that such motions will not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); *see also Patton v. Dole*, 806 F.2d 24, 30 (2d Cir. 1986). The Court therefore accepts all factual allegations set forth in the Amended Complaint as true and draws all reasonable inferences from those allegations in the light most favorable to the government. *Scheuer v Rhodes*, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); *Corcoran v American Plan Corp.*, 886 F.2d 16, 17 (2d Cir. 1989). The defendants assert that this action should be dismissed because the filing of the state lawsuit was entitled to either absolute or qualified immunity under the First Amendment. These arguments will be discussed in turn.

### I. Absolute Immunity

The filing of a complaint in court is a form of petitioning activity protected by the [*12] First Amendment.[10] *See McDonald v. Smith*, 472 U.S. 479, 484, 86 L. Ed. 2d 384, 105 S. Ct. 2787 (1985). Relying on this right, the defendants and Amicus Curiae Center for First Amendment Rights, Inc. ("Amicus Curiae") initially contend that because the state lawsuit sought a judicial interpretation of a facially valid ordinance, the act of filing that lawsuit was absolutely protected. *See, e g.*, Hodgson and Leventhal's Response at 8-9; Amicus Curiae's Mem. at 4-6. This contention is without merit.

> 10   The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I.

Noting that the Petition Clause is "cut from the same cloth as the other guarantees of the [First] Amendment," *McDonald*, 472 U.S. at 482, the defendants and Amicus Curiae argue that courts consistently have rejected attempts to balance equality [*13] rights with the right of free speech. For example, Amicus Curiae cites two cases, *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir. 1985), *aff'd mem.*, 475 U.S. 1001 (1986), and *Collin v. Smith*, 578 F.2d 1197 (7th Cir. 1978), *cert. denied*, 439 U.S. 916, 58 L. Ed. 2d 264, 99 S. Ct. 291 (1978), for the proposition that courts consistently have rejected attempts to balance equality rights with the right of free speech. *Hudnut* involved an Indianapolis ordinance which prohibited production and distribution of "pornography," defined as "'the graphic sexually explicit subordination of women.'" *Hudnut*, 771 F.2d at 324 (quoting ordinance). The ordinance was intended to advance equality values, in that the city sought through the ordinance to prevent the subjugation of women to men created and preserved by pornography. *Id.* at 324-25. Likewise, *Collin* involved a Skokie, Illinois ordinance prohibiting "'the dissemination of any material . . . which promotes and incites hatred against persons by reason of their race, national origin, or religion,'" in an effort to prevent discrimination [*14] against minorities. *Collin*, 578 F.2d at 1199 (quoting ordinance). In each case the Seventh Circuit rejected efforts to balance the First Amendment rights of persons potentially subject to the ordinances against the equality rights of women or minorities. *See Hudnut*, 771 F.2d at 325, 331-32; *Collin*, 578 F.2d at 1203-05; *see also The UWM Post, Inc. v. Board of Regents of the University of Wisconsin*, 774 F. Supp. 1163 (E.D. Wis. 1991) (invalidating, on First Amendment grounds, a university speech code designed to foster equality by prohibiting students from using discriminatory epithets). Indeed, the *Collin* court specifically found insufficient the municipality's argument that the hate speech ordinance advanced its fair housing policy by discouraging racial animus. *See Collin*, 578 F.2d at 1205.

These and analogous cases rest on the premise that free speech and equality rights do not conflict when the "competition of ideas" itself ultimately protects and advances equality rights. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974); *Hudnut*, 771 F.2d at 332; [*15] *Collin*, 578 F.2d at 1203 (quoting *Gertz*). This premise fails, however, in situations where First Amendment rights conflict directly with other rights. *See, e g.*, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 65 L. Ed. 2d 973, 100 S. Ct. 2814 (1980) (balancing First Amendment with Sixth Amendment rights in case brought by newspaper seeking reversal of order closing murder trial to public).

