UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _x

|  |  |  |
|---|---|---|
| EUREKA V LLC, | : | |
| | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 302 CV 356 (DJS) |
| VS. | : | |
| | : | |
| THE TOWN OF RIDGEFIELD, THE BOARD | : | |
| OF SELECTMEN OF THE TOWN OF | : | |
| RIDGEFIELD, THE BOARD OF FINANCE OF | : | |
| THE TOWN OF RIDGEFIELD, THE | : | |
| ECONOMIC DEVELOPMENT COMMISSION | : | |
| OF THE TOWN OF RIDGEFIELD, THE | : | |
| BENNETT'S FARM DEVELOPMENT | : | |
| AUTHORITY, BARBARA SERFILIPPI, IN | : | |
| HER OFFICIAL CAPACITY AS THE TOWN | : | |
| CLERK OF THE TOWN OF RIDGEFIELD and | : | |
| THE PLANNING AND ZONING COMMISSION | : | |
| OF THE TOWN OF RIDGEFIELD, | : | |
| | : | |
| Defendants. | : | |
| | : | SEPTEMBER 25, 2007 |

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:x

## [PROPOSED] THIRD AMENDED COMPLAINT

### Nature of the Action

1.    This is an action, <u>inter alia</u>, to enjoin the Defendants from (i) taking by eminent domain the Plaintiff's real property located in Ridgefield, Connecticut, and (ii) implementing the Bennett's Farm Corporate Park Preliminary Project Plan.   In short, in early 2001, the Selectmen of the Town of Ridgefield decided in bad faith to take Plaintiff's property and stop its plans for developing affordable housing on the property, and set about to create a pretext for doing so.  The proposed taking is unlawful and constitutes an abuse of the municipal power of eminent domain for several reasons

including that (i) it is undertaken in bad faith and as a pretext to take control of the property from Eureka and stop its development plans, in particular its plans for affordable housing on the site, (ii) it is unnecessary and unreasonable since the Plaintiff itself has proposed a commercial development on much of the property that is comparable to that proposed in the Bennett's Farm Corporate Park Preliminary Project Plan, (iii) the preparation and approval of the Bennett's Farm Corporate Park Preliminary Project Plan were a sham, and (iv) it is not for a valid public purpose.

2.      Implementation of the Bennett's Farm Corporate Park Preliminary Project Plan should be enjoined because (i) its preparation and approval were a sham, (ii) it fails to comply with the statutory requirements of Connecticut General Statutes Chapter 132 regarding municipal development projects, (iii) it is contrary to the intent of Conn. Gen. Stat. § 8-186, since the Plaintiff itself has proposed a commercial development on the subject property which is comparable in size and scope to the development proposed by the defendants, (iv) it does not constitute a bona fide plan for a municipal development project, (v) is not for a valid public purpose and (vi) is designed to stop Plaintiff's affordable housing plans.

**<u>The Parties</u>**

3.      Plaintiff Eureka V LLC ("Eureka" or the "Plaintiff") is a Delaware limited liability company with its principal place of business in New York, New York.  None of its members is a citizen of Connecticut. Eureka, whose principals are experienced developers, is the owner of approximately one hundred and fifty-five (155) acres of real property located to the south of Bennett's Farm Road at U.S. Route #7 in Ridgefield,

Connecticut (the "South Parcel"). Attached as Exhibit A hereto is the legal description of the South Parcel.

4.     Defendant Town of Ridgefield is a municipal corporation of the State of Connecticut ("Ridgefield").

5.     Defendant Board of Selectmen of the Town of Ridgefield ("Board of Selectmen") is the duly elected executive body of the Town of Ridgefield. At all relevant times prior to November 20, 2001, the Board of Selectmen was comprised of First Selectman Rudy Marconi and Selectmen Barbara Manners, Dr. Peter Yanity, Steve Zemo and Joseph Heyman. On November 20, 2001, Joan Plock replaced Mr. Heyman on the Board.

6.     Defendant Economic Development Commission of the Town of Ridgefield (the "EDC") is a commission of the Town of Ridgefield established pursuant to Conn. Gen. Stat. §7-136 and the Ridgefield Town Charter and is empowered to assist the Town with municipal development projects.  The EDC was created pursuant to an ordinance passed on August 8, 2001 that became effective on or about August 31, 2001.

7.     Defendant Bennett's Farm Development Authority ("BFDA") is an authority of the Town of Ridgefield that was created on January 9, 2002, pursuant to the Ridgefield Town Charter and Conn. Gen. Stat. §8-186, et seq.

8.     Defendant Board of Finance of the Town of Ridgefield ("Board of Finance") is a board of the Town of Ridgefield that is charged in Article 10 of the Ridgefield Town Charter with, inter alia, appropriation of funds.

9.     Defendant Barbara Serfilippi is the duly elected Town Clerk of Ridgefield and is sued herein in her official capacity.

10.     Defendant the Planning and Zoning Commission of the Town of Ridgefield ("Planning and Zoning Commission") is a commission of the Town of Ridgefield, Connecticut that is empowered, inter alia, pursuant to Conn. Gen. Stat. §8-1, et seq. to adopt and amend Zoning Regulations of the Town of Ridgefield.

### Jurisdiction and Venue

11.     The jurisdiction of this Court is invoked based upon diversity of citizenship of the parties under 28 U.S.C. §1332 and the existence of a federal question under 28 U.S.C. §1331.  Plaintiff is a Delaware limited liability company having its principal place of business in the State of New York. None of its members is a citizen of the State of Connecticut. Each of the Defendants is a citizen of the State of Connecticut. The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. §1332, as evidenced by the fact that the Town of Ridgefield seeks to acquire the subject real property for $2,750,000.00.  Jurisdiction is also predicated on the existence of a federal question under 28 U.S.C. §1331, as Plaintiff asserts a claim under the Federal Fair Housing Act (Third Count), as well as an attempted taking of real property in violation of the United States Constitution (Count Two).  The Court has pendant jurisdiction over plaintiff's state law claims.

12.     Venue is proper in this district under 28 U.S.C. §1391(b) in that the real property that is the subject of this action is located within this District and the events or omissions giving rise to the claims herein occurred in this District.

**Background of the Bennett's Farm Property
And Its Purchase by Eureka**

13.    In February 1998, Eureka acquired approximately 682 contiguous acres of real property located in Danbury (69 acres) and Ridgefield (613 acres), Connecticut from the IBM Corporation.  In Ridgefield, 458 acres are located to the north of Bennett's Farm Road (the "North Parcel") and were taken from Eureka by the Town of Ridgefield on December 20, 2001, by eminent domain.  The remaining 155-acre tract is located to the south of Bennett's Farm Road (the "South Parcel") and is the subject of this action (collectively, the North Parcel and the South Parcel are referred to herein as the "Bennett's Farm Property").

14.    The Bennett's Farm Property consists of approximately 370.4 acres zoned CDD (Corporate Development District), 237.1 acres zoned RAAA (Residential 3 Acres), 2.0 acres zoned RAA (Residential two acre) and 5.9 acres zoned RA (Residential 1 Acre), all as defined in the zoning regulations of the Town of Ridgefield.  The entire 155-acre South Parcel is zoned CDD.

15.    Between 1995 and 1998, IBM publicly marketed the Bennett's Farm Property for sale.

16.    In May 1995, upon learning of IBM's plans to sell the Bennett's Farm Property, the Planning and Zoning Commission of the Town of Ridgefield ("Planning and Zoning") made a request to the Selectmen that the Town purchase it for open space.

