# EXHIBIT C

LexisNexis® *Total Research System*

Switch Client ┊ Preferences ┊ Sign Off ┊ [?] Help

Search ┊ Research Tasks ┊ Get a Document ┊ *Shepard's*® ┊ Alerts ┊ Total Litigator

Dossier ┊ History ┊ 🖰

Service: **Get by LEXSEE®**
Citation: **1995 U.S. Dist. LEXIS 22327**

*1995 U.S. Dist. LEXIS 22327, \**

UNITED STATES OF AMERICA v. DUNCAN ROBINSON, ELIZABETH ROBINSON, RONAN-EDGEHILL NEIGHBORHOOD ASSOCIATION, JAMES BROWNLOW, ROBIE POOLEY, BEVERLY HODGSON, AND JOHN LEVENTHAL, Defendants.

Civ. No. 3:92CV00345 (TFGD)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

1995 U.S. Dist. LEXIS 22327

January 26, 1995, Filed

**DISPOSITION:** The defendants' objections to the magistrate's report and recommendation were sustained and the motions to dismiss were granted.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendants, homeowners and a neighborhood association, brought a motion to dismiss the Government's action against defendants, under the Fair Housing Act of 1968 (FHA), 42 U.S.C.S. §§ 3601 et seq., for the filing of a lawsuit seeking the enforcement of a facially valid zoning ordinance to bar a family containing handicapped foster children from occupying a residence without first obtaining a variance or special use permit.

**OVERVIEW:** Defendants' moved to dismiss because the filing of the lawsuit was protected by the First Amendment. Defendants had previously filed a suit alleging that the use of a house for a family containing handicapped foster children would violate the city's zoning ordinance. The Government alleged that by filing the lawsuit, defendants discriminated against the family because of its familial status. The court held that because the filing of the state lawsuit created a conflict between defendants' First Amendment right of petition and the family's statutory right to equality in housing, defendants' First Amendment right of petition did not provide absolute immunity from liability. Whether defendants were entitled to qualified immunity depended on whether the state lawsuit was a genuine exercise of the right to petition. Accordingly, defendants' motions to dismiss should have been granted if the state lawsuit possessed a reasonable basis in fact or law. The ambiguity of the caselaw on the FHA's familial status provision suggested that defendants reasonably relied on the validity of the city zoning ordinance. Therefore, defendants' lawsuit presented a genuine issue of law.

**OUTCOME:** The court sustained defendants' objections. The court granted defendants' motions to dismiss.

**CORE TERMS:** lawsuit, ordinance, zoning ordinance, familial status, zoning, neighborhood, foster, housing, foster children, handicap, sham, handicapped, unrelated, antitrust, density, discriminatory, residential, fair housing, qualified immunity, single-

family, discriminate, petitioning, interfere, facially, marriage, baseless, motive, blood, right of petition, right to petition

**LEXISNEXIS® HEADNOTES**                                                    ⊟ **Hide**

Civil Procedure > Summary Judgment > Appellate Review > General Overview
Civil Procedure > Summary Judgment > Supporting Materials > General Overview
Evidence > Judicial Notice > General Overview
*HN1* In general a district court has discretion to accept or reject any supplementary materials offered in support of or response to a Fed. R. Civ. P. 12(b)(6) motion, but if such matters are reviewed the court must consider the motion as one for summary judgment under Fed. R. Civ. P. 56. *More Like This Headnote*

Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act
Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights >
Fair Housing Amendments Act & Housing for Retirees
Public Health & Welfare Law > Housing & Public Buildings > Fair Housing
*HN2* 42 U.S.C.S. § 3604(a) of the Fair Housing Act makes it unlawful to make unavailable or deny a dwelling to any person because of familial status. 42 U.S.C.S. § 3602(k) of the Act defines "familial status" as one or more individuals, who have not attained the age of 18 years, being domiciled with a parent or other person having legal custody of such individual or individuals. 42 U.S.C.S. § 3602 (k). *More Like This Headnote*

Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act
Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights >
Fair Housing Amendments Act & Housing for Retirees
Public Health & Welfare Law > Housing & Public Buildings > Fair Housing
*HN3* The Fair Housing Act defines handicap as meaning, with respect to a person: (1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance as defined in 21 U.S.C.S. § 802. 42 U.S.C.S. § 3602(h). *More Like This Headnote*

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims
*HN4* Motions pursuant to Fed. R. Civ. P. 12(b)(6) will not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. A court therefore accepts all factual allegations set forth in the complaint as true and draws all reasonable inferences from those allegations in the light most favorable to the non-moving party. *More Like This Headnote*

Civil Procedure > Appeals > Amici Curiae
Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom
*HN5* The filing of a complaint in court is a form of petitioning activity protected by the First Amendment. *More Like This Headnote*

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Assembly
Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom
Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom to Petition
*HN6* The First Amendment provides that Congress shall make no law abridging the

freedom of speech or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S. Const. amend. I. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom

*HN7* Free speech and equality rights do not conflict when the competition of ideas itself ultimately protects and advances equality rights. This premise fails, however, in situations where First Amendment rights conflict directly with other rights. More Like This Headnote

Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Coverage
Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Sham Exception
Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom

*HN8* Noerr-Pennington generally holds that the First Amendment protects the filing of a lawsuit from antitrust liability unless the suit is a mere sham to cover an attempt to interfere directly with the business relationships of a competitor. To determine whether a lawsuit falls under the sham exception, a court must first determine whether the lawsuit was objectively baseless in the sense that no reasonable litigant could expect success on the merits. Only if this question is answered in the affirmative must the court investigate the defendant's subjective motivation, defined as the intent to injure the plaintiff through the use of the governmental process and not through the outcome of that process. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom

*HN9* First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom
Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

*HN10* The right of petition is one of the freedoms protected by the Bill of Rights, and courts cannot, of course, lightly impute to Congress an intent to invade these freedoms. The legislative history of the Fair Housing Act does not demonstrate that Congress intended the Act to prohibit a "well-founded" lawsuit without some showing that the lawsuit was filed to effectuate illegal extra-judicial conduct. More Like This Headnote

Estate, Gift & Trust Law > Intestacy > Adopted Children
Evidence > Inferences & Presumptions > Exceptions > Common Law Presumptions
Family Law > Adoption > General Overview

*HN11* Connecticut law does not consider foster children to be related by blood, marriage or adoption. For example, foster children do not qualify as related children for the purposes of Connecticut's law of intestacy, and Connecticut law historically precluded adopted children from intestate inheritance. Rather, Connecticut law defines a "foster child" as a child placed temporarily in a home, pending permanent placement, and defines a "permanent placement" as a home for a child with his genetic or adoptive parents considered to be such child's permanent residence. Conn. Gen. Stat. § 17a-110. Connecticut law clearly distinguishes between foster children and adopted or biological children, and generally excludes the former from its definitions of "related" persons. More Like This Headnote

Public Health & Welfare Law > Housing & Public Buildings > Fair Housing
Real Property Law > Financing > Federal Programs > Federal Housing Administration

Real Property Law > Zoning & Land Use > Ordinances

HN12⬚ While 42 U.S.C.S. § 3615 of the Fair Housing Act (FHA) invalidates conflicting local law, the FHA does not exert so strong a preemptive effect as to displace all local zoning ordinances, which must be reviewed on the facts of a given case. No court has yet held that 42 U.S.C.S. § 3602(k) of the FHA requires the invalidation of zoning ordinances defining "family" in terms of blood, marriage or adoption. Nor has any court resolved the potential conflict between 42 U.S.C.S. § 3602(k) and 42 U.S.C.S. § 3607(b) of the FHA in the context of single-family zoning ordinances. The few decisions considering the legal status of foster families under the FHA also do not provide a clear rule. More Like This Headnote |
*Shepardize: Restrict By Headnote*

Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Enforcement
Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights
Fair Housing Amendments Act & Housing for Retirees
Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

HN13⬚ See 42 U.S.C.S. § 3615.

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom

HN14⬚ Under the First Amendment's free speech protection, a district court must resist the understandable temptation to engage in post hoc reasoning by concluding that, because a party did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom
Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices >
General Overview

HN15⬚ The presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom
Constitutional Law > Bill of Rights > Fundamental Rights > General Overview

HN16⬚ The right to petition for redress of grievances is among the most precious of the liberties safeguarded by the Bill of Rights. It shares the "preferred place" accorded in the system of government to the First Amendment freedoms, and has a sanctity and a sanction not permitting dubious intrusions. An intrusion into this right cannot be sustained merely because the federal statute at issue was enacted for the purpose of dealing with some evil within the State's legislative competence, or even because the law does in fact provide a helpful means of dealing with such an evil. More Like This Headnote

**COUNSEL:** [*1]  For USA, plaintiff: John B. Hughes, U.S. Attorney's Office, New Haven, CT. Jennifer C. Cass, Paul F. Hancock, Brian F. Heffernan, Eileen Penner, U.S. Department Of Justice, Housing & Civil Enforcement Section, Washington, DC.

