# EXHIBIT B

## Connecticut Trial Court Official Decisions

JORDAN v. OLD SAYBROOK ZONING COMM., No. CV01 0508891-S (Oct. 31, 2003)

JORDAN PROPERTIES, LLC ET AL. v. OLD SAYBROOK ZONING COMMISSION.

2003 Ct. Sup. 11935

No. CV01 0508891-S

Connecticut Superior Court, Judicial District of New Britain

at New Britain

October 31, 2003

[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
*MEMORANDUM OF DECISION*

TANZER, JUDGE.

The plaintiffs, Jordan Properties, LLC (Jordan) and Jandim Realty Co., Inc. (Jandim), appeal from the decision of the defendant, Old Saybrook Zoning Commission (commission), approving an affordable housing application but conditioning such approval on the satisfaction of sixteen conditions. The plaintiffs also appeal from the commission's subsequent denial of an amended application, submitted in response to the sixteen conditions.

On September 18, 2000, Jordan applied to the commission for a Certificate of Zoning Compliance and for approval of a site plan in conjunction with the proposed construction of a multi-family housing development to be known as "Saybrook Commons." ("Application") Saybrook Commons was proposed to consist of 216 units to be located on an 11.97 acre parcel of land situated on North Main Street, Old Saybrook, Connecticut and owned by the plaintiff, Jandim.**[fn1]**

Prior to opening the matter for public comment, the commission held hearings on the site plan application on October 2, 2000, October 16, 2000 and November 6, 2000. The commission subsequently held public hearings on the application on November 13, 2000 and November 20, 2000. On December 4, 2000, the commission voted to approve the Application but limited their approval by imposing sixteen conditions.**[fn2]** Notice of the commission's decision was duly published in the *Hartford Courant* on December 12, 2000.

On December 26, 2000, Jordan submitted an amended application pursuant to General Statutes § 8-30g (d), now subsection (h). This amended application modified several aspects of the original application by incorporating several of the sixteen conditions articulated by the commission. The commission held public hearings on the amended application on January 16, 2001, January 22, 2001 and February 7, 2001. On February 7, 2001, at the close of the public hearings, the commission upheld its prior determination, essentially affirming each of the
CT Page 11936
conditions with which the plaintiffs had not already. Notice of this decision was duly published in the *Hartford Courant* on February 16,

2001.

On February 28, 2001, the plaintiffs appealed from both the commission's December 4, 2000 denial of the original Application and its February 7, 2001 denial of the amended application. On appeal, the plaintiffs challenge ten of the sixteen conditions.**[fn3]** The plaintiffs allege that the ten conditions have a substantial adverse impact on both the viability of Saybrook Commons as an affordable housing development and the degree of affordability of the dwelling units, in violation of § **8-30g**. The plaintiffs seek an order sustaining their appeal and directing the commission to set aside the ten conditions or, in the alternative, an order directing the commission to grant the amended application.

## JURISDICTION

General Statutes § **8-30g** (c), now subsection (g), establishes the appeals procedure for affordable housing applications. Section **8-30g** (a)(2) defines an affordable housing application as "any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing." The Application for site plan approval and the amended application for site plan approval satisfy the statutory definition of an affordable housing application, the provisions of § **8-30g** govern the present appeal. CITE HERE

## AGGRIEVEMENT

"[P]leading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal." (Internal quotation marks omitted.) *Harris v. Zoning Commission*, **259 Conn. 402**, **409**, **788 A.2d 1239** (2002). "A person does not become aggrieved until the zoning authority has acted, and the question of aggrievement is a jurisdictional one for the court . . . To be entitled to an appeal, the plaintiff[s] [are] required to allege and prove that [they are] aggrieved by the decision of the commission . . . The fundamental test by which the status of aggrievement . . . is determined encompasses a well-settled twofold determination. First, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the
CT Page 11937
decision . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citations omitted; internal quotation marks omitted.) *Quarry Knoll II Corp. v. Planning & Zoning Commission*, **256 Conn. 674**, **702**, **780 A.2d 1** (2001). "Aggrievement is an issue of fact . . . and credibility is for the trier of the facts . . . Conclusions are not erroneous unless they violate law, logic or reason or are inconsistent with the subordinate facts." (Internal quotation marks omitted.) *Id.*, 703.

The owners of property that is the subject of an application may prove aggrievement by testimony at the time of trial; *Winchester Woods Associates v. Planning & Zoning Commission*, **219 Conn. 303**, **308**, **592 A.2d 953** (1991); or "by the production of the original documents or certified copies from the record." (Internal quotation marks omitted.)

*Quarry Knoll II Corp. v. Planning & Zoning Commission*, supra, 256 Conn. 703.

Jandim alleges that it "is the owner of certain undeveloped real property situated on North Main Street in the Town of Old Saybrook"; and that it is aggrieved by the decision because the property it owns is the subject of the application. At the hearing, held on October 1, 2002, Jandim introduced two warranty deeds demonstrating, to the court's satisfaction, that it owns the subject premises. Jandim has successfully demonstrated a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole to support a finding of aggrievement.