In this action the filing of the state lawsuit created a conflict between the defendants' First Amendment right of petition and the Eichlers' statutory right to equality in housing. In the face of this conflict the defendants' First Amendment right of petition does not provide absolute immunity protecting the filing of the state lawsuit from

liability under the FHA. *See McDonald*, 472 U.S. at 485 (holding defendant's right to petition not absolute where it conflicted with plaintiff's common-law right to be free from defamatory statements). The petitioning activity reflected in the defendants' lawsuit therefore deserves only a qualified First Amendment immunity. This qualified immunity depends on whether the state lawsuit was a genuine [*16] exercise of the right to petition or whether it constituted baseless litigation. *See id.* at 484 (holding First Amendment does not "include an unqualified right to express damaging falsehoods in exercise of [the right to petition]."); *Bill Johnson's Restaurants, Inc v NLRB*, 461 U.S. 731, 743, 76 L. Ed. 2d 277, 103 S. Ct. 2161 (1983) ("Just as false statements are not immunized by the First Amendment right to freedom of speech, . . . baseless litigation is not immunized by the First Amendment right to petition.") (citations omitted); *accord*, *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 30 L. Ed. 2d 642, 92 S. Ct. 609 (1972). [11]

[11] This finding of qualified immunity under the Petition Clause should not be confused with the Supreme Court's recent rejection of qualified immunity for private persons in cases brought under 42 U.S.C. § 1983. *See Wyatt v. Cole*, 504 U.S. 158, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992). *Wyatt* resolved a question left open in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 n.23, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982), as to whether a private defendant is entitled to qualified immunity, in actions brought under 42 U.S.C. § 1983, for attaching property pursuant to a facially valid prejudgment attachment statute subsequently found to be unconstitutional. Following *Lugar*, decisions in several circuits extended the qualified immunity granted state officials under § 1983 to private citizens who requested enforcement of presumptively valid laws and engaged in constitutionally protected speech. *See, e.g., Jones v. Preuit & Mauldin*, 851 F.2d 1321, 1325 (11th Cir. 1988), *vacated on other grounds*, 489 U.S. 1002 (1989); *Buller v. Buechler*, 706 F.2d 844, 850-52 (8th Cir. 1983); *Folsom Inv. Co. v. Moore*, 681 F.2d 1032, 1037-38 (5th Cir. 1982). These courts held that a private citizen cannot be liable under § 1983 for urging governmental action unless that action would violate a clearly established constitutional or statutory right of which the defendants knew or should have known. *See Folsom*, 681 F.2d at 1037. *Wyatt* rejected this approach, holding that private citizens who rely on state laws are not entitled to the protection from liability accorded public officials under § 1983. *See Wyatt*, 112 S. Ct. at 1835-37.

The *Wyatt* Court rested its holding on an analysis of the basis of the judicially-created immunity for public officials under § 1983, finding that this immunity derived from the need to protect the functioning of government. *Id.*; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 815, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). Moreover, the *Lugar* line of cases involve allegations that a private defendant conspired with state officials to violate the plaintiff's constitutional rights through the use of the judicial system to effectuate the attachment of property. As discussed below, no such extra-judicial conduct exists in this action. *See infra* pp. 20-23. Finally, the above cases do not involve a consideration of immunity derived from the Petition Clause. Instead, the lower-court cases decided prior to *Wyatt* demonstrate judicial efforts to protect private citizens' right to rely on facially valid statutes if such reliance is objectively reasonable. *See, e.g., Folsom*, 681 F.2d at 1037.

[*17] **II. Qualified Immunity**

A. *Applicable Standard*

The Court therefore must assess whether the defendants' lawsuit was "baseless," an issue for which no definitive standard exists. The defendants argue for an objective test, asserting that if their lawsuit was supported by "objective probable cause" the filing of that lawsuit is protected under the Petition Clause. *See, e.g.,* Hodgson and Leventhal's Response at 4. The government argues, in response, that the Court must also consider the defendants' alleged discriminatory intent and the lawsuit's illegal objective. *See, e.g.,* Govt's Response at 5 n.3.

The defendants principally rely on the *Noerr-Pennington* doctrine. [12] *Noerr-Pennington* generally holds that the First Amendment protects the filing of a lawsuit from antitrust liability unless the suit "'is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor.'" *Professional Real Estate Investors, Inc v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 113 S. Ct. 1920, 1923, 123 L. Ed. 2d 611 (1993) (quoting *Eastern R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 5 L. Ed. 2d 464, 81 S. Ct. 523). To determine whether a lawsuit falls under [*18] the sham exception, a court must first determine whether the lawsuit was objectively baseless "in the sense that no reasonable litigant could expect success on the merits." 113 S. Ct. at 1928. Only if this question is answered in the affirmative must the court investigate the defendant's subjective motivation, defined as the intent to