17.    Ridgefield never made an offer to IBM to purchase the Bennett's Farm Property.

18.     In February 1998, Eureka acquired the Bennett's Farm Property from IBM.

### Eureka's Attempts to Develop the Bennett's Farm Property and Its Filing of an Affordable Housing Mixed Use Master Plan of Development

19.     In April, 1999, Eureka filed with the Planning and Zoning Commission of the Town of Ridgefield an application for a zone change and text amendment as part of a proposed development of the Bennett's Farm Property that would include a 475,000 square foot office-hotel/conference center, an 18-hole golf course and 286 age restricted town homes.  The application was met with vigorous organized special interest opposition, in particular from the newly created Ridgefield Open Space Association ("ROSA"), a not-for-profit neighborhood association whose stated mission is "[t]o preserve the 680 acre Bennett's Pond Property as open space in perpetuity . . . ." Stopping Eureka's development plans and taking control of the property became a significant political issue in Ridgefield, in large part because ROSA and others believed the Town wasted the opportunity to purchase it from IBM. Eureka's application was denied by the Planning and Zoning Commission in September, 1999.

20.     On or about October 14, 1999, Eureka applied for a permit from the Inland Wetlands Board of the Town of Ridgefield ("Wetlands Board") to allow five wetlands crossings necessary to construct a loop road from Bennett's Farm Road to two proposed residential subdivisions totaling 13 lots on the North Parcel. On April 13, 2000, the Wetlands Board denied the application for several reasons, primarily because it claimed it needed to know how Eureka intended to develop the entire 682-acre tract before it could properly rule on the wetlands application.  On appeal, the Connecticut Superior

6

Court rejected this claim, but nonetheless dismissed the appeal, based upon a finding that there were reasonable and prudent alternatives for location of the proposed road.

21.    On January 24, 2001, as part of the Planning and Zoning Commission's pre-application process for a proposed 10 lot subdivision on a portion of the North Parcel (see paragraph 22, infra), Eureka filed with the Commission's staff an "Affordable Housing Mixed Use Master Plan of Development" ("Master Plan"), which showed Eureka's plans for development of the entire Bennett's Farm Property.  The Master Plan shows (i) a residential development of 710 units (including the 10 lot subdivision), of which 30 percent would constitute affordable housing under Connecticut's Affordable Housing Appeals Procedure, Conn. Gen. Stat. §8-30g, and (ii) 445,000 square feet of commercial development.  The proposed development of the South Parcel was for 150 residential units, 30 percent of which would constitute affordable housing, and all 445,000 square feet of commercial development.

22.    The contents of Eureka's Master Plan, including its affordable housing component, were widely reported in the local press. For example, an article in the February 19, 2001 Danbury News Times reported as follows: "The company [Eureka] has filed a plan that calls for hundreds of homes, including some deemed affordable under state law."  Eureka's Master Plan was also discussed by the Board of Selectmen on January 31, 2002, before the Planning and Zoning Commission during public hearings on May 29, 2001, and July 31, 2001, on Eureka's application for a 10 lot subdivision, and at various public hearings as described below.

23.    On March 14, 2001, Plaintiff filed (i) an application with the Planning and Zoning Commission for a ten-lot subdivision and (ii) an application with the Wetlands

Board for various regulated activities within wetlands and/or upland review areas, including to construct a loop road from Bennett's Farm Road to provide access to seven of the ten lots of the proposed subdivision. These applications met with organized special interest opposition, particularly from the now politically powerful ROSA, which once again vilified Eureka and expressed unqualified opposition to any development of the Bennett's Farm Property.

24.    On September 4, 2001, the Wetlands Board denied Plaintiff's wetlands application, and on September 25, 2001, the Planning and Zoning Commission denied the subdivision application. Eureka appealed these decisions to the Connecticut Superior Court, but withdrew the appeals as moot following Ridgefield's taking of the North Parcel on December 20, 2001.

25.    On August 31, 2001, the Plaintiff filed with the Planning and Zoning Commission an application for a zone change and amendment to the Town Plan of Conservation and Development as part of a development plan consistent with its Master Plan filed in January 2001, including 700 residential units (plus the 10 lot subdivision) of which 210 would constitute affordable housing under Conn. Gen. Stat. §8-30g. Like the Master Plan, this application proposed to develop the South Parcel with 445,000 square feet of commercial development and 150 residential units. That application was withdrawn as a result of the acquisition of the North Parcel by the Town of Ridgefield by eminent domain.

26.    On March 7, 2005, Eureka filed an application for a zone change and amendment to the Town Plan of Conservation and Development as part of a development plan for 510 residential units that would constitute affordable housing under Conn. Gen.

Stat. §8-30g. This plan contemplates sewer from the City of Danbury, as evidenced by a letter from the City of Danbury indicating its willingness and ability to provide such service, and water from Bridgeport Hydraulic Company pursuant to a Diversion Permit application by the Connecticut Department of Environmental Protection (the "March 2005 Applications").

27.    The Planning and Zoning Commission directed its staff to prepare a resolution of denial of the March 2005 Applications, but the March 2005 Applications were withdrawn pursuant a Settlement Agreement between Eureka and the Town of Ridgefield (dated August 31, 2005) prior to the Commission voting on that resolution.

### Bennett's Farm Property for Open Space

28.    Soon after Eureka filed its Master Plan in late January 2001 showing a substantial affordable housing component, the Selectmen began actively to pursue acquisition of the Bennett's Farm Property by eminent domain.

29.    The Selectmen initially determined that Ridgefield should take the entire Bennett's Farm Property for open space.

30.    The Selectmen's overriding objective in pursing eminent domain was to take control of the property and ensure that there would be no residential development -- and in particular, no affordable housing on the property.

31.    On February 7, 2001, the Board of Selectmen voted to accept two petitions obtained by ROSA calling for a referendum on purchasing the North and South Parcels for open space, and voted to refer the petitions to the Board of Finance for its approval.

32.    At a special meeting on February 19, 2001, the Board of Finance rejected two motions relating to the taking of the North and South Parcels for open space, specifically: (a) a motion that "the Board of Finance recommend that the Town of Ridgefield appropriate $3,060,000.00 for acquisition of approximately 155 acres of largely undeveloped land located south of Bennett's Farm Road in Ridgefield, currently owned by Eureka V LLC, to be maintained by the town as open space, or used for recreational or other municipal purposes …" and (b) a motion that "the Board of Finance recommend that the Town of Ridgefield appropriate $8,260,000.00 for acquisition of approximately 458 acres of largely undeveloped land located to the north of Bennett's Farm Road in Ridgefield, currently owned by Eureka V LLC, to be maintained by the town as open space…"  (emphasis added).

33.    The Board of Finance's refusal to approve the motions for appropriation of funds for taking of the North or South Parcels led to a series of attacks on it by some of the Selectmen, ROSA and others (including claims that the Board was not legally constituted and had committed ethical violations), consideration of legal action against it, and even attempts to revise the Town Charter to allow a land acquisition referendum without approval of the Board of Finance.

### The Selectmen's Efforts to Create a Pretext to Take the Property

34.    The Board of Finance's refusal to support taking of the entire Bennett's Farm Property for open space led the Selectmen to explore and create alternative schemes by which Ridgefield could take control of Eureka's property.

35.    As reported in the Ridgefield Press, the Selectmen even considered designating the Bennett's Farm Property a "port district" under a state statute that allows

towns to establish a port authority to administer and take property by eminent domain.

[<u>Ridgefield</u> <u>Press</u>, July 26, 2001.]

36.     In April 2001, the Selectmen conducted two public hearings and a Town Meeting on the potential acquisition of the property and specifically on two *advisory* questions:

> 1) To consider a resolution to advise the Board of Selectmen and the Board of Finance of the Town Meeting's desire that the Town acquire, through negotiated purchase or through the exercise of the Town's power of eminent domain, the approximately 613 acres of land, and any appurtenances thereto, located to the north and south of Bennett's Farm Road in Ridgefield currently owned by Eureka V LLC, known as the "Bennett's Pond Property" at an estimated cost including legal and administrative expenses in connection with the acquisition, of $10,800,000, the property to be maintained by the Town for <u>open space</u>, recreation and other municipal purposes (emphasis added).

> 2) To consider a resolution to advise the Board of Selectmen and the Board of Finance of the Town Meeting's desire that, if the resolution presented under Item 1 is defeated, the Town acquire, through negotiated purchase or through the exercise of the Town's power of eminent domain, the approximately 458 acre portion of said "Bennett's Pond Property" located to the north of Bennett's Farm Road in Ridgefield, at an estimated cost including legal and administrative expenses in connection with the acquisition of $8,000,000, the property to be maintained by the town as open space.