For DUNCAN ROBINSON, defendant: Joseph D. Garrison, Garrison, Phelan, Levin-Epstein, Chimes & Richardson, New Haven, CT. Lisa M. Grasso, Durant, Nichols, Houston, Mitchell & Sheahan, Bridgeport, CT.

For ELIZABETH ROBINSON, defendant: Joseph D. Garrison, Garrison, Phelan, Levin-Epstein,

Chimes & Richardson, New Haven, CT.

For RONAN-EDGEHILL NEIGHBORHOOD ASSOCIATION, ROBIE POOLEY, defendants: Andrew B. Bowman, Law Offices Of Andrew Bowman, Westport, CT.

For BEVERLY HODGSON, JOHN LEVENTHAL, defendants: David S. Golub, Jonathan M. Levine, Silver, Golub & Teitell, Stamford, CT.

**OPINION**

**RULING ON OBJECTIONS TO RECOMMENDED RULING**

This action presents the question whether various homeowners and a neighborhood association can be liable under the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. §§ 3601 et seq., [1] for the filing of a lawsuit seeking the enforcement of a facially valid zoning ordinance to bar a family containing **[*2]** handicapped foster children from occupying a residence without first obtaining a variance or special use permit. The defendants each moved to dismiss the government's Amended Complaint on the ground that the filing of the lawsuit was protected by the First Amendment, and the motions were referred to Magistrate Judge Thomas P. Smith. The Magistrate Judge recommended that the motions be denied, and the defendants filed timely objections. After de novo review, and for the reasons stated below, the defendants' objections are sustained and the motions to dismiss are granted.

**FOOTNOTES**

[1] The Fair Housing Act constituted Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90-284, 82 Stat. 73, 81-89, and was amended by the Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619.

**BACKGROUND**

**I. Facts**

The government's Amended Complaint alleges the following facts. Marjorie Eichler ("Eichler") is the mother of seven adopted and three foster children. All ten children are handicapped. Eichler **[*3]** also is the president of There's No Place Like Home, Inc., a tax-exempt corporation whose primary purpose is to assist her in managing her family's financial affairs.

Eichler, acting on behalf of There's No Place Like Home, sought to purchase a larger home in March 1992. She placed a deposit on a former dormitory building, located at 150 Huntington Street in New Haven, Connecticut and owned by Albertus Magnus College, and the parties agreed to a closing date of June 16, 1992. Defendant Robie Pooley ("Pooley"), president of defendant Ronan-Edgehill Neighborhood Association ("Neighborhood Association"), learned of the agreement and wrote to Albertus Magnus College, the College's realtor, and Eichler's realtor requesting information about the proposed use of the property. Pooley also attempted to gather a quorum of the Neighborhood Association to consider taking legal action. Meanwhile, defendants Duncan and Elizabeth Robinson ("the Robinsons"), Beverly Hodgson ("Hodgson") and John Leventhal ("Leventhal") consulted an attorney to discuss potential legal responses to the pending purchase of the building. In early April 1992 the Robinsons held a meeting of the Neighborhood Association **[*4]** to discuss the Eichlers' impending move into the neighborhood.

The Robinsons, who occupy the home next door to 150 Huntington Street, then filed suit in Connecticut Superior Court on May 1, 1992 against Eichler and There's No Place Like Home. Their complaint alleged that the Eichlers' proposed use of the property would violate New Haven's Zoning Ordinance, and it sought an order barring the family from occupying the property until Eichler obtained a zoning variance or special use permit. The Robinsons also sought a temporary restraining order on the ground that, in the absence of a variance or permit, occupancy by the Eichlers would cause them imminent harm by diminishing the attractiveness and value of their property. ² The Superior Court issued an order directing the parties "to maintain the status quo" on May 18, 1992, thereby preventing Eichler and her family from assuming occupancy. Pooley, on behalf of the Neighborhood Association, then filed an intervening complaint joining the Robinsons' lawsuit, while the state joined the lawsuit as a defendant. ³

## FOOTNOTES

2 The state complaint alleged the following specific injuries:

> 1. [The Robinsons'] legal right and opportunity to appear to be heard by the New Haven Zoning Board of Appeals *prior to* [the Eichlers'] intended use will be infringed; and

> 2. Their right to use and enjoy their home consistent with their expectations of residence in an RS 1 District will be diminished or destroyed in that:

>> a. There will be increased noise, traffic and disruption from such impermissibly high density, including visits by [Department of Children and Youth Services] staff having responsibility for the unrelated minors placed with [Mrs. Eichler], the unrelated minors' relatives, and the general increased transportation needs;

>> b. [The Robinsons'] right to the use and quiet enjoyment of their own property will be immediately and substantially impaired by the close proximity of the unlawful use of the adjoining Property, since that presence of the unrelated persons *in addition to* "family," [sic] under the circumstances presents a substantial likelihood that unsupervised pre-school children will enter [the Robinsons'] premises from [the Eichlers'] adjoining Property, thereby (1) diminishing [the Robinsons'] quietude and causing anxiety and worry for the children's safety and [the Robinsons'] liability therefore, (2) producing a noise and activity level antagonistic to the low density residential character of the neighborhood and (3) diminishing the attractiveness, value and unique qualities [the Robinsons] have enjoyed and expected from an RS 1 zone.

State Complaint, P16 (emphases in original). **[\*5]**

3 Since Pooley's complaint on behalf of the Neighborhood Association merely sought permission to intervene, the Court considers the original and intervening complaints as a single lawsuit and looks to the original complaint as the basis of the government's allegations against all defendants.

Eichler and There's No Place Like Home then moved to dismiss the action and to dissolve the Court's stay order, and on May 26, 1992 the Superior Court held a hearing on the motions.

During the course of the proceeding the presiding Superior Court Judge, the Honorable William J. Sullivan, inquired into the disabilities of the children who would be moving into the property. Eichler's counsel refused to divulge this information, arguing that a state statute prohibited such disclosure. The court recessed for lunch, and during the recess Eichler's counsel removed the case to federal court. This Court subsequently granted defendants' motion to remand the case to the Superior Court, concluding that no grounds for removal existed. See *Robinson v. Eichler*, 795 F. Supp. 1253 (D. Conn. 1992).

Eichler **[\*6]** also responded to the defendants' lawsuit by filing a complaint of housing discrimination with the Department of Housing and Urban Development ("HUD"). On June 6, 1992 HUD referred the complaint to the United States Attorney General, who began an investigation. After the commencement of the investigation the Robinsons and the Neighborhood Association voluntarily dismissed the state lawsuit. The government then filed the instant action pursuant to the FHA, 42 U.S.C. § 3614(a).

## II. The State Lawsuit

The defendants' state complaint [4] alleged that Eichler intended to occupy the former dormitory at 150 Huntington Street as a "permanent family residence" [5] for the members of her family and "at least four foster children . . . unrelated . . . by blood, adoption or marriage." State Complaint PP14-15. The complaint asserted that the operation of such a residence at the proposed site, without a variance or special use permit, would violate the New Haven Zoning Ordinance because the proposed site was located in a zoning district designated as RS-1, which limits residences to single-family dwellings. *Id.* P15. [6] Article I of the Zoning Ordinance defines **[\*7]** "family" as "one or more persons related by blood, marriage or adoption, and in addition, any domestic servants or gratuitous guests thereof; or a group of not more than four persons who need not be so related." New Haven Zoning Ordinance, Article I, § 1. Moreover, the Ordinance prohibits a homeowner in an RS-1 zone from taking in a roomer or boarder where the "family" is comprised of related persons. *See id.* The state complaint alleged that the Eichlers' proposed residence would violate zone RS-1 restrictions because the Eichlers, together with their foster children, fell under neither of the two definitions of "family" set forth in Article I. The defendants' lawsuit thus urged the Superior Court to interpret the term "family," as used in the New Haven Zoning Ordinance, so as to exclude foster children from those "related by blood, marriage or adoption."

## FOOTNOTES

[4] The government relies extensively on the wording of the defendants' state complaint in support of its allegation that the filing of the lawsuit violated the FHA. The government did not, however, include the state complaint as an exhibit to its Amended Complaint, but submitted it as an attachment to a brief on the instant motion. This gives rise to a preliminary issue, which the parties have not addressed, as to whether the Court may review the state complaint when ruling on motions filed pursuant to Rule 12(b)(6).