"The interest which supports aggrievement need not necessarily be an ownership interest in real property." R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice 2 Ed. (1999) 32.5, p. 538. A contract purchaser of the property that is the subject of the application possesses an interest tantamount to ownership and, thus, has standing to appeal a decision on the application. See *Shapero v. Zoning Board*, 192 Conn. 367, 376-77, 472 A.2d 345 (1984); see also *R&R Pool & Home, Inc. v. Zoning Board of Appeals*, 43 Conn. App. 563, 569-70, 684 A.2d 1207 (1996), rev'd on other grounds 257 Conn. 456, 778 A.2d 61.

Jordan alleges that it "has entered into an agreement with Jandim Realty whereby Jordan Properties has a contract to purchase the premises;" and that it is aggrieved by the commission's decision both because it is the contract purchaser of the subject premises and the applicant for site plan approval. In addition to being the applicant, Jordan, at the hearing, held on October 1, 2002, introduced a contract to
CT Page 11938
purchase the premises demonstrating, to the court's satisfaction, that at all relevant times it was a valid contract purchaser of the premises. Jordan has successfully demonstrated a specific, personal and legal interest in the subject matter of the decision, to support a finding of aggrievement.

In addition to demonstrating their specific personal and legal interests in the subject matter of the decision, the plaintiffs are also required to demonstrate that they have been injured by the decision. "Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units in a set-aside development, may appeal such decision pursuant to the procedures of this section." Section 8-30g (f)

The plaintiffs have sufficiently demonstrated a possibility that the conditions imposed had a substantial adverse impact on the viability of the affordable housing development and on the degree of affordability of the affordable dwelling units. At trial, the plaintiffs introduced expert testimony as to the nature and extent of the adverse financial impact of the conditions on the project. This evidence included a "pro forma" analyzing the construction costs of implementing the sixteen conditions and projecting profit returns in view of these added costs. The pro forma and the expert testimony adduced at the hearing demonstrate, to the court's satisfaction, that the plaintiffs are aggrieved because the conditions have a substantial adverse impact on the viability of the affordable housing development.

It is the conclusion of this court, therefore, that the plaintiffs have

satisfactorily demonstrated aggrievement.

## TIMELINESS AND SERVICE OF PROCESS

The commission's decision denying the plaintiffs' original application was published on December 12, 2000. The plaintiffs then filed their amended application on December 26, 2000. The date of publication of the decision denying the amended application was February 16, 2001. The plaintiffs commenced their appeal on March 1, 2001, by service of process upon the town clerk of Old Saybrook and the chairman of the commission. The plaintiffs filed a timely appeal upon the proper parties.[fn4]

## SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a planning and zoning commission's decision on an affordable housing application is set forth at §
CT Page 11939
8-30g (g), which provides that: "Upon an appeal taken under subsection (f) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. The commission shall also have the burden to prove, based upon the evidence in the record compiled before such commission, that (1)(A) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (B) such public interests clearly outweigh the need for affordable housing; and (C) such public interests cannot be protected by reasonable changes to the affordable housing development, *or* (2)(A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses, and (B) the development is not assisted housing, as defined in subsection (a) of this section. If the commission dos not satisfy the burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it." (Emphasis added.)[fn5]

This provision reveals two different burdens of proof for appeals brought pursuant thereto. Subpart (1) applies to traditional affordable housing appeals and subpart (2) applies to affordable housing appeals that seek to locate housing in an area zoned for industrial use. Under both alternatives, the burden is on the commission first to cite the reasons for their decision; JPI: and to demonstrate that the "reasons cited for such decision are supported by sufficient evidence in the record." See § 8-30g (g). Second, "[t]he commission *shall also have the burden to prove*" one of two things: if it is a traditional affordable housing appeal, the commission must satisfy the three-pronged test set forth in parts (1)(A)(B) and (C). If the application seeks to place housing in an area zoned for industrial use, the commission must only satisfy the two-pronged test set forth in parts (2)(A) and (B).

In the present case, if the commission establishes the applicability of the industrial zone exemption, it must only show that the reasons it cited are supported by sufficient record evidence. If, however, the industrial zone exemption does not apply, the commission must satisfy the heightened burden of proof set forth in part (1) of the statute.

As the industrial zone exemption is determinative of the commission's burden of proof and the scope of this court's review, its applicability

must be determined at the outset. General Statutes § **8-30g** (g)
(2),**[fn6]** the industrial zone exemption, sets forth a less
CT Page 11940
stringent burden of proof than that set forth in § **8-30g**
(g)(1). The commission asserts that this exemption applies to the
plaintiffs' applications and, therefore, that its burden of proof is
limited to demonstrating that (1) its decision is supported by sufficient
evidence, (2) the applications sought to locate affordable housing is
an area which is zoned for industrial use and which does not permit
residential uses and (3) the development is not assisted housing.

The commission asserts, and the record reflects, that the premises is
located in a B-2 Shopping Center Business District. The Commission takes
the position that this appeal is governed by the industrial use exemption
because the area for which the plaintiffs seek approval for its
affordable housing is zoned for industrial use.

The argument fails. The Application does not locate affordable housing
in an area which is zoned for industrial use. Turning to the zoning
regulations of the Town of Old Saybrook, we find that they specifically
designate in Article IV — Industrial Districts — the town's
two industrial zones. The subject area is not located in either. Rather,
it is located in a B-2 zone which is expressly designated as a "Shopping
Center Business District" under Article III — Business and Maritime
Districts.