37.     The Board of Selectmen held public hearings on these advisory questions and the proposed taking of the Bennett's Farm Property for open space on April 11 and 25, 2001, and a Town Meeting was held on May 5, 2001.

38.     Selectman Manners made clear her goals at the April 11, 2001 public hearing, stating that she "would like to see the Town in control of the entire parcel to do what it sees fit."

39.   At the same hearing, First Selectman Marconi, after describing Eureka's affordable housing plans, expressed his views regarding Connecticut's affordable housing laws:

> It's an open-ended question [whether it can build 700 units], but the possibility of it, I believe is slim.  *But, nonetheless, it's a threat and it's been used many, many times before. It's a horrible piece of legislation [Conn. Gen. Stat. § 8-30g]. Attempts have been made to remove it at the State, they refused to even get it on the floor, and it's hurt communities such as Ridgefield across the state where developers have used this as a tool, as a club over the heads of the P and Z Commission, to force them to approve their projects.  That's something that we have to deal with now.* (Emphasis added).

40.   On April 17, 2001, the Planning and Zoning Commission reported favorably to a Conn. Gen. Stat. §8-24 referral from the Board of Selectmen that acquisition of the entire Bennett's Farm Property for open space was consistent with the Town's Plan of Conservation and Development. It did so notwithstanding a pending application before it by Eureka for a subdivision on the North Parcel. (See paragraph 22 supra.)

41.   The following day, the Selectmen met with the Board of Finance to explain their plan to acquire the North and South Parcels for open space. There was extensive discussion about the advisory questions and the "estimated" figures contained in the questions.  As the Minutes of the Board of Finance's Meeting on April 18, 2001 reflect, when asked why the Selectmen couldn't wait until they had an updated appraisal and firmer figures, Mr. Marconi responded as follows:

> *"Because we need to get some bullets in our gun.* We haven't done anything. We've got a gun in our holster, we can flash it but there's nothing in there. We haven't taken any action as a Town. P&Z has now in fact taken action giving CGS §8-24 approval. We want to get on the record, it's been going on for two and a half years. We've discussed

eminent domain, we've discussed the purchase, but we really haven't taken any formal action. It's important for the record that we establish ourselves as a community wanting to pursue the acquisition of property at Bennett's Pond for the purpose of open space, and that's what we're trying to do (emphasis added)."

42.     Two *advisory* questions were placed on the May 15, 2001 budget referendum ballot as follows:

1.     Shall the Town Meeting advise the Board of Selectmen and the Board of Finance of its desire that the Town acquire the Bennett's Pond property through negotiated purchase or by exercise of the power of eminent domain, at an estimated cost of $10,800,000?

2.     Shall the Town Meeting, if the resolution regarding the acquisition of the entire Bennett's Pond property is defeated, advise the Board of Selectmen and the Board of Finance of its desire that the Town acquire the northern parcel of said property, at an estimated cost of $8,000,000?

On the first question 54% voted yes and 46% no, and on the second question 57% voted yes and 43% voted no.  The results of the vote on the advisory questions led the Board of Selectmen to continue their efforts to acquire the entire Bennett's Farm Property for open space.

43.     On June 27, 2001, the Board of Selectmen again met with members of the Board of Finance to discuss acquisition of the property. As the Minutes of the June 27, 2001, Board of Selectmen's meeting reflect, the Board of Selectmen confirmed their desire to acquire control of the entire property so as to prevent residential development on the site:

<u>Mr. Scarbrough [of the Board of Finance] raised the issue of $2.5 million dollars in tax revenue lost if the property becomes open space.</u> Cited one of Standard and Poor's reasons for giving Town of Ridgefield a Aaa rating was the future tax base growth in Ridgefield and specifically cited Eureka's development of the Bennett's Pond property. "The financial health and well-being of the Town is the responsibility of the Board of Finance," Mr. Scarbrough [of the Board of Finance] stated. [Selectman]

Ms. Manners cited studies identifying open space as the most economical course for municipalities. Both [Selectman] Ms. Manners and [Selectman] Mr. Zemo stated that residential development that creates burdens on infrastructure, construction of additional schools and operating costs would offset tax revenue  (emphasis added).

### The Defendants' Action to Create a Corporate Park As A Pretext for Acquiring the Bennett's Farm Property, Including the South Parcel, by Eminent Domain

44.     On July 18, 2001, the Board of Selectmen passed a resolution that provides in pertinent part as follows:

**RESOLVED,** that the Board of Selectmen recommends that the Town of Ridgefield appropriate $11,600,000 for acquisition of real property as follows:

A.     $8,700,000 for acquisition of approximately 458 acres of land, and any appurtenances thereto, located to the north of Bennett's Farm Road in Ridgefield, currently owned by Eureka V LLC, known as the northern parcel of the "Bennett's Pond Property', the property to be maintained by the Town for *open space*, recreation and other municipal purposes . . .

B.     $2,900,000.00 for: (1) *acquisition for corporate, municipal and/or purposes set forth in Section 8-187 or 32-222 of the Connecticut General Statutes, of approximately 155 acres of land*, and any appurtenances thereto, located to the south of Bennett's Farm Road in Ridgefield, currently owned by Eureka V, LLC, known as the southern parcel of the "Bennett's Pond Property" (estimated cost $2,750,000); and (2) *for the preparation of a plan for a development project or a municipal development project pursuant to Chapter 132 or Charter 5881, respectively, of the General Statutes of Connecticut*. . . . (emphasis added).

45.     Later that same day, the Board of Finance, after meeting in executive session with the First Selectman and his counsel, approved the same resolution approving expenditure of up to $11.6 million for the Bennett's Farm Property providing for acquisition of the North Parcel for open space and the South Parcel for a municipal development project.

46.     Chapter 132 of the General Statutes, §§ 8-186 to 8-193, provides the statutory framework for the municipal acquisition and improvement of real property for

business and industrial purposes.  These include designation of an economic development commission (§8-188), preparation of a "project plan" (§8-189), and approval of the plan by the economic development commission and the municipality's legislative body (§8-191).  Following the requisite approvals of a project plan, and only after such approvals, may the municipality acquire property by eminent domain as provided for in Conn. Gen. Stat. §8-193.

47.     Following the Resolutions described in paragraphs 41 and 42 above, the Selectmen scheduled public hearings on August 29 and September 12, 2001, a Town Meeting on September 12, 2001, and a referendum on September 25, 2001, on the taking of the Bennett's Farm Property.

48.     On July 27, 2001, under Conn. Gen. Stat. § 8-24, the First Selectman referred to the Planning and Zoning Commission the question of whether the following would be consistent with the Town Plan of Conservation and Development: (1) acquisition of 458 acres north of Bennett's Farm Road for "open space, recreation and other municipal purposes" and (2) acquisition of the south 155 acres for "corporate, municipal and/or purposes set forth in Sec. 8-187 or 32-222 of Conn. Gen. Statutes."

49.     On July 31, 2001, the Planning and Zoning Commission issued a favorable report on the acquisition of both parcels, finding it consistent with the 1999 Plan of Conservation and Development.

50.     On August 8, 2001, following a public hearing, an ordinance was passed in Ridgefield creating for the first time an Economic Development Commission ("EDC") pursuant to Conn. Gen. Stat. §§7-138 and 8-188, which became effective on or about August 31, 2001.

51.    The Board of Selectmen's first public hearing on the proposed taking was held on August 29, 2001. First Selectman Marconi explained the plans to take the North Parcel for open space and the South Parcel for a municipal development project, and that EDC had been created as part of that process.