*HN1* In general a district court has discretion to accept or reject any supplementary materials offered in support of or response to a Rule 12(b)(6) motion, but if such matters are reviewed the court must consider the motion as one for summary judgment under Rule 56. See *Fonte v. Board of Managers of Continental Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1992). The taking of judicial notice of facts outside the pleadings, however, does not so convert the motion. See *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). Judicial notice of the Robinsons' state complaint is appropriate here, as the complaint is a public document maintained by the Connecticut Superior Court and is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see, e.g., Kramer*, 937 F.2d at 774 (approving judicial notice of public disclosure documents filed with and maintained by the

Securities and Exchange Commission); _United States v. Wood_, 925 F.2d 1580, 1582 (7th Cir. 1991) (approving judicial notice of filings in bankruptcy court proceedings); _St. Louis Baptist Temple, Inc. v. FDIC_, 605 F.2d 1169, 1172 (10th Cir. 1979) ("federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (citation omitted); _see generally_ 2A James W. Moore & Jo D. Lucas, Moore's Federal Practice P12.09[3]. Accordingly, the Court considers the state complaint as the basis for the defendants' alleged violations of the FHA. The Court also takes judicial notice of the applicable sections of the New Haven Zoning Ordinance and the official regulations of the Connecticut Department of Children and Youth Services, _see_ Moore's Federal Practice P8.17[12], as the latter department was named during the events in question. _See_ 1993 Conn. Acts § 1 (Reg. Sess.) (renaming the Department of Children and Youth Services as the Department of Children and Families). **[*8]**

5 _See_ Conn. Gen. Stat. § 17a-154 (defining "permanent family residence" as "a child care facility . . . designed to provide permanent care to handicapped children in a home environment and family setting."). Regulations promulgated under this statute condition approval of a license for a permanent family residence on compliance with all local laws and ordinances, _see_ Conn. Agencies Regs. § 17-52b-9(b), and require that any such facility comply with local maximum occupancy ordinances. _See id._ § 17-52b-2 ("When state statutes, administrative regulations or local ordinances limit the number of children to be cared for, such number shall be the maximum.").

6 Article III, § 11 of the New Haven Zoning Ordinance specifies that RS-1 districts "exist for the protection of certain fully developed single-family areas of relatively small total size but of unique and irreplaceable value to the community as a whole. The specific purpose of these districts is to stabilize and preserve the low-density residential character of these areas to the maximum possible extent."

The government **[*9]** alleges that by filing the lawsuit the Robinsons, Pooley, and the Neighborhood Association discriminated against the Eichler family because of its familial status, as defined in 42 U.S.C. § 3602(k), 7 and against the Eichler children because of their handicapped status, as defined by 42 U.S.C. § 3602(h). 8 The Amended Complaint further alleges that Leventhal and Hodgson, who were not parties to the state lawsuit, nonetheless discriminated against the Eichler family "by soliciting and orchestrating support" for the lawsuit in order "to interfere with the Eichlers' fair housing rights, because of the handicaps of the Eichler children and because of the foster child status of some of the children." Amended Complaint P27. Finally, the Amended Complaint alleges that the defendants acted intentionally, willfully, and with deliberate disregard for the rights of the Eichler family. _Id._ P37. 9

**FOOTNOTES**

7 Section 3604(a) of the FHA _HN2_ makes it unlawful to "make unavailable or deny[] a dwelling to any person because of . . . familial status." 42 U.S.C. § 3604(a); _see also_ 42 U.S.C. § 3617 ("It shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of . . . any right granted by section . . . 3604 . . . of this title."). Section 3602(k) of the Act defines "familial status" as "one or more individuals (who have not attained the age of 18 years) being domiciled with . . . a parent or other person having legal custody of such individual or individuals." 42 U.S.C. § 3602 (k). **[*10]**

8 _HN3_ The FHA defines handicap as follows:

"Handicap" means, with respect to a person--

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

> (2) a record of having such an impairment, or

> (3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance as defined in section 802 of Title 21.

42 U.S.C. § 3602(h).

9 The government dismissed its allegations against another defendant, James Brownlow, on October 19, 1992.

The defendants moved to dismiss the Amended Complaint, arguing that the filing of the lawsuit was protected by the First Amendment. Magistrate Judge Thomas P. Smith, in a thoughtful opinion, rejected these arguments and recommended that the Court deny the motions. The defendants filed timely objections to the Magistrate Judge's opinion, and accordingly the Court reviews the motions to dismiss de novo. 28 U.S.C. § 636(b)(1).

## DISCUSSION

As the defendants seek dismissal [*11] of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court's review follows the well-established precept that such HN4 motions will not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); see also Patton v. Dole, 806 F.2d 24, 30 (2d Cir. 1986). The Court therefore accepts all factual allegations set forth in the Amended Complaint as true and draws all reasonable inferences from those allegations in the light most favorable to the government. Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); Corcoran v. American Plan Corp., 886 F.2d 16, 17 (2d Cir. 1989). The defendants assert that this action should be dismissed because the filing of the state lawsuit was entitled to either absolute or qualified immunity under the First Amendment. These arguments will be discussed in turn.

## I. Absolute Immunity

HN5 The filing of a complaint in court is a form of petitioning activity protected by the [*12] First Amendment. 10 See McDonald v. Smith, 472 U.S. 479, 484, 86 L. Ed. 2d 384, 105 S. Ct. 2787 (1985). Relying on this right, the defendants and Amicus Curiae Center for First Amendment Rights, Inc. ("Amicus Curiae") initially contend that because the state lawsuit sought a judicial interpretation of a facially valid ordinance, the act of filing that lawsuit was absolutely protected. See, e.g., Hodgson and Leventhal's Response at 8-9; Amicus Curiae's Mem. at 4-6. This contention is without merit.

## FOOTNOTES

10 HN6 The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to

petition the Government for a redress of grievances." <u>U.S. Const. Amend. I</u>.

Noting that the Petition Clause is "cut from the same cloth as the other guarantees of the [First] Amendment," <u>McDonald, 472 U.S. at 482</u>, the defendants and Amicus Curiae argue that courts consistently have rejected attempts to balance equality **[\*13]** rights with the right of free speech. For example, Amicus Curiae cites two cases, <u>American Booksellers Ass'n v. Hudnut, 771 F.2d 323 (7th Cir. 1985)</u>, aff'd mem., <u>475 U.S. 1001 (1986)</u>, and <u>Collin v. Smith, 578 F.2d 1197 (7th Cir. 1978)</u>, cert. denied, <u>439 U.S. 916, 58 L. Ed. 2d 264, 99 S. Ct. 291 (1978)</u>, for the proposition that courts consistently have rejected attempts to balance equality rights with the right of free speech. <u>Hudnut</u> involved an Indianapolis ordinance which prohibited production and distribution of "pornography," defined as "'the graphic sexually explicit subordination of women.'" <u>Hudnut, 771 F.2d at 324</u> (quoting ordinance). The ordinance was intended to advance equality values, in that the city sought through the ordinance to prevent the subjugation of women to men created and preserved by pornography. <u>Id. at 324-25</u>. Likewise, <u>Collin</u> involved a Skokie, Illinois ordinance prohibiting "'the dissemination of any material . . . which promotes and incites hatred against persons by reason of their race, national origin, or religion,'" in an effort to prevent discrimination **[\*14]** against minorities. <u>Collin, 578 F.2d at 1199</u> (quoting ordinance). In each case the Seventh Circuit rejected efforts to balance the <u>First Amendment</u> rights of persons potentially subject to the ordinances against the equality rights of women or minorities. See <u>Hudnut, 771 F.2d at 325, 331-32</u>; <u>Collin, 578 F.2d at 1203-05</u>; see also <u>The UWM Post, Inc. v. Board of Regents of the University of Wisconsin, 774 F. Supp. 1163 (E.D. Wis. 1991)</u> (invalidating, on <u>First Amendment</u> grounds, a university speech code designed to foster equality by prohibiting students from using discriminatory epithets). Indeed, the <u>Collin</u> court specifically found insufficient the municipality's argument that the hate speech ordinance advanced its fair housing policy by discouraging racial animus. See <u>Collin, 578 F.2d at 1205</u>.

These and analogous cases rest on the premise that <sup>HN7</sup>free speech and equality rights do not conflict when the "competition of ideas" itself ultimately protects and advances equality rights. See <u>Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974)</u>; <u>Hudnut, 771 F.2d at 332</u>; **[\*15]** <u>Collin, 578 F.2d at 1203</u> (quoting <u>Gertz</u>). This premise fails, however, in situations where <u>First Amendment</u> rights conflict directly with other rights. See, e.g., <u>Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 65 L. Ed. 2d 973, 100 S. Ct. 2814 (1980)</u> (balancing <u>First Amendment</u> with <u>Sixth Amendment</u> rights in case brought by newspaper seeking reversal of order closing murder trial to public).