The commission argues, however, that the industrial use exception
applies because the B-2 zone permits industrial uses, that is, some of the
same uses permitted in the Industrial Districts. According to the town's
zoning regulations, the B-2 district permits various commercial and
business uses. The commission argues that because some of the uses
permitted in the B-2 zone are "industrial in nature" and, in fact, overlap
many of the uses permitted in the town's two industrial zones, the
industrial zone exemption should apply to the plaintiffs' applications.
The commission further asserts that the B-2 zone does not permit
residential uses and that the development is not assisted housing, as
that term is defined in subsection (a) of § **8-30g**.

This court is not persuaded. While many of the permitted uses in the
Industrial District and the B-2 District overlap,**[fn7]** the fact that two
different zones permit some of the same uses or attributes does not mean
that the two zones are interchangeable or wholly congruent. This court is
mindful of the proposition that "all squares are rectangles, but not all
rectangles are squares." It is the differences in the permitted uses, not
the similarities, that are important. Indeed, what would set one zone
apart from another if not the allowance in one of uses prohibited in
others. Both the I-1 and I-2 zones permit uses that the B-2 zone
expressly prohibits, for example: painting, plumbing, electrical, sheet
CT Page 11941
materials, carpentry, wood-working, blacksmith, welding and machine shops
(See § 41.1.5 and § 32.3.2,) and warehousing and wholesale
businesses; building contractors' businesses and storage years; lumber
and building materials businesses; freight and materials trucking
terminals and businesses; bus terminals; commercial storage, sale and
distribution of fuel. (See § 41.1.3 and § 32.3.5.)

In assessing whether the B-2 zone falls within the industrial zone
exemption, this court is mindful of the legislative purpose behind the
affordable housing land use appeals statute which is to "encourage and
facilitate the much needed development of affordable housing throughout

the state"; *JPI Partners, LLC v. Planning and Zoning Board*, **259 Conn. 675**, **689**, **791 A.2d 552** (2002)); and that, as a remedial statute, section § **8-30g** "must be liberally construed in favor of those whom the legislature intended to benefit." (Internal quotation marks omitted.) *Kaufman v. Zoning Commission*, **232 Conn. 122**, **140**, **653 A.2d 798** (1995). If this court were to adopt the broad interpretation of § **8-30g** (g)(2) advanced by the commission and expand the exemption to include not only "areas zoned for industrial use" but also areas in which permitted uses overlap with areas zoned for industrial use, it would thwart the important purposes of the statute to promote the development of affordable housing. It is an established and long-held rule that statutory exceptions are to be strictly construed. *Conservation Commission v. Price*, **193 Conn. 414**, **424** (1984); *Kulis v. Moll*, **172 Conn. 104**, **110** (1976). See also, *State v AFSCME*, **257 Conn. 80**, **93** (2001).

This court concludes that the B-2 Shopping Center Business District is not "an area zoned for industrial use" and that the industrial zone exemption is not applicable to the plaintiffs' applications. As such, this appeal is governed by § **8-30g** (g)(1), and the commission must satisfy that section with respect to each of the reasons it cites for imposing the ten challenged restrictions.

As a predicate addressing the merits of this appeal, the court finds, and it is undisputed by the parties, that the Town of Old Saybrook is seriously lacking an adequate supply of affordable housing and, indeed, is well below the 10% goal set by the statute. In a report dated April 11, 2000, the Connecticut Department of Economic and Community Development determined that 1.93% of the town's housing stock was affordable. That dire need, informs, as it must, any plenary review conducted by this court.

First, however, pursuant to § **8-30g** (g), the commission must demonstrate that the reasons it cites for imposing each of the ten
CT Page 11942
challenged conditions are supported by sufficient evidence in the record. If the commission meets the initial burden of proof that there is sufficient evidence in the record to support its reason for imposing each condition, the trial court then undertakes a plenary review of the record to determine whether: "(A) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (B) such public interests clearly outweigh the need for affordable housing; and (C) such public interests cannot be protected by reasonable changes to the affordable housing development." Section **8-30g** (g)(1). It is important to underscore that under subparagraphs (A), (B), and (C) of the statute, "the court must review the commission's decision independently, based upon its own scrupulous examination of the record." *Quarry Knoll II Corp. v. Planning and Zoning Commission*, supra, 256 Conn. 727.

It is well settled that, while a zoning commission does not have to make its findings in perfect language, the reasons it gives for acting on an affordable housing application must be the collective reasons cited by the commission at the time it took its formal vote on the application, rather than reasons that later might be culled from the record. See *Mackowski v. Planning and Zoning Commission*, **59 Conn. App. 608**, **615**, **757 A.2d 1162** (2000). In the present case, only the commission's collective reasons for the conditions, given in its decision-making sessions and contained in the resolutions dated December 4, 2000 and