52.    Public discussion at the August 29, 2001, public hearing centered on Eureka's affordable housing plans and the development potential of the site.   The Selectmen's true motives in seeking to take the Property again were revealed, as Selectman Manners explained how affordable housing can be used to "bust" the zoning and Mr. Marconi explained his desire that the Town control the property:

> Ms. Day [a resident] asked why would we ever want to change the zoning and allow Eureka to develop the land? Why not let the Planning and Zoning Commission handle this?
>
> Ms. Manners explained that Eureka V submitted a 700 [unit] Residential Plan. **They <u>can</u> bust the zoning regulations if they put in 30% low income housing units (which would cost $350,000).** The Planning and Zoning Commission will not give Eureka V what it wants.
>
> Mr. Marconi furthered the point by saying that by obtaining Bennett's Pond Road **we would take control of our own destiny.** There is 2 million square feet that can be developed as corporate as it is zoned now. (with consideration on the impact it would have on Route 7). The Planning and Zoning Commission's efforts to resist Eureka V could go on for years and incur lot of legal entanglements.

[Certified Minutes of August 29, 2001 Public Hearing (underlining in original, emphasis added).]

53.    On September 5, 2001, the Selectmen appointed themselves as the members of the newly created EDC, and stated their intention that there would be a Bennett's Farm Development Authority made up of local business leaders to work on project plans for the South Parcel.

54.    The second public hearing was held on September 12, 2001, followed by a Town Meeting.  Selectman Heyman gave his remarks in opposition to the proposed taking which resulted in First Selectman Marconi interrupting him and directing the other Selectmen that there was to be no further discussion of affordable housing:

MR. HEYMAN:        For the record, my name is Joseph Heyman ……

What was submitted to the Planning and Zoning Commission, which I saw, and I looked at it the other day, is an application for 710 homes. Under state law, under the affordable housing act, they can eliminate or not go along with local zoning, it then becomes the burden of the town to give reasons why we should deny it. And we've been mixing this up about what the land is zoned for and the 700 acres – 700 housing units. It's a separate issue.

The land is zoned for one way, as I mentioned. An applicant can come in and disregard local zoning and come in with an affordable housing project, which is what is on the desk at the planning and zoning office today.  I know of no community in Connecticut, I know of no community in Connecticut that has been able to take land by eminent domain as a method of not allowing affordable housing.   I now – well, okay, go ahead.

MR. MARCONI:  I need to say something right now. . . .

. . .

MR. MARCONI:   No one will say anything else about it [affordable housing].

[Certified Transcript of September 12, 2001 Public Hearing of the Board of Selectmen on an Appropriation of $11,600,000 at p. 31- 36 (emphasis added).]

55.    The September 12, 2001 Town Meeting was adjourned to a referendum on September 25, 2001.

56.    On September 25, 2001, a referendum passed on the single question put to the voters, approving (1) acquisition of the North Parcel for "open space, recreation and other municipal purposes and of the southern parcel for corporate, municipal and/or

purposes set forth in Section 8-187 or 32-22 of the Connecticut General Statutes, and (2) for the preparation of a development plan for the southern parcel, and authorizing borrowing to finance said appropriation." No project plan under Chapters 132 or 5588 of the Connecticut General Statutes had been prepared, reviewed, or approved prior to the referendum.

57.    Ridgefield completed the taking of the North Parcel by eminent domain on December 20, 2001, when it filed its Certificate of Taking with the Town Clerk of Ridgefield.

**Preparation and Approval of the
Bennett's Farm Preliminary Project Plan**

58.    On August 3, 2001, following the referendum but before an economic development commission had been created pursuant to Conn. Gen. Stat. §§7-138 and 8-188, the Town of Ridgefield entered into an agreement with Planimetrics, LLP pursuant to which Planimetrics was to prepare a "project plan" in accordance with Conn. Gen. Stat. Chapter 132. The project schedule provided that the plan would be submitted to the Development Agency or to Town of Ridgefield by September 15, 2001. Nonetheless, the plan was not considered by the EDC until January, 2002.

59.    On January 9, 2002, at a Special Town Meeting, a resolution was passed to designate the EDC as the Bennett's Farm Development Authority ("BFDA") pursuant to the provisions of Sections 8-186 et seq. of the Connecticut General Statutes for the purported purpose of implementing the project plan under Chapter 132 of the Connecticut General Statutes. Thus, the Board of Selectmen also comprises both the EDC and the BFDA.

60.     On January 9, 2002, the EDC met for the first time to discuss the "Bennett's Farm Corporate Preliminary Project Plan" ("Preliminary Project Plan") prepared by Planimetrics.  The EDC met again on January 12, 2002 to discuss and review the Preliminary Project Plan, and at that meeting it referred the Preliminary Project Plan to the Planning and Zoning Commission to determine under Section 8-191(a) whether it was consistent with the Town Plan of Conservation and Development.

61.     On January 15, 2002, the Preliminary Project Plan was reviewed by the Planning and Zoning Commission to determine whether it is consistent with the Town Plan of Conservation and Development, and on January 22, 2002, the Preliminary Project Plan was approved by the Planning and Zoning Commission as being so consistent.

62.     At the January 22 meeting at which Planning and Zoning considered the Preliminary Project Plan, Commissioner A. J. DiMattia expressed his grave skepticism about the plan.  He noted, among other things, that the plan's authors had disclaimed all cost and revenue information, that the proposed development was premised upon use of septic systems but no septic feasibility study or testing had been done and that the plan excluded use of public sewers, making the development "questionable."  Commissioner DiMattia stated that "this document is so laden with environmental, engineering and structural millstones that it causes me to suspect that development isn't really the point of this exercise."  As the minutes of the meeting reflect, Town counsel "responded that this report is strictly intended to be a conceptual plan, as outlined in the report."

63.     On February 6, 2002, the EDC, acting as the BFDA, conducted a Public Hearing to consider the adoption of the Preliminary Project Plan. Eureka read into the record a report prepared by David Schiff, AICP, a certified planner with extensive

experience with municipal projects, which identified several of the deficiencies with the Preliminary Project Plan, including clear violations of the requirements of §8-189 or §32-224(b) of the Connecticut General Statutes.

64.     Mr. Schiff's report stated, among other things, that:

- The Preliminary Project Plan simply states its finding, "that public action is warranted in order to carry out and administer the project and to preserve the property for business or industrial purposes" without any explanation as to why its current owner cannot or will not accomplish the same objective;

- The Plan raises numerous unanswered questions about various characteristics of the property and makes recommendations for additional work that should be done, such as undertaking "an environmental assessment of the property prior to acquisition" and soil testing for sewer feasibility;

- "No specific evaluation has been done of septic feasibility at the subject property," a central assumption relating to development of the site;

- The development yields are entirely speculative because of the number of unsupported assumptions on which they are based, including factors such as the desire to protect environmental resources, septic capability of the property, water yields at the property, and market factors at the property;

- There is no marketability analysis and Planimetrics disclaims any expertise in the area, stating that, "[t]he Town of Ridgefield should engage persons with specific expertise in commercial real estate to obtain more detailed information";

- There is no bona fide plan for relocating project-area occupants;

- There is no bona fide financing plan;

- There is no bona fide evaluation of project economics and the plan notes that, "the cost and revenue estimates in this report are for general information only...;"

- There is no title search; and

- There is no appraisal in the project plan, and the appraisal report referred to in the Plan is nearly two years old.

[See Certified Transcript of February 6, 2002 Public Hearing at pages 4-10.]

65.    At the February 6, 2002 public hearing, A. J. DiMattia, the member of the Ridgefield Planning and Zoning Commission who had stated some of his concerns at the Planning and Zoning Commission meeting on January 22, agreed with Mr. Schiff's report and also expressed his serious reservations about the Project Plan, including the following:

> If it [the project plan book] does go to a court, I would expect that counsel will hasten to advise the court, as it did to me as a Planning and Zoning commissioner, that this book is merely a concept; and that this book, as counsel represented to me in my capacity as a commissioner, is unlikely to appear again at the Planning and Zoning Commission in this form. That is that it is to be taken only as a concept.

> And I would also expect as an officer of the court and as a lawyer that the court will be fully apprised of that caveat on page 46 and page 51 in which the creators of the book have disclaimed any responsibility for anything contained in here, has declared unequivocally that none of the data is based on independent research, that no due diligence was performed in the creation of this book, and that indeed as a party, the Town of Ridgefield is required to do the due diligence before it proceeds with any plan of development. That is what I expect the Court will be apprised of when it is offered as an exhibit.