In this action the filing of the state lawsuit created a conflict between the defendants' <u>First Amendment</u> right of petition and the Eichlers' statutory right to equality in housing. In the face of this conflict the defendants' <u>First Amendment</u> right of petition does not provide absolute immunity protecting the filing of the state lawsuit from liability under the FHA. See <u>McDonald, 472 U.S. at 485</u> (holding defendant's right to petition not absolute where it conflicted with plaintiff's common-law right to be free from defamatory statements). The petitioning activity reflected in the defendants' lawsuit therefore deserves only a qualified <u>First Amendment</u> immunity. This qualified immunity depends on whether the state lawsuit was a genuine **[\*16]** exercise of the right to petition or whether it constituted baseless litigation. See <u>id. at 484</u> (holding <u>First Amendment</u> does not "include an unqualified right to express damaging falsehoods in exercise of [the right to petition]."); <u>Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 743, 76 L. Ed. 2d 277, 103 S. Ct. 2161 (1983)</u> ("Just as false statements are not immunized by the <u>First Amendment</u> right to freedom of speech, . . . baseless litigation is not immunized by the <u>First Amendment</u> right to petition.") (citations omitted); accord, <u>California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513, 30 L. Ed. 2d 642, 92 S. Ct. 609 (1972)</u>. [11]

**FOOTNOTES**

**11** This finding of qualified immunity under the Petition Clause should not be confused with the Supreme Court's recent rejection of qualified immunity for private persons in cases brought under 42 U.S.C. § 1983. *See Wyatt v. Cole*, 504 U.S. 158, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992). *Wyatt* resolved a question left open in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 n.23, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982), as to whether a private defendant is entitled to qualified immunity, in actions brought under 42 U.S.C. § 1983, for attaching property pursuant to a facially valid prejudgment attachment statute subsequently found to be unconstitutional. Following *Lugar*, decisions in several circuits extended the qualified immunity granted state officials under § 1983 to private citizens who requested enforcement of presumptively valid laws and engaged in constitutionally protected speech. *See, e.g., Jones v. Preuit & Mauldin*, 851 F.2d 1321, 1325 (11th Cir. 1988), *vacated on other grounds*, 489 U.S. 1002 (1989); *Buller v. Buechler*, 706 F.2d 844, 850-52 (8th Cir. 1983); *Folsom Inv. Co. v. Moore*, 681 F.2d 1032, 1037-38 (5th Cir. 1982). These courts held that a private citizen cannot be liable under § 1983 for urging governmental action unless that action would violate a clearly established constitutional or statutory right of which the defendants knew or should have known. *See Folsom*, 681 F.2d at 1037. *Wyatt* rejected this approach, holding that private citizens who rely on state laws are not entitled to the protection from liability accorded public officials under § 1983. *See Wyatt*, 112 S. Ct. at 1835-37.

The *Wyatt* Court rested its holding on an analysis of the basis of the judicially-created immunity for public officials under § 1983, finding that this immunity derived from the need to protect the functioning of government. *Id.; see also Harlow v. Fitzgerald*, 457 U.S. 800, 815, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). Moreover, the *Lugar* line of cases involve allegations that a private defendant conspired with state officials to violate the plaintiff's constitutional rights through the use of the judicial system to effectuate the attachment of property. As discussed below, no such extra-judicial conduct exists in this action. *See infra* pp. 20-23. Finally, the above cases do not involve a consideration of immunity derived from the Petition Clause. Instead, the lower-court cases decided prior to *Wyatt* demonstrate judicial efforts to protect private citizens' right to rely on facially valid statutes if such reliance is objectively reasonable. *See, e.g., Folsom*, 681 F.2d at 1037.

## [*17] II. Qualified Immunity

### A. *Applicable Standard*

The Court therefore must assess whether the defendants' lawsuit was "baseless," an issue for which no definitive standard exists. The defendants argue for an objective test, asserting that if their lawsuit was supported by "objective probable cause" the filing of that lawsuit is protected under the Petition Clause. *See, e.g.*, Hodgson and Leventhal's Response at 4. The government argues, in response, that the Court must also consider the defendants' alleged discriminatory intent and the lawsuit's illegal objective. *See, e.g.*, Govt's Response at 5 n.3.

The defendants principally rely on the *Noerr-Pennington* doctrine. **12** *HN8 Noerr-Pennington* generally holds that the First Amendment protects the filing of a lawsuit from antitrust liability unless the suit "'is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor.'" *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 113 S. Ct. 1920, 1923, 123 L. Ed. 2d 611 (1993) (quoting *Eastern R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 5 L. Ed. 2d 464, 81 S. Ct. 523) To determine whether a lawsuit falls under **[*18]** the sham exception, a court must first determine whether the lawsuit was objectively baseless "in the sense that no reasonable litigant could expect success on the merits." 113 S. Ct. at 1928. Only if this question is answered in the affirmative must the court investigate the defendant's subjective

motivation, defined as the intent to injure the plaintiff through the use of the governmental process and not through the outcome of that process. *Id.* [13] The Amended Complaint alleges that the defendants intended to discriminate against the Eichlers through the expected outcome of their lawsuit, rather than through the process of litigation itself. The state lawsuit thus falls outside the "sham" exception. [14] See *id.* The defendants argue that the *Noerr-Pennington* doctrine applies to cases outside the antitrust context, and therefore the filing of the state lawsuit was protected under the First Amendment.

## FOOTNOTES

12 The *Noerr-Pennington* doctrine refers to a trilogy of cases defining the limits of First Amendment protections under the antitrust laws. See *Eastern Rail Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965); *California Motor Transport*, 404 U.S. 508, 30 L. Ed. 2d 642, 92 S. Ct. 609. The *Noerr-Pennington* doctrine holds that activities which seek "to influence legislative, executive or judicial action to eliminate competition are wholly immune from federal antitrust liability unless the conduct falls within the 'sham exception' to the doctrine." *Suburban Restoration Co. v. Acmat Corp.*, 700 F.2d 98, 99 (2d Cir. 1983). **[*19]**

13 The Supreme Court described the test for whether a lawsuit is a "sham" as follows:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether a baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor," *Noerr, supra*, 365 U.S. 127 at 144 . . . (emphasis added), through the use of the governmental *process*--as opposed to the *outcome* of that process--as an anticompetitive weapon," [*City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380, 113 L. Ed. 2d 382, 111 S. Ct. 1344 (1991) (emphasis in original).

*Professional Real Estate Investors*, 113 S. Ct. at 1928 (footnote omitted). **[*20]**

14 The government has disavowed any intent to rely on the sham exception. *See* Magistrate Judge's Opinion at 12 (noting government's concession on issue at oral argument before Magistrate Judge).

The defendants' argument succeeds only if the Constitution mandates the protections defined by the *Noerr-Pennington* doctrine, and if sham lawsuits constitute the sole exceptions to that doctrine. The defendants concede that the Second Circuit considers these issues open. *See Suburban Restoration*, 700 F.2d at 100-01 (noting, in dicta, that while the *Noerr-Pennington* doctrine constitutes an application of the right of petition, no Supreme Court decision definitively states that the doctrine is mandated by the First Amendment); *see also In re IBP Confidential Business Documents Litigation*, 755 F.2d 1300, 1312 n.15 (8th Cir. 1985). The defendants assert that *Suburban Restoration* was decided prior to the Supreme Court's

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 22327     Page 13 of 23

Case 3:02-cv-00338-DJS     Document 107-4     Filed 11/07/2007     Page 14 of 23

decision in *Bill Johnson's*, in which the Supreme Court applied a case decided under the *Noerr-Pennington* doctrine in a case brought **[*21]** under the National Labor Relations Act ("NLRA"). *See* Hodgson and Leventhal's Mem. at 5-6.

The *Bill Johnson's* decision, however, neither states nor implies that the *Noerr-Pennington* doctrine is constitutionally mandated or must be applied mechanically in cases outside the antitrust area. *Bill Johnson's* involved an employer who brought a lawsuit in state court, alleging libel and various interferences with its business, against workers engaged in concerted labor activities. The workers filed a charge with the National Labor Relations Board ("NLRB"), asserting that the employer's lawsuit lacked a reasonable basis and that it was filed in retaliation for the workers' labor activities. The NLRB, noting that the NLRA defines as an "unfair labor practice" any action taken "to interfere with, restrain, or coerce employees" in the exercise of their rights under the Act, 29 U.S.C. § 157, found in the workers' favor and ordered the employer to withdraw the lawsuit, and the Ninth Circuit affirmed. The Supreme Court reversed, however, finding that the NLRB's interpretation of the Act gave insufficient weight to the employer's First Amendment right of petition.