February 7, 2001, will be considered. As stated previously, the burden is initially on the commission to demonstrate that the decision from which such appeal is taken and the reasons cited by such decision are supported by sufficient evidence. See § **8-30g** (g). If the reasons assigned by the commission are not supported by sufficient evidence, the court need not consider them further. The "sufficient evidence" threshold has been defined as "less than a preponderance of the evidence, but more than a mere possibility . . . [T]he zoning commission need not establish that the effects it sought to avoid [by imposing the condition] are definite or more likely than not to occur, but . . . such evidence must establish more than a mere possibility of such occurrence . . . Thus, the commission was required to show a reasonable basis in the record for concluding [as it did]. The record, therefore, must contain evidence concerning the potential harm that would result if the [condition was not imposed] . . . and concerning the probability that such harm in fact would occur." (Citation omitted; internal quotation marks omitted.) *Christian Activities Council, Congregational v. Town Council,* **249 Conn. 566**, **585**, **735 A.2d 231** (1999), superseded by *Quarry Knoll II Corp. v. Planning & Zoning Commission,* supra, **256 Conn. 674**.

Each of the ten challenged conditions will be separately addressed.
CT Page 11943

CONDITION 1: Building Materials

The commission imposed the following restriction: "The materials as identified in the plans submitted shall be utilized in the final construction, and no substitutions shall be permitted without the express approval of the Commission." The commission was referring to certain surface materials including wood siding, trim, and cedar shingles, natural stone foundation walls and small-lite windows. In support of its imposition of this condition, the commission asserted that the materials identified in the plaintiffs' plans "provide significant visual enhancements to the finished product" and are "essential elements to the overall sense of community and history both in Old Saybrook and in the new residential community which the applicant seeks to create."

Building and Site Materials

In a January 22, 2001 report, Point One, the commission's architects, expressed concern that some of the building materials had been changed from the plaintiffs' original application and that the new materials "will not be consistent with the traditional residential construction found throughout the town of Old Saybrook" and "may reduce the sense of pride that the residents feel towards their residential community."

This condition is not supported by sufficient evidence in the record. In support of the condition, the commission provided only vague statements about how the recommended materials would provide "visual enhancements" and an "overall sense of community and history" to the development. The commission has failed to explain how these purely aesthetic considerations pose a specific hazard to a substantial public interest in health, safety of other legitimate concerns, nor does the commission quantify the likelihood of any such harm. See *Christian Activities Council, Congregational v. Town Council,* supra, 249 Conn. 585. There is no evidence in the record that the materials proposed by the plaintiffs are in any way inferior to the ones recommended by the commission or that this condition is otherwise supported by a reasonable basis in the record. Purely aesthetic concerns, without any identified connection with a substantial public interest, do not withstand scrutiny

under § **8-30g** (g).

The commission's recommendation with respect to building materials is not supported by sufficient evidence in the record.

CONDITION 2: Recommendations of Commission's Architects and Planners
CT Page 11944

The commission imposed the following restriction: "The site, buildings, parking areas, driveways, pedestrian circulation, and all other applicable elements of the plan shall be revised in accordance with the recommendations contained in the reports of the Commission's architects and planners." This condition encompasses various general recommendations made by the town's architectural consultant, Point One Architects, in a report to the commission dated November 13, 2000: The report included recommendations about the scale and proportion of the development, site lighting, building materials, landscaping, public space and pedestrian and vehicular circulation. While the plaintiffs' amended application incorporated many of the recommendations, the commission's denial of the amended application stressed that the plaintiffs "[have] not moved toward the recommended *density, no remediation of the heights of the buildings to conform to town existing policy, pedestrian access to Main Street and the existing Old Saybrook Shopping Center* has not been addressed." (Emphasis supplied).

In a report compiled in response to the plaintiffs' amended application, dated January 22, 2001, Point One addressed the recommendations with which the plaintiffs had not yet complied and advised the commission as to why compliance of each was still necessary. The recommendations of Point One are in most instances general, vague and non-specific. Nonetheless, the report of Point One, as it relates to those areas of concern expressed by the commission — density, no remediation of the heights of the buildings to conform to town existing policy, pedestrian access to Main Street and the existing Old Saybrook Shopping Center — will be addressed and evaluated separately.

   a. Scale and Proportion

In its January 22, 2001 report, Point One addressed the scale and proportion recommendations that had not been incorporated into the plaintiffs' amended application. Of particular concern to Point One was the height and width of the proposed buildings. They stated that "[t]he gable end wall proportions have not been modified as suggested in our previous report, *these elevations are still not proportionally pleasing*. A steeper roof pitch and/or details at the end walls should be incorporated to reduce the overall scale and improve the proportions." (Emphasis added.)

This recommendation is not supported by sufficient evidence in the record. The commission has failed to explain how the scale and proportion of the buildings as proposed by the plaintiffs poses a specific harm to a substantial public interest in health, safety or other legitimate concerns, nor does the commission quantify the likelihood of any such
CT Page 11945
harm. See *Christian Activities Council, Congregational v. Town Council, supra*, 249 Conn. 585. While Point One's report does reference concern about the building elevations not being "proportionally pleasing," this is a purely aesthetic consideration and, as discussed previously, such concerns do not withstand § **8-30g** (g) scrutiny if they are not tied to a legitimate public interest. The commission has failed to pinpoint the

harm it was seeking to avert by imposing this restriction and there is no evidence that this recommendation is otherwise supported by a reasonable basis in the record.