> **This is not a plan. This is a legal strategy. This is a legal gambit. This is a legal play. It is a $25,000 prop that will be employed in furtherance of a court action which I believe is ill founded and ill advised and unwise.**
>                                        …

> The law under which we are proceeding, as Eureka's attorney has said, was not intended for eminent domain. It was intended to be implemented, to be used by economically distressed municipalities who could not rely upon the private sector to invest in the community. It was giving these towns an opportunity to do what the private sector apparently was not going to do. That's what Chapter 132 is intended to do. It's stated in the declaration. You read the law. It's not twisted. It's not arcane. It's very clear. That is how we are proceeding.

> Now the law contemplated that a town in economic distress or a town with a diminished infrastructure should be able to help itself. **But the predicament that we are in is that before we created an economic development commission, before we consider the implications of**

21

**corporate development of private land, before we did the due diligence and the feasibility studies, before we created and assembled an implementable plan, we decided to have a referendum on the taking of land by eminent domain. We decided to elect our remedy before we had a plan in hand. And now we've got until next month to drop the hammer. Because if we do not drop the hammer next month, the referendum question becomes stale.** …

[Certified transcript of February 6, 2002 Public Hearing at 10-21 (emphasis added).]

66.     Notwithstanding the comments it received as set forth in the two preceding paragraphs, the BFDA made not a single change to the Preliminary Project Plan – not even deletion of the word "Preliminary" from the plan title. Instead, the BFDA approved the Preliminary Project Plan at a Special Meeting held immediately after the public hearing on February 6, 2002. In doing so, the BFDA relied almost solely on statements of its counsel that the plan complied with the requirements of Chapter 132. No one from Planimetrics testified in support of the plan, and no real explanation or defense of the plan was offered by anyone but counsel. Several BFDA members expressed their view that the Preliminary Project Plan should be presented to the voters in order to be consistent with the September 25, 2001 referendum. The First Selectman also stated that no testing had been done on the property because the Town did not have permission to go on the property, with full knowledge that the Town had never asked for such permission.

67.     Even before the BFDA approved the Preliminary Project Plan, First Selectman Marconi announced a Special Town Meeting to be held one week later, February 13, 2002, to approve or disapprove of the plan. The notice of the Special Town Meeting was given to the local newspaper, the <u>Ridgefield</u> <u>Press</u>, on February 5, 2002, for publication in the February 7, 2002 edition, *before* the Public Hearing had occurred on

February 6 and before the Selectmen had authorized scheduling of a Special Town Meeting.

68.     The Selectmen/EDC/BFDA had predetermined that they would approve the Preliminary Project Plan in their several capacities.

69.     On February 13, 2002, at a Special Town Meeting, the legislative body of the Town of Ridgefield approved the Preliminary Project Plan.   No one from Planimetrics attended the Town Meeting and neither the Plaintiff nor any member of the public was able to ask any questions of the Preliminary Project Plan's author about the plan.

70.     By letter dated February 14, 2002, which was sent by certified mail on February 15, 2002 and received by Plaintiff on February 19, 2002, the First Selectman made an offer to Eureka to purchase the property from it for $2,750,000.  The offer letter stated that the offer is '[c]onsistent with, and in furtherance" of the September 25, 2002 referendum vote to acquire the subject property.  It also stated that the offer "shall be deemed to have been withdrawn" if not accepted by February 28, 2002. The First Selectman has publicly stated that he intends to complete the taking before March 25, 2002, when the September 25, 2001, referendum vote expires as a matter of Connecticut law.

**The Planning and Zoning Commission's
Recent Changes to the Town's Zoning Regulations to Preclude Affordable Housing
and Discriminate Against Families With School Age Children**

71.    In the 1970's, Ridgefield's IL – 40, light industrial zone was changed to the CDD zone.

72.    The CDD zone as it existed prior to May 1, 2007 allowed several light industrial uses but allowed only one residential category of use as follows:

> Section 410.0 G.2 (e) Accredited institutions of higher learning. *Facilities for accredited institutions of higher learning may include student dormitories and residences for executive and professional staff.* (Emphasis added.)

73.    During the hearings on Eureka's March 2005 Application, the Planning and Zoning Commission challenged Eureka about whether the above referenced provision in Ridgefield's CDD regulations permitted Eureka to apply for affordable housing under section 8-30g of the Connecticut General Statutes which exempts any parcel zoned for industrial uses "and which does not permit residential uses."    In response, Eureka explained that such an application was clearly permissible under Ridgefield's existing Regulations including specifically Section 410.0 G.2 (e), quoted in paragraph 72 herein, which expressly permitted a residential use in the zone.

74.    By letter dated September 6, 2005, following the Commission's directive to staff to prepare a resolution of denial but prior to its vote on such a resolution, Eureka withdrew the March 2005 Application pursuant to the Settlement Agreement dated August 31, 2005 between Eureka and Ridgefield.

75.    In 2006, the Planning and Zoning Commission proposed new Zoning Regulations.

76.    The Commission sought to prohibit affordable housing in the CDD zone by repealing language in Section 410.0 G.2 (e) quoted in paragraph 72 above that permitted a residential use in the CDD zone.  This is the very language Eureka identified for the Commission in the 2005 hearing supporting its right to file applications for affordable housing under C.G.S. 8-30g.

77.    In deposition, neither Glenn Chalder of Planemetrics, the planning company engaged by the Commission to assist it in revising its Regulations, the Chairman of the Commission, the Vice-Chairman of the Commission, or the Town Planner had any specific recollection of why this language was deleted from the CDD zone.

78.    At numerous times, including by letter dated December 26, 2006, Eureka objected to the proposed changes to Section 410.0 G.2 (e) and elimination of the second sentence of that Section.   Specifically, Eureka's December 26, 2006 letter stated as follows:

> We write as counsel to Eureka V LLC, owners of a 155± property located at Bennett's Farm Road in Ridgefield.   Section 410.0 G.2 (e) of the Town of Ridgefield's existing zoning regulations includes the following as a permissible use in the Corporate Development District ("CDD Zone"):
>
> (e)        Accredited institutions of higher learning. *Facilities for accredited institutions of higher learning may include student dormitories and residences for executive and professional staff.*  (Emphasis added.)
>
> As you will recall from our extensive discussions during the hearing on Eureka's affordable housing application last year, Section 410.0 is not exempt from amendment pursuant to Connecticut General Statutes Section 8-30g because (i) industrial uses are permitted in the CDD Zone and (ii) subsection G.2 (e)

allows accredited institutions of higher learning, which facilities may include "student dormitories and residences for executive and professional staff.." C.G.S. §8-30g (b) (2)(g) allows exceptions when affordable housing would be located in an area which is zoned for industrial uses and which does *not* permit any residential uses.

The Commission's proposed CDD regulations eliminate the second sentence of 410.0 G.2 (e) highlighted above and thereby eliminates all residential uses in the CDD Zone. Coming on the heels of Eureka's affordable housing application last year, and its well-known intention to re-file such an application absent resolutions of its dispute with the Town, it appears clear that the intent of the change is to preclude affordable housing on Eureka's Bennett's Farm property and prevent families with school age children from [moving] into and residing in the Town of Ridgefield. Especially given the Town's paucity of affordable housing, and the pending litigation between Eureka and the Town regarding the Town's attempts to take its property to stop affordable housing on the site, we find the proposed change extremely troubling. Eureka strongly objects to the change and requests that Section 410.0 G.2 (e) remain in its current form.

79.     The Commission forwarded the December 26, 2006 letter to its Counsel for review. Counsel to the Commission "had a very simple answer, that the Planning and Zoning Commission is the land use authority in the Town, and it is within its purview to write and adopt regulations as it sees fit." [Minutes of the Commission's January 9, 2007 meeting at 9.]