**[*22]** The sole feature of the employer's lawsuit which the NLRB found rendered the action an "unfair labor practice" was the employer's allegedly retaliatory motive. *See Bill Johnson's*, 461 U.S. at 737 n.5, 739-40. Relying on *California Motor Transport*, 404 U.S. at 510, however, the Supreme Court found that the Petition Clause required a different interpretation of the NLRA. 461 U.S. at 741 ("The right of access to a court is too important to be called an unfair labor practice solely on the ground that what is sought in court is to enjoin employees from exercising a [right protected by the NLRA].") (quotation omitted). Accordingly, the Supreme Court concluded that "the filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the [NLRA]." 461 U.S. at 743. [15]

## FOOTNOTES

[15] The Supreme Court then remanded the case for a determination of whether the employer's lawsuit presented any genuine issue of fact. 461 U.S. at 745 n.11, 748.

**[*23]** While relying on a case decided under the *Noerr-Pennington* doctrine to support its analysis, the *Bill Johnson's* Court did not base its holding exclusively on the doctrine. The Court instead based its decision on an interpretation of the NLRA in light of the First Amendment, thereby effectively deciding the question whether the *Noerr-Pennington* doctrine is constitutionally mandated. [16] *Bill Johnson's* makes clear that the doctrine rests on an interpretation of the antitrust laws, and the application of the Petition Clause to cases under different statutes requires a fresh interpretation of a given statute in the context of a particular set of circumstances. See 461 U.S. at 742-44.

## FOOTNOTES

[16] While this means that the *Noerr-Pennington* doctrine need not be applied wholesale, the doctrine can be looked to for the resolution of issues raised by the Petition Clause under other statutes. *See Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1343 (7th Cir. 1977).

Before determining the **[*24]** standard for an actionable lawsuit under the FHA, therefore, the particular circumstances at issue in this case must be determined. Several characteristics

Get a Document by Citation 1895 U.S. Dist. LEXIS 22327

Case 3:02-cv-00938-DJS  Document 76-4  Filed 11/07/2007  Page 15 of 24  Page 14 of 23

of the state lawsuit warrant clarification. First, although the government alleges in its Amended Complaint that the defendants filed the state lawsuit with the intent to discriminate against the Eichlers because of the handicaps of the children, the state lawsuit specifically mentions only the Eichlers' status as a foster family. Thus this is not a case in which existing residents sought the enforcement of land-use restrictions applicable only to handicapped persons. [17] Cf. _City of Cleburne v. Cleburne Living Center_, 473 U.S. 432, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985). Instead, this case involves the interpretation of a facially neutral single-family zoning ordinance.

## FOOTNOTES

[17] Of course, the facts alleged in the Amended Complaint provide a basis from which the defendants' discriminatory intent reasonably could be inferred, weighing all ambiguities and inferences in the government's favor. Thus the defendants' intent to discriminate against the Eichlers both because of their familial status, and because of the handicaps of their children, must be presumed for the purposes of this motion. See _Scheuer_, 416 U.S. at 236. On the other hand, the defendants' alleged motives need be considered only once it is determined that their underlying behavior, the filing of the lawsuit, was unprotected. Those motives therefore cannot be used to transform protected speech or petitioning into an unprotected tort. See _Wisconsin v. Mitchell_, 508 U.S. 476, 113 S. Ct. 2194, 2201, 124 L. Ed. 2d 436 (1993) (permitting states to consider a perpetrator's racially biased motives for crimes when setting penalties for such conduct, because underlying conduct was unprotected by First Amendment). Indeed, the defendants' alleged motive ultimately may be irrelevant if the state lawsuit was not baseless. See _NAACP v. Claiborne Hardware Co._, 458 U.S. 886, 913-14, 73 L. Ed. 2d 1215, 102 S. Ct. 3409 (1982) (holding that where First Amendment protections apply, the government may not punish a citizen based on the reason for the exercise of those rights); _Noerr_, 365 U.S. at 139 (noting that right of the people to petition their government "cannot properly be made to depend on their intent in doing so").

[*25]  Second, it is undisputed that the zoning ordinance on which the state lawsuit relied was in effect prior to the defendants' lawsuit, and the government does not claim that it was adopted as a subterfuge to discriminate against the Eichlers. Thus this also is not a case involving a challenge by affected handicapped persons to a zoning board's requirement that they obtain a zoning variance that otherwise would not be required, cf. _Metropolitan Housing Dev. Corp. v. Village of Arlington Heights_, 558 F.2d 1283 (7th Cir. 1977), cert. denied, 434 U.S. 1025, 54 L. Ed. 2d 772, 98 S. Ct. 752 (1978); _Stewart B. McKinney Found., Inc. v. Town Plan and Zoning Comm'n of Fairfield_, 790 F. Supp. 1197 (D. Conn. 1992), or concerning a zoning board's refusal to grant a zoning variance as a reasonable accommodation for protected persons. Cf. _City of Cleburne_, 473 U.S. at 447-48; _Huntington Branch, NAACP v. Town of Huntington_, 844 F.2d 926 (2d Cir.), aff'd, 488 U.S. 15, 102 L. Ed. 2d 180, 109 S. Ct. 276 (1988) (per curiam).

Third, and most importantly, whether the defendants' lawsuit sought an illegal [*26] objective depends on the lawsuit's legal merits. The government essentially argues that the lawsuit sought an illegal objective on its face, in that it sought a court order excluding the Eichlers from their proposed residence solely on the basis of their familial status. See, e.g., Govt's Response at 5 n.3. The government argues that the lawsuit therefore constitutes conduct unprotected by the First Amendment. See, e.g., id. at 12 (citing _California Motor Transport_, 404 U.S. at 514 ([HN9]"First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute.") (emphasis added, citation omitted)). [18] The sole discriminatory act alleged in the government's Amended Complaint, however, is the filing of the state lawsuit. All other acts alleged by the government consist of meetings undertaken to plan or prepare the lawsuit, [19] and the

government does not claim that such meetings or other organizational activity constituted independent violations of the FHA. These subsidiary acts were not unlawful if the defendants were entitled to bring the state lawsuit, as to do so they would be entitled **[\*27]** to combine with others in order to maximize the lawsuit's effectiveness. See _NAACP v. Button_, 371 U.S. 415, 429-30, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1973); _Weiss v. Willow Tree Civic Ass'n_, 467 F. Supp. 803, 817-18 (S.D.N.Y. 1979).

## FOOTNOTES

**18** The _California Motor Transport_ Court thus distinguished expressive conduct, or "speech plus," from protected petitioning activity. See 404 U.S. at 514 (citing _Giboney v. Empire Storage & Ice Co._, 336 U.S. 490, 93 L. Ed. 834, 69 S. Ct. 684 (1949) (holding picketing was subject to state regulation, even though the picketing was part of a campaign which included protected speech)).

**19** Indeed, the Amended Complaint's allegations concerning defendants Beverly Hodgson and John Leventhal are limited to the claim that they sought to "orchestrate" the state lawsuit, as neither of these defendants was named as a party to that action.

The defendants' lawsuit is distinguishable from cases involving lawsuits that sought **[\*28]** to use the courts as a means to approve or enforce illegal conduct undertaken outside the judicial system. See, e.g., _Mayer v. Wedgewood Neighborhood Coalition_, 707 F.2d 1020, 1023 (9th Cir. 1983) ("while normally protected by the First Amendment, the invocation of administrative or judicial proceedings may be tortious and actionable if employed for a purpose that is unlawful and is other than and in addition to the goal sought openly in the proceeding itself."). For example, the lawsuit did not seek an order enforcing an unlawful private agreement. Cf. _Premier Elec. Const. Co. v. National Elec. Contractors Ass'n_, 814 F.2d 358 (7th Cir. 1987) (holding lawsuit to enforce agreement to restrain trade was not protected under First Amendment). Likewise, the state lawsuit did not seek judicial enforcement of a restrictive covenant which discriminated against a protected class of individuals. Cf. _Shelley v. Kraemer_, 334 U.S. 1, 92 L. Ed. 1161, 68 S. Ct. 836 (1948); _United States v. Scott_, 788 F. Supp. 1555 (D. Kan. 1992). Rather, the defendants filed the state lawsuit to exclude the Eichler family from their proposed **[\*29]** residence by obtaining a favorable interpretation of a facially valid local ordinance, and not to enforce extra-judicial conduct. Cf. Premier Electrical, 814 F.2d 358 at 376 ("[The defendant's legal action] was not a petition for a favorable rule of law; it was not an effort to implement an existing rule of law; it was an unvarnished effort to enforce a private price-fixing agreement."). Whether the lawsuit sought an illegal objective thus solely depends on a determination that the lawsuit was without legal merit.