It is the conclusion of this court, therefore, that the recommendation of the commission with respect to scale and proportion is not supported by sufficient evidence in the record.

b. Pedestrian and Vehicular Circulation

In its January 22, 2001 report, Point One expressed concern that the amended application "does not address the issue of pedestrian circulation along North Main Street or from the housing complex to the Saybrook Shopping Center" and that a "[s]afe means of pedestrian circulation should be provided along these areas."

This recommendation as to the original application is supported by sufficient evidence in the record. In support of this condition, the commission cited the dangerous circulation patterns created in the original application and the resulting adverse impact on public safety. See *Christian Activities Council, Congregational v. Town Council*, supra, 249 Conn. 585. Point One's original report, dated November 13, 2000, discussed several specific concerns including that the plan required residents to cross through roads, lawns and parking areas because of a lack of appropriate sidewalks and crossing hazards resulting from the absence of crosswalks at busy intersections. As illustrated in the Review Comment Response of the plaintiff's engineering Consultant, Langan, the modified plan responded to many of these concerns by moving the Community Center building to a more central location and modeling the parking, vehicular and pedestrian circulation on the Point One suggestions. The Commission's Traffic Consultant, Robert J. Bass found the modified plan acceptable as to site circulation for pedestrians and autos. There was also agreement to address the recommendations as reflected in the January 30, 2001 report of Hesketh and Associates reflecting the representations of Steven Mitchell at the January 22, 2001 hearing before the commission as to the off-site improvements including a sidewalk on the east side of North Main Street, replacement of a traffic signal and handicap access and markings. The commission, therefore, did not establish a reasonable basis in the record for imposing this condition on the modified plan.
CT Page 11946

CONDITION 3: Recommendations of Commission's Civil and Traffic Engineers

The commission imposed the following restriction: "All recommendations contained in the reports of the Commission's civil and traffic engineers shall be incorporated into the revised plans." While the amended application incorporated many of the engineers' recommendations, the commission maintained, in its denial of the amended application, that "the recommendations as to pedestrian access, handicap intersection access, and center median replacement, are still [a] concern of the commission and need to be incorporated into the revised plans."

Traffic safety represents a substantial public interest that must be protected, and, indeed, there were numerous recommendations of the civil and traffic engineers which the commission sought to impose on the original application. There is, however, insufficient evidence to support this condition on the application as modified. Robert Bass of Milone & MacBroom, Inc., the commission's traffic consultant, submitted two reports to the commission, one evaluating the plaintiffs' original

application and suggesting twelve changes, and the other evaluating the amended application and suggesting six additional changes not previously raised. Some of these recommendations duplicate the commission's conditions as to the traffic island (Condition #9), discussed *infra*, and pedestrian and vehicular circulation (Condition #2), discussed *supra*. Other recommendations appear to have been abandoned by the traffic engineers entirely. As previously indicated, Mr. Bass found the site circulation for pedestrians and automobiles acceptable in the modified plan. Additionally, the applicant agreed to make off-site improvements including a sidewalk on North Main Street and replacement of a traffic signal. Mr. Bass was of the opinion that the plaintiffs should be required to make off-site improvements to remedy existing deficiencies at Stage Road. However, before the commission, Mr. Bass agreed with Steven Mitchell, the plaintiff's consultant, that those off-site improvements which had previously been proffered in connection with an unrelated application for the same site, were not necessary because of the reduced traffic generated by the instant application.

CONDITION 4: Environmental Remediation

The commission imposed the following restriction: "The site shall be remediated to the appropriate standard for residential uses, and, prior to the issuance of a Certificate of Zoning Compliance, the applicant shall produce the certification of the Connecticut Department of Environmental Protection [indicating] that such remediation has been
CT Page 11947
completed in accordance with applicable Connecticut General Statutes and Regulations of Connecticut State Agencies.

This condition is not supported by sufficient evidence. An environmental site assessment, conducted by environmental consultant Phase II, makes clear that there are no environmental concerns at the site. The Phase II report constitutes authoritative evidence that remediation is not necessary. In its brief, the commission points out that "even the commission members stated that there is no present contamination." Furthermore, the plaintiffs have stated that they fully intend to comply with all applicable environmental laws. The commission has failed to identify what substantial public interest it seeks to protect by requiring remediation when the record demonstrates that there are no immediate environmental concerns. See *Christian Activities Council, Congregational v. Town Council*, *supra*, 249 Conn. 585. As such, there is no reasonable basis in the record for imposing this condition.

CONDITION 5: Noise Attenuation and Acoustic Insulation

The commission imposed the following restriction: "The applicant shall install noise attenuation berms or barriers along the northerly side of the site which shall be sufficient, in the opinion of the Commission's Industrial Hygienist, to shield the residential buildings from unreasonable noise impacts resulting from railroad operations, including times when the windows of the dwelling units are open. All buildings shall be acoustically insulated to the generally accepted standard for residential properties in close proximity to industrial or high-output noise generators. All buildings shall be centrally air conditioned, as well as heated. There shall be no window air conditioners."