80.     No one from the Commission, including staff and its legal counsel, advised Eureka or publicly indicated that the position expressed in Attorney Healy's letter of December 26, 2006, that the proposed change was intended to preclude affordable housing in the CDD zone, was incorrect.

81.     During the February 27, 2007 public hearings on the proposed new regulations, ROSA, the group opposed to Eureka's affordable housing plans and development of the site, through one of its spokesman, Erik Kristofferson, inquired of the Commission whether a day car center can be considered a residential use and thereby

provide a basis for Eureka to make application under 8-30g since the property under the proposed regulations is in an industrial zone that precludes residential use.  The Town Planner confirmed that a day care center was not a residential use that would remove the exemption from 8-30g:

**Eric Kristoffersen:** The reason I bring that up . . . right now is that Eureka's property is zoned for CCD zone, is an industrial zone that precludes residential and is therefore exempt from 8-30g, and if you add a day care center to that zone, does that become an industrial zone that allows residential use, and is therefore no longer exempt from 8-30?

**Planner Brosius:** No, the day care center that would be, and perhaps it needs to be defined a little bit better than listing it as a day care center, but the day care center that would be allowed in the CDD zone, if the Commission decides to leave it in there, would be for the care of children during the day, for the use of the corporate employees.  It's similar to . . .  Boehringer Ingelheim has one on their own property as an accessory use, but that is for day care of the children of the employees of the Corporate Development District.

**Eric Kristoffersen:** Okay.

**Planner Brosius:** So that's the type of facility.  I am not saying that it would be exclusive to the . . .

**Eric Kristoffersen:** It doesn't become  . . .

**Planner Brosius:** It doesn't become a residence use.  It is "day care."  It is not a residence.  It is day care.

**Eric Kristoffersen:** It is not a residential use.

**Planner Brosius:** No.

Transcript of Public Hearing of February 27, 2007 at 14-15 (emphasis in original).

82.    No member of the Commission challenged, corrected or disagreed with Mr. Kristofferson's statement that under the new regulations Eureka's property was in an

industrial zone that did not allow residential uses and therefore was exempt from 8-30g, or the Town Planner's confirmation that Mr. Kristofferson's statement was accurate.

83. In the course of the public hearings and deliberations on the New Regulations, the Commission never stated that the new CDD zone was not an industrial zone, or that residential uses were permitted in the zone, or that CDD zoned properties were not exempt from 8-30g, or explained why it was eliminating the second sentence of Section 410.0.G.2 (e) regarding residential uses in the CDD zone.

84. Based on the changes to the CDD regulations including elimination of the specified residential uses, Eureka's December 26, 2006 letter to the Commission, ROSA's views as expressed by Mr. Kristofferson at the February 27, 2007 hearing, and the Commission's responses (and lack of responses), the intended impact and effect of the change in the CDD regulation was that the public, including persons owning property in the CDD zone or considering acquiring property in the CDD zone, would conclude that the new CDD zone was an industrial zone in which residential uses were not permitted and therefore was exempt from C.G.S. 8-30g.

85. At its March 20, 2007 meeting, following public hearings, the Commission adopted the new regulations, effective May 1, 2007 (the "News Zoning Regulations").

86. The New Zoning Regulations eliminate student dormitories and residences for executive and professional staff as a permitted use in the CDD zone, leaving no other residential uses as allowed in the CDD zone.

87. By eliminating the specified residential uses from the CDD zone in which the Plaintiff's property is located, Ridgefield and the Commission created or intended to

create an industrial zone in which residential uses were not permitted and which therefore was exempt from C.G..S. 8-30 g..

88.     Alternatively, or in addition to, Ridgefield and the Commission intended that the public would believe that the new CDD zone was an industrial zone in which residential uses were not permitted and which therefore was exempt from C.G..S. 8-30 g.

89.     The Commission and Ridgefield have acted to interfere with and/or preclude future applications for affordable housing on the property, with the intent and/or effect of precluding new families with school age children from moving to Ridgefield.

90.     In *Terrar, LLC v. Town of Ridgefield Planning and Zoning Com'n*, 2006 WL 1000314 (Conn. Super. March 29, 2006) (No. HHBCV0504004079Z) the Connecticut Superior Court (i) sustained the plaintiff's appeal of the denial of its affordable housing applications by the Planning and Zoning Commission, including its application to create a new "Housing Opportunity Development" ("HOD") District pursuant to C.G.S. 8-30g, and (ii) ordered the Commission to adopt the HOD District.

91.      At its March 20, 2007 meeting, the Commission repealed the court-ordered HOD zone from its zoning regulations.

92.     Following filing of the Second Amended Complaint, the Defendants moved to dismiss the Fourth Count for violation of the Federal Fair Housing Act.  In its Motion to Dismiss, the Commission, which is statutorily charged with adopting and implementing the Town's zoning regulations, expressly refused to join the argument of the co-defendants that the new CDD zone was not an industrial zone and therefore was not exempt from C.G.S. 8-30g, stating:  "the Defendant Commission has not had an affordable housing application filed with it subsequent to the adoption of the new

regulations for property located within the Corporate Development District ("CDD") Zone and, accordingly, has not had an opportunity to take any formal position on the exclusive industrial zone exemption issue." *See* Defendants' Motion to Dismiss, dated June 18, 2007, at 2.

93.     As of June 18, 2007, the Commission had not formed an intent for the CDD zone to allow residential uses and not be exempt from C.G.S. 8-30g, notwithstanding Eureka's letters to the Commission and ROSA's comments and questions on this very issue during the public hearing process.

94.     Only after meeting in executive session on **five** occasions and in the context of two litigations brought by Plaintiff against the Commission arising out the changed regulations, did the Commission, post hoc, conclude that the new CDD was not exempt from C.G.S. 8-30g.

95. The Commission's intent/position stated in the Defendant Planning and Zoning Commission of Ridgefield's Reply to Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss, filed July 12, 2007, was not formed at the time it modified Section 410.0 G.2 (e) to repeal the residential uses in the CDD zone.

96.     The Commission's recent determination for trial purposes that the CDD zone is not exempt from 8-30g is based on its analysis of the revised text and perceived risk of litigation and not based on its actual intent at the time it proposed and adopted the new regulations.

**The Plaintiffs Are Threatened With Imminent, Irreparable Harm Relating to the
Taking of the Property and Implementation of the Project Plan**

97.     Based upon the foregoing, it is clear that the defendants plan to proceed imminently with the implementation of the Preliminary Project Plan and the taking of the South Parcel by eminent domain.

98.     In the absence of the prohibitory injunctive relief sought by the plaintiff herein, the plaintiff will suffer irreparable harm for which it has no adequate remedy at law if the defendant Town and its agencies and employees, proceeding under Conn. Gen. Stat. §§8-193 and §§8-129 to 133, file a Statement of Compensation and Return of Notice, take title to the South Parcel, and divest Plaintiff of its fee ownership of the Property, in that:

(a)     the plaintiff herein will lose its standing to assert, and will be deprived of, without any adjudication, its rights under the Fifth and Fourteenth Amendments to the United States Constitution, Article First, § 11 of the Connecticut Constitution, federal and state statutes and Connecticut common law, to procedural due process, and to have the government take real property by eminent domain only for "public use," and only in good faith, and for a lawful purpose in accordance with statutorily mandated procedures;

(b)     as a matter of equity, the plaintiff will be stripped of title to a parcel of real property that is a unique and irreplaceable asset, the deprivation of which cannot adequately be compensated through an award of money damages.

99.     The entry of a temporary restraining order or a preliminary injunction will not prejudice the Town of Ridgefield or the other defendants, because the Town does not have any immediate plans or approvals for development of the South Parcel.

31

**FIRST COUNT**
**(To Enjoin Implementation of the Bennett's Farm**
**<u>Preliminary Project Plan Pursuant to Conn. Gen. Stat. Chapter 132</u>)**

100.     Paragraphs 1 through 99 of the Complaint are hereby incorporated by reference and realleged as if fully set forth herein.