In sum, the act of filing the state lawsuit alone forms the basis for the FHA violations alleged in this action, placing the defendants within the heartland of the Petition Clause. [20] The question presented by this case thus is whether, and if so to what extent, Congress intended the FHA to encroach on this territory. The FHA's statement of purpose makes clear that "it is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Likewise, the House Report on the Fair Housing Amendments Act of 1988 [21] states that the Act was intended to reach indirect **[\*30]** discrimination affected through the judicial system. [22] This legislative history does not reflect, however, whether Congress distinguished between efforts to obtain enforcement of "otherwise neutral rules and regulations" and efforts to obtain enforcement of "special requirements" involving extra-judicial agreements (such as restrictive covenants). That is, in drafting the FHA Congress did not distinguish between pure petitioning activities and those petitioning activities that "are used as an integral part of conduct which violates a valid statute." _California Motor Transport, 404 U.S. at 514._ Further, Congress declared that

the FHA's familial status provisions were not to interfere with reasonable local density restrictions, which thus can be enforced without fear of liability under the Act. [23]

## FOOTNOTES

[20] The filing of the lawsuit thus is distinguishable from other methods whereby the defendants could have voiced their disagreement to the Eichlers' proposed residence. For example, had the issue been raised at a hearing before the New Haven Zoning Commission, it appears to be without question that any protest made by the defendants in opposition would be protected by the First Amendment. *See, e.g., Christian Gospel Church, Inc. v. City and County of San Francisco*, 896 F.2d 1221 (9th Cir.), *cert. denied*, 498 U.S. 999, 112 L. Ed. 2d 565, 111 S. Ct. 559 (1990); *Evers v. County of Custer*, 745 F.2d 1196 (9th Cir. 1984). **[*31]**

[21] As Magistrate Judge Smith noted, *see* Magistrate Judge's Opinion at 16 n.7, the Supreme Court has cautioned that courts should inquire into legislative intent when applying statutes only reluctantly. *See West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100-01, 113 L. Ed. 2d 68, 111 S. Ct. 1138 (1991). This case, like cases involving the antitrust laws, requires a determination of the extent to which Congress intended a statute to affect constitutionally protected rights, however, suggesting the need to review the legislative history of the FHA. *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977).

[22] The House Report on the Fair Housing Amendments Act states:

> The Committee intends [the provisions of the Act prohibiting discrimination on the basis of handicap] to prohibit not only discrimination against the primary purchaser or named lessee, but also to prohibit denials of housing opportunities to applicants because they have children . . . with disabilities.

> These new subsections would also apply to state or local land use and health and safety laws . . . which discriminate against individuals with handicaps. While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities . . . [through] the enactment or imposition of health, safety or land-use requirements . . . .

> The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community. . . .

> Another method of making housing unavailable to people with disabilities has been the application or enforcement of otherwise neutral rules and regulations on health, safety and land-use in a manner which discriminates against people with disabilities. . . . These and similar practices would be prohibited.

H.R. Rep. No. 711, 100th Cong., 2d Sess. 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185 (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 435, 87 L.

Get a Document - by Citation - 1895 U.S. Dist. LEXIS 22327    Page 17 of 23

Case 3:02-cv-00356-DJS    Document 76-4    Filed 11/07/2007    Page 18 of 24

Ed. 2d 313, 105 S. Ct. 3249 (1985)). It is noteworthy that in drafting the Fair Housing Amendments Act Congress focused primarily on the rights of handicapped persons, as the Report's citation of *City of Cleburne* reveals. The legislative history concerning protections against discrimination on the basis of familial status is less clear. **[*32]**

23 *See* H.R. Rep. No. 711, 100th Cong., 2d Sess. 31 (1988) ("[The familial status provisions] are not intended to limit the applicability of any reasonable local, State, or Federal restrictions on the maximum number of occupants permitted to occupy a dwelling unit. . . . Reasonable limitations by governments would be allowed to continue, as long as they were applied to all occupants, and did not operate to discriminate on the basis of race, color, religion, national origin, handicap, or familial status."), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2192. This declaration of legislative intent does not, of course, end the issue of the interpretation of the FHA's familial status provisions under the facts of this case. *See infra* pp. 27-37.

As the Supreme Court stated in *Noerr*, HN10 "the right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Noerr*, 365 U.S. at 138. 24 The legislative history of the FHA does not demonstrate that Congress intended the Act to prohibit **[*33]** a "well-founded" lawsuit without some showing that the lawsuit was filed to effectuate illegal extra-judicial conduct. 25 *Bill Johnson's*, 461 U.S. at 743. Accordingly, the defendants' motions to dismiss this action must be granted if the state lawsuit possessed "a reasonable basis in fact or law." *Id.* at 748. 26

## FOOTNOTES

24 The government appears to argue that the Second Circuit's decision in *Ragin v. New York Times Co.*, 923 F.2d 995 (2d Cir. 1991), supports a finding that Congress intended the FHA to proscribe any speech if it leads to discrimination prohibited by the FHA. *See* Govt's Response at 11-12. *Ragin* involved a suit by black prospective home purchasers and an equal opportunity organization against a newspaper alleging that the models used in the newspaper's housing advertisements indicated a racial preference in housing, in violation of the FHA. The Second Circuit held that the FHA reached the use of models as a medium for the expression of racial preferences, and that the application of the Act to the newspaper would not violate the First Amendment. Central to the court's decision, however, was its finding that the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 1002 (quoting *Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 562-63, 65 L. Ed. 2d 341, 100 S. Ct. 2343 (1980)). *Ragin* does not suggest that Congress intended to curtail the right of petition, a First Amendment right unfettered by the limitations imposed on commercial speech. **[*34]**

25 Indeed, it is unclear whether a statute written to prohibit such a suit would be unconstitutional under the Petition Clause. The Court need not reach this issue, however, for as in *Bill Johnson's* the issue can be resolved by interpreting the FHA so as not to conflict with the Petition Clause. *See Bill Johnson's*, 461 U.S. at 740-44.

26 *Bill Johnson's* is particularly on point because it involved a construction of a statute which Congress drafted to reach all forms of labor discrimination or coercion. In particular, Congress intended § 8(a)(1) of the NLRA, the section allegedly violated by the employer's lawsuit in that case, to prohibit all efforts by employers to interfere with workers' rights protected under that Act. *See, e.g.*, Hearings on H.R. 6288 Before the House Comm. on Labor, 74th Cong., 1st Sess. 13 (1935) (statement of Senator Wagner) (stating that § 8(a)(1) (then § 8(1)) was intended as a "general declaration" proscribing

Get a Document - by Citation - 1895 U.S. Dist. LEXIS 22327

Case 3:02-cv-00936-DJS   Document 161-4   Filed 11/07/2007   Page 19 of 24   Page 18 of 23

employer interference, restraint, and coercion of workers in the exercise of their rights under the NLRA), *reprinted in* 2 National Labor Relations Board, Legislative History of the National Labor Relations Act of 1935, at 2487 (1949).

Indeed, apart from the different statutes allegedly violated, the sole significant distinction between *Bill Johnson's* and this case is the nature of the claims in the challenged lawsuits. The employer's lawsuit in *Bill Johnson's* asserted, *inter alia*, claims of libel. See 461 U.S. at 734. The Supreme Court pointed to no disputed issues of law raised by the lawsuit, and instead directed the NLRB on remand to determine whether the lawsuit presented any genuine issues of fact. *Id. at 748*. In contrast, the facts asserted by the defendants in their state complaint essentially are not contested by the government in this action. Whether that lawsuit was objectively meritless therefore depends only on whether it raised a genuine issue of law.

**[*35]** B. *Whether the State Lawsuit Was Objectively Meritless*

The defendants argue that the state lawsuit possessed a reasonable basis in law because the position it asserted was consistent with prior decisions by both Connecticut and federal courts, and because it raised a novel issue under the FHA. The government contends, in response, that the cases on which the defendants rely are readily distinguishable, and that the defendants' position in any case would be preempted under the FHA. The Court concludes that, on balance, the novelty of the defendants' position and the primacy of the First Amendment rights asserted weigh in favor of a finding that the filing of the lawsuit did not constitute a violation of the FHA.