There is insufficient evidence to support a finding that noise levels at the site would have and adverse impact on the public health and safety of the residents. Nonetheless, in their amended application, the plaintiffs attempted to address this concern and proposed an 8' tall,

board-on-board fence on a 3' landscaped berm along the entire property line adjacent to the railroad tracks. Although Point One initially recommended a solid landscaping fence it did not make any recommendation as to the height. Yet, another consultant recommended a 6' fence. Subsequently, Point One opined that the proposed fence 8' fence "will provide little if any noise attenuation for the residential units" and that the amended application does not specify whether there will be "acoustically insulated construction for the units nearest the tracks."

While the ongoing presence of railroad noise implicates a substantial public interest in the health, safety and the quality of life of the
CT Page 11948
residents of the development, the evidence is not sufficient for the imposition of vague conditions that the berms "shall be sufficient, in the opinion of the Commission's Industrial Hygienist" and that all buildings shall be acoustically insulated "to the generally accepted standard for residential properties in close proximity to industrial or high-output noise generators." There was no evidence other than the conclusory statement of Point One as to why the commission rejected the 8' berm proposed by the plaintiffs in the amended application. Further, there is no requirement in the regulations that would require acoustically insulated construction for any units, including "units nearest the tracks." In fact, the modified plans relocated the units which had been adjacent to the tracks, and the nearest building is over 100 feet from the railroad line. The is insufficient evidence to conclude that the 8" fence on a 3' berm is insufficient and no evidence as to what would be sufficient. There is no regulation requiring the *imprimatur* of the Commission's Industrial Hygienist; and central air-conditioning is included for all units.

CONDITION 7: EMF Warning

The commission imposed the following condition: "The applicant shall provide a written warning, in letters not less than 16 point in type, as follows: `Portions of this site are adjacent to the AMTRAK railroad corridor, which generates Electric Magnetic Fields (EMF) as high as 500 mG within the railroad right of way, and lesser readings up to 200 feet from the edge of that right of way. Although there are no known health effects or residential standards for EMF, the United States Department of Environmental Protection recommends prudent avoidance and keeping exposure as low as possible.' No building shall be located within 200 feet of the tracks."

This condition is not supported by sufficient evidence in the record. The commission has failed to explain how this condition is necessary to protect a substantial public interest in health, safety or other legitimate concerns, nor has the commission qualified the likelihood of harm to this interest. See *Christian Activities Council, Congregational v. Town Council*, supra, 249 Conn. 585. The commission has not identified any known health effects of EMF exposure. Indeed, a report compiled by TRC Environmental Corporation reveals that: "the effects [of EMF] have not been clearly demonstrated [but] *there is a suspicion* that EMF exposure may be linked to certain cancers." (Emphasis added.) While this report does recommend avoidance because of a suspicion of a potential harm, it acknowledges that the effects of EMFs "have not been clearly demonstrated." Furthermore, the record is devoid of any evidence that EMF measurements were ever taken at the proposed site. Vague and generalized
CT Page 11949
warnings that are not tied to a specific, quantifiable harm do not amount to sufficient evidence and the commission's assertion that EMFs pose a

threat to future residents of the development is not otherwise supported by a reasonable basis in the record.

It is the conclusion of this court, therefore, that the commission's condition with respect to the EMF warning is not supported by sufficient evidence in the record.

CONDITION 8: Density

The commission imposed the following condition: "The development shall be reduced by 48 units, and they shall be those located in the buildings closest to the Amtrak railroad line." Even though the plaintiffs' amended application relocated two buildings containing 24 units that were closest to the Amtrak line and even though it also reduced the number of units by 12, down to 204 from 216 in the original application, the commission continues to require the plaintiffs to reduce density to 168 units.

This condition is not supported by sufficient evidence. The commission has failed to demonstrate how the density of the proposed development poses a specific hazard to a substantial public interest in health, safety or other legitimate concerns nor has the commission identified or qualified the likelihood of any such harm. See *Christian Activities Council, Congregational v. Town Council*, supra, 249 Conn. 585. A zoning agency may not deny an affordable housing application because it does not comply with the town's zoning regulations. *Wisniowski v. Planning Commission of the Town of Berlin*, **37 Conn. App. 303**, **313** (1995). It is well settled that a generalized statement about density, without being tied to any potential public harm, is not sufficient and does not withstand § **8-30g** (g) scrutiny. See *Smith-Groh v. Planning and Zoning Commission*, Superior Court, judicial district of New Britain, Docket No. CV 01 0506781 (January 28, 2002, Eveleigh, J.) (determining that commission's general concern about traffic density, absent specific evidence demonstrating the impact of the increased density on public safety, is not a valid reason). The Fire Marshall approved both the original and modified proposals. There is no evidence in the record that the density of the proposed development has any adverse impact on public health or safety. The commission appears to have relied on a market analysis that concludes that this proposal is not feasible and that reducing the number of units would render the plan less unfeasible, an analysis that was presented to this court during the aggrievement hearing. The court does not find that analysis or that conclusion credible. This condition is not supported by a reasonable basis in the record.
CT Page 11950

CONDITION 11: Height of Buildings

The commission imposed the following condition: "No building shall exceed a height of 35 feet." Both the plaintiffs' original and amended applications proposed the ridge of all housing units to be at 38 feet.