101.     The defendants' proposed implementation of the Preliminary Project Plan for a corporate park as adopted by the defendant BFDA on February 6, 2002, and the Town Meeting on February 13, 2002, violates §§7-136 and 7-148 and Chapter 132 of the Connecticut General Statutes, does not constitute a <u>bona fide</u> plan for a municipal development project, and constitutes a bad faith exercise of the authority granted to Connecticut municipalities by these statutes in one or more of the following respects:

(a)     the Preliminary Project Plan has not been devised, drafted, or adopted to implement a "commercial, financial or retail enterprise" or "business purpose" as set forth in and required by Conn. Gen. Stat. §8-187, but rather, as First Selectman Marconi and other defendants have conceded, to (1) create a pretextual basis for the use of eminent domain to acquire the South Parcel; (2) take control of the property from Eureka; (3) block a multi-family affordable housing development under Conn. Gen. Stat. §8-30g; (4) prevent a perceived influx into Ridgefield of "low income" families; and (5) prevent perceived increases in municipal services and taxes;

(b)     the Preliminary Project Plan is defective and deficient and in clear violation of the requirements of §8-189 of the Connecticut General Statutes in that, among other things, (1) the Preliminary Project Plan simply states its finding, "that public action is warranted in order to carry out and administer the project and to preserve the property for business or industrial purposes" without any factual support or explanation

as to why its current owner cannot or will not accomplish the same objective; (2) the Plan raises numerous unanswered questions about various characteristics of the property and makes recommendations for additional work that should be done, such as undertaking "an environmental assessment of the property prior to acquisition" and soil testing for sewer feasibility; (3) "No specific evaluation has been done of septic feasibility at the subject property," and yet the adequacy of the site for septic systems is a central assumption underlying the development contemplated in the Plan; (4) the predicted development yields are entirely speculative because of the unsupported assumptions on which they are based, including factors such as the desire to protect environmental resources, septic capability of the property, water yields at the property, and market factors at the property; (5) there is no marketability analysis and Planimetrics disclaims any expertise in the area; (6) there is no bona fide plan for relocating project-area occupants; (7) there is no bona fide financing plan; (8) there is no bona fide evaluation of project economics and the plan notes that, "the cost and revenue estimates in this report are for general information only …"; (9) there is no title search; (10) there is no appraisal in the project plan, and the appraisal report referred to in the plan is nearly two years old; (11) there is no analysis or demonstration of the need or public purpose for acquiring the South property by eminent domain; (12) the Plan contains other unsupported and baseless assumptions and conclusions; and (13) the Plan is riddled with internally inconsistent and contradictory findings and assertions;

(c)    the Preliminary Project Plan is "inimical to statewide planning program objectives," and thus in violation of § 8-189 of the General Statutes, in that (1) the Connecticut Statewide Plan of Conservation and Development classifies the South Parcel

as "Rural" and not "Growth", and (2) by both eliminating an affordable housing development on the South Parcel and effectively eliminating all opportunities for any significant new multi-family affordable housing in the Town of Ridgefield, the defendants are acting in a discriminatory manner and contrary to the planning policies and objectives set forth in Conn. Gen. Stat. §§ 8-2, 8-2h, 8-30g, and 8-199bb and Chapter 5 of the State Plan of Conservation and Development 1998-2003; and

(d)    the Preliminary Project Plan, though covering a wide variety of professional disciplines including environmental, site engineering, traffic planning, commercial real estate, economic development, survey, appraisals, and legal matters, was apparently prepared by a single firm, Planimetrics, whose expertise, upon information and belief, does not extend to most of the disciplines represented.  In fact, Planimetrics has expressly disclaimed any expertise in many of these areas.

## SECOND COUNT
### (To Enjoin Taking By Eminent Domain Of The South Parcel)

1-101  Paragraphs 1 through 101 of the First Count are hereby incorporated by reference and realleged as if fully set forth herein.

102.    The Fifth Amendment to the United States Constitution provides in pertinent part that "No person shall be . . . deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation."

103    The Fourteenth Amendment to the United States Constitution states in pertinent part that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

34

104.    Article First, § 11 of the Connecticut Constitution provides that "the property of no person shall be taken for public use, without just compensation therefor."

105.    The defendants' intended condemnation of the South Parcel violates the Fifth and Fourteenth Amendments to the United States Constitution and Article First, § 11 of the Connecticut Constitution, in that the condemnation is not being carried out to serve a public use or purpose, in one or more of the following respects:

(a)    as set forth in Paragraphs 60-62, the Preliminary Project Plan violates §§7-136 and 7-148 and Chapter 132 of the General Statutes and does not constitute a bona fide plan for a municipal development project, and the condemnation will violate plaintiffs' rights to procedural due process and will not serve a valid public purpose;

(b)    even if the Preliminary Project Plan complied procedurally with applicable law, the defendants' avowed purpose for the acquisition by eminent domain is to turn over the South Parcel to a private developer or business in preference to the Plaintiff for private business use, which does not constitute a valid public purpose;

(c)    the South Parcel is not "blighted," and therefore the proposed condemnation cannot be based upon a public purpose of clearance or redevelopment of a blighted or degraded property or condition;

(d)    the prevention of affordable housing, i.e., the exclusion of certain families from the Town of Ridgefield on the basis of their annual household income, is not a proper public purpose;

(e)    the exclusion from the Town of Ridgefield of multi-family housing or housing for families with school-aged children is not a proper public purpose;

(f)     the use of eminent domain to preclude a lawful yet politically unpopular use of land is not a proper public purpose; and

(g)     because the Preliminary Project Plan will subject the Town of Ridgefield to greater investment risk and loss of tax revenue than the use proposed by Eureka, the costs to the Town of Ridgefield of the proposed condemnation exceed the probable benefits.

106.     The defendants' intended condemnation of the South Parcel by eminent domain constitutes a bad faith and unlawful exercise of the municipal power of eminent domain, in one or more of the following respects:

(a)     as set forth in Paragraphs 60-62, the Preliminary Project Plan violates §§ 7-136 and 7-148 and Chapter 132 of the General Statutes and does not constitute a <u>bona fide</u> plan for a municipal development project;

(b)     the condemnation will violate plaintiffs' rights to procedural due process;

(c)     the condemnation will not serve a valid public purpose;

(d)     defendants expressed no interest in creating a corporate park until Eureka filed its Master Plan, including development of affordable housing, in January 2001, and even then only after the Town's attempts to take the property for open space failed;

(e)     the sole purpose of the taking is to block Eureka's development plans, and in particular its affordable housing plans, and the preparation, review and approval of the Preliminary Project Plan were a sham and an unlawful pretext to take

control of the property from Eureka and stop its development and affordable housing plans; and

(f)     in July 2001, the defendants declared their intention to condemn the South Parcel before they had even initiated a development plan under Chapter 132 or conducted a study of appropriate or alternative locations.

## THIRD COUNT
### (For Violation of Federal Fair Housing Act)

1-106.  Paragraphs 1 through 106 of the Second Count are hereby incorporated by reference and realleged as if fully set forth herein.

107.    Plaintiff, as the intended provider of dwelling units, is acting in aid of certain rights granted by the Federal Fair Housing Act.

108.    Title 42 U.S.C. § 3617 provides that "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . ., or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

109.    The actions of the defendants in this Third Count to use eminent domain to prevent families with school-aged children from moving into and residing in the Town of Ridgefield, or to prevent the perceived fiscal consequences of such families moving to and residing in Ridgefield, as evidenced by the statements quoted in ¶¶ 28, 29, 38–44, 52-54, 61-66 of the First Count, constitute interference with aiding the exercise or enjoyment of the rights and protections granted by 42 U.S.C. § 3604, in violation of 42 U.S.C. §§ 3604 and 3617.

110.    As a direct result of the actions of the defendants to this Third Count as set forth above, the plaintiffs have suffered and will suffer substantial financial losses, including increased carrying costs, mortgage principal and interest payments, other

financing payments, and property taxes; lost profits; lost business opportunities; expert witness and consultant fees; attorneys' fees; and litigation costs.