The defendants' lawsuit urged the Superior Court to interpret the term "family," as used in the New Haven Zoning Ordinance, so as to exclude foster children from those "related by blood, marriage or adoption." This interpretation is consistent with $^{HN11}$ Connecticut law, which does not consider foster children to be so related. For example, foster children do not qualify as related children for the purposes of Connecticut's law of intestacy, *see* Conn. Gen. Stat. § 45a-438, **[*36]** and Connecticut law historically precluded adopted children from intestate inheritance. *See, e.g.*, Bridgeport-City Trust Co. v. Buchtenkirk, 143 Conn. 531, 124 A.2d 231 (1956) (noting adopted children were not considered "descendants" or "issue" under common law); *but see* Conn. Gen. Stat. § 45a-731 (formerly Conn. Gen. Stat. § 45-65a, first applicable in 1959, reversing common-law presumption). Rather, Connecticut law defines a "foster child" as "a child placed *temporarily* in a home, pending permanent placement," and defines a "permanent placement" as "a home for a child with his *genetic* or *adoptive* parents considered to be such child's permanent residence." Conn. Gen. Stat. § 17a-110 (emphases added). [27] The record reflects that the Eichlers intended to adopt their foster children, and in any case practical experience suggests that contemporary foster care can be anything but "temporary." Regardless of the fairness or practicality of doing so, however, Connecticut law clearly distinguishes between foster children and adopted or biological children, and generally excludes the former from its definitions of "related" persons.

**FOOTNOTES**

27 In addition, while a foster parent is accorded standing to seek a writ of habeas corpus seeking legal custody of a child currently or recently under his or her care, *see* Conn. Gen. Stat. § 52-466(f), this right is limited when the foster parent possesses interests potentially in conflict with the foster child. *See* Orsi v. Senatore, 230 Conn. 459, 645 A.2d 986 (1994); Nye v. Marcus, 198 Conn. 138, 502 A.2d 869 (1985).

**[*37]** The defendants' lawsuit also presented a novel issue under federal law, although the

applicable caselaw is not so ambiguous as the defendants argue. In particular, the defendants appear to argue that their lawsuit sought the enforcement of an ordinance controlling residential density in a residential neighborhood, and did not seek to exclude the Eichlers on the basis of their membership in the protected class of foster families. The defendants note that Article III, § 11 of the New Haven Zoning Ordinance specifies that RS-1 districts exist to preserve existing low-density residential neighborhoods, *see supra* note 6 (quoting § 11), and they assert that density-based ordinances are exempted from coverage by section 3607(b) of the FHA [28] and have been upheld on constitutional challenges by the United States and Connecticut Supreme Courts.

## FOOTNOTES

[28] *See* 42 U.S.C. § 3607(b) ("Nothing in this subchapter limits the applicability of any reasonable local, State or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.").

[*38] The distinction between density and class-based zoning restrictions derives from a trio of Supreme Court cases. In *Village of Belle Terre v. Boraas*, 416 U.S. 1, 39 L. Ed. 2d 797, 94 S. Ct. 1536 (1974), the Supreme Court upheld a zoning ordinance that limited to two the number of persons who could reside in a single-family zoning district, if those persons were unrelated by blood, marriage, or adoption. The Court concluded, in the context of the application of the ordinance to six unrelated students living in a single residence, that the zoning restriction constituted a permissible exercise of a locality's police power where the locality designed the restriction to maintain "[a] quiet place where yards are wide [and] people few." *Id.* at 9; *see also Dinan v. Board of Zoning Appeals*, 220 Conn. 61, 595 A.2d 864 (1991) (rejecting state constitutional challenge to zoning ordinance that defined "family" to exclude five or more unrelated persons). In *Moore v. City of East Cleveland*, 431 U.S. 494, 52 L. Ed. 2d 531, 97 S. Ct. 1932 (1977), however, the Supreme Court invalidated a single-family zoning ordinance which excluded [*39] the class of all grandparents from its definition of "family." The Court concluded that such a distinction, "by slicing deeply into the family itself," violated the Due Process Clause because "the tradition of uncles, aunts, cousins and especially grandparents sharing a household along with parents and children has roots . . . equally deserving of constitutional recognition." *Id.* at 498, 504 (footnote omitted). The Court in *City of Cleburne* extended this logic on equal protection grounds, holding invalid a zoning ordinance requiring group homes for the mentally handicapped to obtain special use permits while freely permitting other care and multiple-dwelling facilities. City of Cleburne, 473 U.S. at 448. The Court based its decision on the ground that the ordinance discriminated against a class protected under the Fourteenth Amendment, and on a finding that the ordinance was not rationally related to the governmental interests advanced. *Id. Belle Terre*, *Moore* and *City of Cleburne* thus hold that while a locality may have a legitimate interest in controlling residential density, notwithstanding an absence of any limitation on the permitted [*40] number of related persons, the locality must advance that interest without discriminating against persons because of their status or membership in a protected class.

Zone RS-1 of the New Haven Zoning Ordinance sets forth a residential density restriction based on a distinction between related and unrelated persons. *Belle Terre* and *Moore* permit localities to draft zoning ordinances containing this distinction. Further, courts in other federal circuits have concluded that density restrictions similar to those in Zone RS-1, which allegedly had discriminatory effects on other classes of persons protected by the FHA, were not unlawful under the Act. *See, e.g.*, *Elliott v. City of Athens*, 960 F.2d 975 (11th Cir.) (holding ordinance, which limited residences to related persons or maximum of four unrelated persons, could be applied to a group of recovering alcoholics without violating FHA), *cert. denied*, 506 U.S. 940, 113 S. Ct. 376, 121 L. Ed. 2d 287 (1992); *Familystyle of St. Paul, Inc. v. City of St. Paul*, 923 F.2d 91 (8th Cir. 1991) (holding ordinance requiring

new group homes for mentally ill persons to be located at least **[*41]** a quarter mile from any existing residential facilities did not violate FHA); _Doe v. City of Butler_, 892 F.2d 315 (3rd Cir. 1989) (holding ordinance limiting transitional dwellings to a total of six persons and a supervisor could be applied to a class of battered women without violating FHA, but remanding on issue of applicability of ordinance in high density zoning districts); _but see, e.g._, _Oxford House-C v. City of St. Louis_, 843 F. Supp. 1556 (E.D. Mo. 1994) (holding single-family ordinance violated the FHA with respect to families composed of handicapped persons).

_Elliott_, _Familystyle_ and _Doe_ principally involved challenges to facially neutral occupancy restrictions which were alleged to have a discriminatory effect on classes of persons protected under the FHA. The government's Amended Complaint, in contrast, alleges that the defendants' state complaint sought an interpretation of New Haven's Zoning Ordinance which would have denied housing explicitly on the basis of the Eichlers' status as a foster family. The government argues that the state lawsuit thus sought an illegal objective on its face, as the FHA prohibits discrimination **[*42]** on the basis of familial status, _see_ 42 U.S.C. § 3604 (a), and defines "familial status" in terms of legal custody and not in terms of blood, marriage or adoption. _See_ 42 U.S.C. § 3602(k).

_HN12_ While section 3615 of the FHA invalidates conflicting local law, [29] the FHA does not exert so strong a preemptive effect as to displace all local zoning ordinances, which must be reviewed on the facts of a given case. [30] _See Familystyle_, 923 F.2d at 93-94; _Familystyle of St. Paul, Inc. v. City of St. Paul_, 728 F. Supp. 1396, 1400 n.8 (D. Minn. 1990). No court has yet held that section 3602(k) of the FHA requires the invalidation of zoning ordinances defining "family" in terms of blood, marriage or adoption. Nor has any court resolved the potential conflict between sections 3602(k) and 3607(b) [31] of the FHA in the context of single-family zoning ordinances. The few decisions considering the legal status of foster families under the FHA also do not provide a clear rule. _Compare Gorski v. Troy_, 929 F.2d 1183 (7th Cir. 1991) (holding section 3602(k) confers standing upon foster parents to bring **[*43]** claims under FHA) _and Seniors Civil Liberties Assoc., Inc. v. Kemp_, 965 F.2d 1030 (11th Cir. 1992) (upholding FHA's prohibition of familial status discrimination against attack based on, _inter alia_, First Amendment right of association and state sovereignty under Tenth Amendment) _with Smith & Lee Assocs., Inc. v. City of Taylor_, 13 F.3d 920 (6th Cir. 1993) (holding state statute, which limited adult foster care homes to six or fewer residents in order to be considered a "single family" under local zoning ordinances, did not violate FHA). In short, the ambiguity of the caselaw on the FHA's familial status provision suggests that the defendants reasonably relied on the validity of the New Haven Zoning Ordinance. The Court therefore concludes that, from the perspective of a reasonable litigant, the defendants' lawsuit presented a genuine issue of law.