This condition is not supported by sufficient evidence in the record. The commission has failed to explain how the plaintiffs' proposed 38' high buildings pose a specific hazard to a substantial public interest in health, safety or other legitimate concerns. See *Christian Activities Council, Congregational v. Town Council*, supra, 249 Conn. 585. While the height of the buildings was addressed in the reports of Point One, the reasons provided for limiting height were purely aesthetic in nature and not tied to any specific harm to a substantial public interest. This condition is similar to the commission's condition regarding scale and

proportion of the buildings and, as stated previously, these aesthetic considerations do not withstand scrutiny under § 8-30g (g).

CONDITION 12: Raised Traffic Island

The commission imposed the following restriction: "The plan shall be modified to include a raised island in North Main Street, comparable to that used along Main Street, and not a painted median area as proposed by the applicant during the pendency of this application; and sidewalks shall be constructed to connect with Main Street." While the plaintiffs did agree to provide a raised traffic island rather than painted median as initially proposed; the plaintiffs take issue with the requirement that the island shall be "comparable to [the island] used along Main Street." The plaintiffs assert that this requirement is based on the commission's preference that the island be constructed of granite rather than asphalt and that the commission is without the authority to specify building materials for their aesthetic and decorative value.

To the extent that this condition is intended to require the use of certain materials in the construction of the island, it is not supported by sufficient evidence in the record. The commission has failed to explain how the plaintiffs' choice of building materials poses a specific hazard to a substantial public interest in health, safety or other legitimate concerns nor has the commission quantified the likelihood of any such harm. See *Christian Activities Council, Congregational v. Town Council*, supra, 249 Conn. 585. There is no evidence in the record that the plaintiffs' proposed materials are inferior to others or that they have any impact on the functionality of the traffic island. As discussed previously, purely aesthetic concerns, without any identified connection
CT Page 11951
to a substantial public interest, do not withstand scrutiny under § 8-30g (g).

It is the conclusion of this court, therefore, that the commission's condition with respect to the materials to be used in the traffic island is not supported by sufficient evidence in the record.

CONDITION 15: Noncompliance of Adjacent Parcels

The commission imposed the following restriction: "The property shall not include any portion of the Burger King property which would create any nonconformity, or increase any existing nonconformity, for such Burger King site." This condition addresses the commission's concern that the development will render certain adjacent parcels nonconforming. The commission notes that this condition is only relevant if the plaintiffs are seeking to "force another lot into noncompliance If the plaintiffs are not intending to do this, then there is no issue. The fact that the plaintiffs felt obligated to appeal the condition could suggest that there *is* a need to violate the [zoning] regulations on the adjacent parcel." (Commission's 4/25/02 Brief, p. 18.)

This condition is not supported by sufficient evidence in the record. The commission appears to misunderstand the nature of its statutory burden under § 8-30g (g) which provides, in relevant part: "[T]he *burden shall be on the commission to prove* . . . that the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record." (Emphasis added.) The commission cannot impose a condition that is contingent upon or only becomes relevant upon the plaintiffs' taking certain actions in the future. By imposing a contingent condition, the commission

inappropriately shifts the burden to the plaintiffs to refute their intention to take such actions. The statutory language makes clear that the commission must demonstrate that the reasons cited for its condition are supported by the record as it currently exists. There is no evidence in the record that the plaintiffs intend to force other lots into noncompliance or that they otherwise intend to violate the town's zoning regulations. Nonetheless, if the adjacent lot is somehow rendered non-compliant because of a transfer of a portion to Jordan, the public interest can be protected by the zoning enforcement powers of the Town.

It is the conclusion of this court, therefore, that the commission's condition with respect to noncompliance of adjacent parcels is not supported by sufficient evidence in the record.

CONCLUSION

CT Page 11952

For the foregoing reasons, this court concludes that the contested restrictions imposed by the Commission in connection with its approval of the site plan for affordable housing are not supported by the evidence. Accordingly, the appeal is sustained and the Commission is directed to approve the Amended Application for Affordable Housing for Saybrook Commons, as modified by this decision, that is *without* conditions 1, 2, 3, 4, 5, 7, 8, 11, 12, and 15.

Tanzer, J.

[fn1] In connection with the proposed development, the plaintiffs also submitted an application for an amendment to the town's zoning regulations to provide for an "Affordable Housing Development District." This application was also denied and is now the subject of a related appeal bearing Docket No. CV 01 0508892.

[fn2] The commission imposed the following sixteen restrictions. (Although in the approval the restrictions are numbered 1-17, inclusive, there is no 13.):

1. The materials as identified in the plans submitted shall be utilized in the final construction, and no substitutions shall be permitted without the express approval of the Commission.

2. The site, buildings, parking areas, driveways, pedestrian circulation, and all other applicable elements of the plan shall be revised in accordance with the recommendations contained in the reports of the Commission's architects and planners.

3. All recommendations contained in the reports of the Commission's civil and traffic engineers shall be incorporated into the revised plans.

4. The site shall be remediated to the appropriate standard for residential uses, and, prior to the issuance of a Certificate of Zoning Compliance, the applicant shall produce the certification of the Connecticut Department of Environmental Protection [indicating] that such remediation has been completed in accordance with applicable Connecticut General Statutes and Regulations of Connecticut State Agencies.