## FOURTH COUNT
### (For Violation of Federal Fair Housing Act)

1-106.    Paragraphs 1 through 106 of the Second Count are hereby incorporated by reference and realleged as if fully set forth herein.

107.    Plaintiff, as the intended provider of dwelling units, is acting in aid of certain rights granted by the Federal Fair Housing Act.

108.    Title 42 U.S.C. § 3617 provides that "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . ., or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

109.    Notwithstanding the pendancy of this action, in which Plaintiff alleges that Ridgefield is seeking to take the Property to stop affordable housing on the Property, the Planning and Zoning Commission has approved amendments to its Zoning Regulations, which include elimination of specified residential uses in the CDD zone where the Property is located.  The amendment of the CDD zone Regulations was for the purpose of making the CDD zone an industrial zone in which residential uses were not permitted and therefore exempt from 8-30g, or alternatively, or at a minimum, to give the appearance to the public that is the case.  These actions were taken for the purpose of precluding or interfering with affordable housing on the Property, or to prevent or interfere with families with school-aged children from moving into and residing in the Town of Ridgefield, or to prevent the perceived fiscal consequences of such families moving to and residing in Ridgefield, as evidenced by, among others, the statements quoted in ¶¶ 28, 29, 38–44, 52-54, 61-66, all of which constitutes interference with

38

Plaintiff aiding the exercise or enjoyment of the rights and protections granted by 42 U.S.C. § 3604, in violation of 42 U.S.C. §§ 3604 and 3617.

110.    By eliminating the specified residential uses from the CDD zone in which the Plaintiff's property is located, Ridgefield and the Commission have acted to interfere with and/or preclude future applications for affordable housing on the property, with the intent or effect of precluding or interfering with new families with school age children from moving to Ridgefield or otherwise making housing unavailable to families with school age children in violation of 42 U.S.C. §§ 3604 and 3617.

111.    The New Zoning Regulations as they relate to the CDD zone and Eureka's property are intended to preclude Plaintiff from filing applications for affordable housing under Section 8-30g of the Connecticut General Statutes after the effective date of the New Zoning Regulations, or make Plaintiff (and others) believe that such applications are not authorized and thereby inhibit or interfere with the filing of such applications by Plaintiff (and others).

112.    Plaintiff seeks a temporary and permanent injunction against Ridgefield and the Commission barring or prohibiting implementation of the New Zoning Regulations to the extent they have eliminated specified residential uses in the CDD zone or include any other changes that preclude or may preclude Plaintiff from filing applications for affordable housing on the Property.

113.    In the absence of the prohibitory injunctive relief sought by the Plaintiff herein, the Plaintiff will suffer irreparable harm for which it has no adequate remedy at law.

114.    As a direct result of the actions of the defendants to this Fourth Count as set forth above, the plaintiffs have suffered and will suffer substantial financial losses, including property taxes; lost profits; lost business opportunities; expert witness and consultant fees; attorneys' fees; and litigation costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant it the following relief:

      a.    A temporary restraining order, pending hearing and determination of the Plaintiff's Application for a Preliminary Injunction, whereby the defendants, and their agents, representatives, employees and assigns, are enjoined and restrained from implementing the "Bennett's Farm Corporate Park Preliminary Project Plan" as adopted by the BFDA on February 6, 2002 and the legislative body of Ridgefield on February 13, 2002;

      b.    A temporary restraining order, pending determination of the Plaintiff's Application for a Preliminary Injunction, whereby defendants, and their agents, representatives, employees and assigns, are enjoined and restrained from taking any of the following actions with respect to the South Parcel in furtherance of its taking by eminent domain:

          (i)    filing a statement of compensation or a deposit with the Clerk of the Superior Court pursuant to Conn. Gen. Stat. §§ 7-136, 7-148, 8-129, 8-130, 8-193, or Chapters 132 or 588l;

          (ii)    recording such a statement of compensation in the office of the Ridgefield Town Clerk;

          (iii)    filing a return of notice with the Clerk of the Superior Court;

          (iv)    obtaining a certificate of taking from the Clerk of the Superior Court;

          (v)    recording a certificate of taking in the office of the Ridgefield Town Clerk; or

(vi)     any other action to take the referenced property by eminent domain.

c.     A Preliminary Injunction, whereby the defendants, and their agents, representatives, employees and assigns, are enjoined and restrained from implementing the "Bennett's Farm Corporate Park Preliminary Project Plan" as adopted by the BFDA on February 6, 2002 and the legislative body of Ridgefield on February 13, 2002;

d.     A Preliminary Injunction, whereby defendants, and their agents, representatives, employees and assigns, are enjoined and restrained from taking any of the following actions with respect to the South Parcel in furtherance of its taking by eminent domain:

(i)     filing a statement of compensation or a deposit with the Clerk of the Superior Court pursuant to Conn. Gen. Stat. §§ 7-136, 7-148, 8-129, 8-130, 8-193, or Chapters 132 or 588l;

(ii)     recording such a statement of compensation in the office of the Ridgefield Town Clerk;

(iii)     filing a return of notice with the Clerk of the Superior Court;

(iv)     obtaining a certificate of taking from the Clerk of the Superior Court;

(v)     recording a certificate of taking in the office of the Ridgefield Town Clerk; or

(vi)     any other action to take the referenced property by eminent domain.

e.     A Permanent Injunction, whereby the defendants, and their agents, representatives, employees and assigns, are permanently enjoined and restrained

from implementing the "Bennett's Farm Corporate Park Preliminary Project Plan" as adopted by the BFDA on February 6, 2002 and the legislative body of Ridgefield on February 13, 2002;

f.    A Permanent Injunction, whereby defendants, and their agents, representatives, employees and assigns, are enjoined and restrained from taking any of the following actions with respect to the Property in furtherance of its taking by eminent domain:

      (i)    filing a statement of compensation or a deposit with the Clerk of the Superior Court pursuant to Conn. Gen. Stat. §§ 7-136, 7-148, 8-129, 8-130, 8-193, or Chapters 132 or 588l;

      (ii)    recording such a statement of compensation in the office of the Ridgefield Town Clerk;

      (iii)    filing a return of notice with the Clerk of the Superior Court;

      (iv)    obtaining a certificate of taking from the Clerk of the Superior Court;

      (v)    recording a certificate of taking in the office of the Ridgefield Town Clerk; or

      (vi)    any other action to take the referenced property by eminent domain.

g.    An order permitting Plaintiff to conduct expedited discovery of the defendants in connection with the issues raised by the Plaintiff's Motion for a Temporary Restraining Order, including but not limited to depositions of current or former members of the Ridgefield Board of Selectmen, the Ridgefield Board of Finance, the Ridgefield Economic Development Commission ("EDC") and the

Bennett's Farm Development Authority ("BFDA"), the authors of the Preliminary Project Plan, as well as production of relevant documents and things.

h.     A preliminary and permanent injunction against Ridgefield and the Planning and Zoning Commission barring, prohibiting and otherwise enjoining implementation or application of the New Zoning Regulations including specifically against the Plaintiff and the South Parcel, to the extent they have eliminated specified residential uses in the CDD zone or include any other changes that preclude or may preclude Plaintiff from filing applications for affordable housing on the Property.

i.     Damages;

j.     Punitive damages;

k.     Attorneys fees, expert witness and consultant fees, and other litigation costs and expenses; and

l.     Any such additional relief as this Court deems just and proper.

THE PLAINTIFF,

By:    /s/ Matthew C. Mason_____
       Matthew C. Mason (ct 15291)
       Gregory and Adams, P.C.
       190 Old Ridgefield Road
       Wilton, CT 06897
       (203) 762-9000 (Tel.)
       (203) 834-1628 (Fax)
       mmason@gregoryandadams.com

## CERTIFICATION

I certify that on September 25, 2007, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Matthew C. Mason
_____
Matthew C. Mason (ct15291)
Gregory and Adams, P.C.
190 Old Ridgefield Rd.
Wilton, CT 06897
(203) 762-9000
Fax: (203) 834-1628
E-mail: mmason@gregoryandadams.com