## FOOTNOTES

[29] Section 3615 provides in part: _HN13_ "Any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." 42 U.S.C. § 3615. **[*44]**

[30] The Court previously addressed the subject of preemption in this case only as it related to the issue of removal of the underlying state lawsuit. _See Robinson v. Eichler_, 795 F. Supp. at 1258-61 (holding that because the lawsuit was not subject to removal under 28 U.S.C. § 1443(1), and because the FHA did not so occupy the field as to displace all local zoning ordinances, a lawsuit brought pursuant to such an ordinance was not necessarily federal and thus was not subject to removal). That decision did not address whether specific provisions of the FHA preempt New Haven's Zoning Ordinance.

Get a Document - by Citation - 1895 U.S. Dist. LEXIS 22327

Case 3:02-cv-00939-DJS   Document 116-4   Filed 11/07/2007   Page 22 of 23   Page 21 of 23

**31** See supra note 28 (quoting text of § 3607(b)); see also supra note 23 (quoting legislative history supporting § 3607(b)), [MISSING TEXT]

Three additional grounds support this finding. First, the Court has viewed the reasonableness of the defendants' lawsuit from the perspective of an objective litigant at the time the state lawsuit was filed. **HN14** "[A] district court [must] resist the understandable temptation to engage in post hoc reasoning **[*45]** by concluding that, because a [party] did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22, 54 L. Ed. 2d 648, 98 S. Ct. 694 (1978); see also Professional Real Estate Investors, 113 S. Ct. at 1928 n.5. **32**

**FOOTNOTES**

**32** That the defendants ultimately decided to withdraw their lawsuit does not suggest that an ex ante perspective should be abandoned. It is certainly true, as the government argues, that the withdrawal is a fact the Court may consider in assessing the lawsuit's merits. See Bill Johnson's, 461 U.S. at 747 (stating that NLRB may consider withdrawal of underlying action in determining whether it constituted an unfair labor practice). As Magistrate Judge Smith found, however, the defendants' decision to withdraw their lawsuit "is ambiguous and capable of supporting competing inferences." Magistrate Judge's Opinion at 19 n.8. Indeed, the Supreme Court's analogy in Bill Johnson's to a state-law action for malicious prosecution or vexatious suit, see 461 U.S. at 747 n.14, neither hinders nor supports the government's position. While under Connecticut law the withdrawal of an underlying suit is the functional equivalent of an adverse determination, see, e.g., Colli v. Kamins, 39 Conn. Supp. 75, 76-77, 468 A.2d 295 (1983), success in a vexatious suit action also requires proof of malice and the lack of probable cause. See DeLaurentis v. City of New Haven, 220 Conn. 225, 248, 597 A.2d 807 (1991). The Connecticut Supreme Court in DeLaurentis stated that whether the outcome of the underlying suit was favorable to the plaintiff is relevant to the issue of probable cause, which the court defined as "'a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.'" Id. at 256 (quoting Wall v. Toomey, 52 Conn. 35, 36 (1884)); see also Professional Real Estate Investors, 113 S. Ct. at 1929 ("The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation. . . . Probable cause . . . requires no more than a reasonable belief that there is a chance that [a] claim may be held valid upon adjudication.") (quotations omitted). In short, the fact that the defendants withdrew their lawsuit merely returns the inquiry to the objective reasonableness of that action.

**[*46]** Second, this is not a case in which only declaratory or injunctive relief was sought under the FHA. Cf. Elliott, 960 F.2d 975; Doe, 892 F.2d 315; Oxford House-C, 843 F. Supp. 1556; LeBlanc-Sternberg v. Fletcher, 781 F. Supp. 261 (S.D.N.Y. 1991). Rather, this is an action in which the government also seeks in addition compensatory and punitive damages, and this fact heightens the importance of the First Amendment rights asserted by the defendants. **HN15** "The presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." Claiborne Hardware, 458 U.S. at 916-17; see also Bill Johnson's, 461 U.S. at 741 ("The chilling effect of a state lawsuit upon [a defendant's] willingness to engage in protected activity is multiplied where the complaint seeks damages

Get a Document - by Citation - 1895 U.S. Dist. LEXIS 22327

Case 3:02-cv-00990-DJS    Document 161-4    Filed 11/07/2007    Page 23 of 23

Page 22 of 23

in addition to injunctive relief.") (citation omitted). This is particularly true where the defendants raised a novel issue under the FHA before a judicial officer responsible for reconciling state and federal **[*47]** law. *Cf. City of Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 176 n.10, 50 L. Ed. 2d 376, 97 S. Ct. 421 (1976) ("It would strain First Amendment concepts extraordinarily to hold that dissident teachers could not communicate [opposing] views directly to the very decisionmaking body charged by law with making the choices raised by the contract renewal demands."). Further, the prospect of a federal lawsuit seeking damages would deter those who may wish to file legal actions presenting genuine legal or factual issues. *See Stern*, 547 F.2d at 1343; *Weiss*, 467 F. Supp. at 819 n.64. Civil rights advocates should be first to note the importance of the ability to resort to courts to test novel issues of law without fear of such liability. [33] *See Button*, 371 U.S. at 440-42 (noting First Amendment rights are not subordinated where civil rights claims involved).

**FOOTNOTES**

[33] Amicus Curiae points to two cases, *Otero v. New York City Housing Authority*, 484 F.2d 1122 (2d Cir. 1973), and *Annunziato v. City of New Haven Bd. of Aldermen*, 555 F. Supp. 427 (D. Conn. 1982), as examples of civil rights cases raising controversial and ultimately unsuccessful legal challenges. *See* Amicus Curiae's Mem. at 13-14 & n.5. Doubtless the Federal Reporter is replete with such cases. Notably, the plaintiffs in *Annunziato* subsequently were accused by one of the defendants of bringing the case with a discriminatory motive, an argument the Second Circuit rejected in assessing an award of attorneys' fees against that defendant under 42 U.S.C. § 1983. *See Annunziato v. The Gan, Inc.*, 744 F.2d 244, 245, 253-54 (2d Cir. 1984). In addition, unlike most other aspects of petitioning behavior, such as mere lobbying of a government official, it is possible to avert the harm posed by a lawsuit by "counter-petitioning;" that is, by responding to the complaint's allegations. *Cf. LeBlanc-Sternberg*, 781 F. Supp. at 267 (reviewing FHA claims against individuals who petitioned township for the incorporation of a village that allegedly excluded Orthodox Jewish families).

**[*48]** Finally, the Court's conclusion is consistent with the primacy of the defendants' First Amendment rights. [HN16] The right to petition for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222, 19 L. Ed. 2d 426, 88 S. Ct. 353 (1967). It shares the "preferred place" accorded in our system of government to the First Amendment freedoms, and has "a sanctity and a sanction not permitting dubious intrusions." *Thomas v. Collins*, 323 U.S. 516, 530, 89 L. Ed. 430, 65 S. Ct. 315 (1945); *see also United States v. Cruikshank*, 92 U.S. 542, 552, 23 L. Ed. 588 (1876) (holding right to petition is logically implicit in and fundamental to the very idea of a republican form of government). An intrusion into this right cannot be sustained merely because the federal statute at issue was "enacted for the purpose of dealing with some evil within the State's legislative competence, or even because the law[] do[es] in fact provide a helpful means of dealing with such an evil." *United Mine Workers*, 389 U.S. at 222 (citations omitted). **[*49]** While the defendants' alleged motives may be abhorred, it remains true that "the Constitution protects expression . . . without regard to the . . . truth, popularity, or social utility of the ideas and beliefs which are offered." *Button*, 371 U.S. at 444-45.

**CONCLUSION**

For the reasons stated above, the defendants' objections to Magistrate Judge Smith's Recommended Ruling are sustained

[ILLEGIBLE SLIP OP. PAGE 38]

Get a Document - by Citation - 1895 U.S. Dist. LEXIS 22327

Case 3:02-cv-00999-DJS    Document 46-4    Filed 11/07/2007    Page 24 of 23    Page 23 of 23

*JUDGMENT*

This cause came on for consideration on defendants' motions to dismiss by the Honorable Thomas P. Smith, United States Magistrate Judge and the Honorable T. F. Gilroy Daly, United States District Judge, and

The Court having considered the motions and all the papers submitted in connection therewith, filed its Ruling on Objections to Recommended Ruling, sustaining the defendants' objections to the Magistrate Judge's Recommended Ruling denying the defendants' motions, and ordered that the defendants' motions to dismiss are each hereby granted and the Government's Amended Complaint is ordered dismissed,

It is therefore ORDERED and ADJUDGED that judgment enter for the defendants and the complaint is dismissed.

Dated at Waterbury, Connecticut, **[\*50]** this 26th day of January, 1995.

Service: **Get by LEXSEE®**
Citation: **1995 U.S. Dist. LEXIS 22327**
View: Full
Date/Time: Wednesday, November 7, 2007 - 8:22 AM EST

\* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case.

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help



About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.