5. The applicant shall install noise attenuation berms or barriers along the northerly side of the site which shall be sufficient, in the

opinion of the Commission's Industrial Hygienist, to shield the residential buildings from unreasonable noise impacts resulting from
CT Page 11953
railroad operations, including times when the windows of the dwelling units arc open. All buildings shall be acoustically insulated to the generally accepted standard for residential properties in close proximity to industrial or high-output noise generators. All buildings shall be centrally air conditioned, as well as heated. There shall be no window air conditioners.

6. No building shall be less than fifty (50') feet from the propane tank on the adjacent property, or such additional distance as the Old Saybrook Fire Marshall reasonably shall require in the interests of the safety of the occupants of this proposed community. In addition, the applicant shall incorporate into the final plans all recommendations contained in the Fire Marshall's report.

7. The applicant shall provide a written warning, in letters not less than 16 point in type, as follows: "Portions of this site are adjacent to the AMTRAK railroad corridor, which generate Electric Magnetic Fields (EMF) as high as 500 mG within the railroad right of way. Although there are no known health effects or residential standard for EMF, the United States Department of Environmental Protection recommends prudent avoidance and keeping exposure as low as possible." No building shall be located within 200 feet of the tracks.

8. The development shall be reduced by 48 units, and they shall be those located in the buildings closest to the Amtrak railroad line.

9. No garage units shall be used for storage, nor shall they be rented out to any individual(s) other than the occupant of the apartment to which the garage is assigned.

10. The affordable housing units shall be distributed throughout all buildings and all floors, and there shall be no greater number of affordable housing units on the third floor than on either of the lower two floors, considered individually, in any building.

11. No building shall exceed a height of 35 feet.

12. The plan shall be modified to include a raised island in North Main Street, comparable to that used along Main Street, and not a painted median area as proposed by the applicant during the pendency of this application; and sidewalks shall be constructed to connect with Main Street.

14. Lighting plans shall be revised to eliminate areas without illumination, and to avoid light spillover onto any adjoining property.
CT Page 11954

15. The property shall not include any portion of the Burger King property which would create any nonconformity, or increase any existing nonconformity, for such Burger King site.

16. There shall be no Certificate of Zoning Compliance until the Old Saybrook Water Pollution Control Authority has approved a construction and maintenance bond or other method of assuring the long-term viability of the community effluent disposal system, and the Connecticut DEP has granted a permit for the construction of such system.

17. The revised plans and other documentation shall be submitted for final review and approval by the Commission prior to the issuance of a Certificate of Zoning Compliance. Final construction plans for a Building Permit, and the actual construction, shall be in strict conformity with the plans approved by the Commission.

[fn3] Conditions 6 (Separation from Propane Tank), 9 (Storage in Garages), 10 (Distribution of Affordable Units), 14 (Approval by WPCA), and 17 (Final Review by Commission) are either not contested or were resolved as a result of the proposed modification.

[fn4] Section 8-30g (), now subsection (f), provides that appeals involving an affordable housing application shall proceed in conformance with the provisions of § 8-8. General Statutes § 8-8 (b) provides, in pertinent part, that an "appeal shall be commenced by service of process . . . within fifteen days from the date the notice of the decision was published as required by the general statutes."

There is, however, an exception to the traditional rule that appeals must be filed within fifteen days from the date of publication of the notice of decision. Section 8-30g (d), now subsection (h), provides, in pertinent part, that [f]ollowing a decision by a commission to reject an affordable housing application . . . the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission on the original application . . . Within the time period for filing an appeal on the proposed modification as set forth in sections 8-8, 8-9, 8-38, 8-30, or 8-30a, as applicable, the applicant may appeal the commission's decision on the original application and the proposed modification in the manner set forth in this section . . .

CT Page 11955

[fn5] Though the amendment that changed the text of § 8-30g (g) to incorporate this burden of proof was effective on October 1, 2000, this act, No. 00-206, § 1(g) of the 2000 Public Acts, was determined to be a clarifying statute and, therefore, has retroactive effect and applies to the present matter even though the affordable housing applications were filed on September 18, 2000. See *Quarry Knoll II Corp. v. Planning & Zoning Commission, supra*, 256 Conn. 701.

[fn6] P.A. 95-280 amended Subsection (c) to add (2)(A) and (B), a provision placing the burden of proof on the commission to show that the application would locate affordable housing "in an area which is *zoned for industrial use* and which does not permit residential uses, and (B) the development is not assisted living." The amendment was intended to preserve the significant tax base a town derives from industrial zones.

[fn7] Both zones permit the manufacture, processing or assembly of goods (see §§ 41.1.1 and 32.1.6), public utility substations and telephone equipment buildings (see §§ 41.1.11 and 32.1.8), water supply

reservoirs, wells, towers, treatment facilities and pump stations (see §§ 41.1.12 and 32.1.9), office buildings for business and professional establishments, banks and other financial institutions and medical and dental clinics (see §§ 41.1.2 and 32.1.1), hotels and motels (§§ 41.1.7 and 32.1.13), stores and other buildings and structures where goods are sold or service is rendered primarily at retail (see §§ 41.1.9 and 32.1.1).

CT Page 11956

Syllabi and Procedural History, Copyright © 2007, Secretary of State, Connecticut Compilation Copyright ©2007 Loislaw.com, Inc., All Right Reserved